IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| THE INCLUSIVE COMMUNITIES PROJECT, INC., | § § § | |
| Plaintiff, | § § | |
| | § | Civil Action No. 3:14-CV-3013-D |
| VS. | § § | |
| THE UNITED STATES DEPARTMENT OF TREASURY, et al., | § § § § | |
| Defendants. | § § | |

MEMORANDUM OPINION
AND ORDER

Plaintiff The Inclusive Communities Project, Inc. ("ICP") brings this action against defendants U.S. Department of the Treasury ("Treasury") and Office of the Comptroller of the Currency ("OCC"), alleging claims under 42 U.S.C. § 3608(d), 42 U.S.C. § 3604(a), 42 U.S.C. § 1982, and the Fifth Amendment, essentially contending that defendants' administration of the Low Income Housing Tax Credit ("LIHTC") program created under the Tax Reform Act of 1986 is perpetuating racial segregation in LIHTC units in the city of Dallas and relegating minority families to unequal conditions of slum, blight, and distress. Defendants move under Fed. R. Civ. P. 12(b)(1) and 12(b)(6) to dismiss ICP's first amended complaint ("amended complaint"). For the reasons explained, the court grants the motion as to ICP's disparate impact claim under § 3604(a) and otherwise denies the motion.

I

Because this case is the subject of a prior memorandum opinion and order, *see Inclusive Communities Project, Inc. v. United States Department of Treasury*, 2015 WL 4629635, at *1 (N.D. Tex. Aug. 4, 2015) (Fitzwater, J.) ("*ICP-Treasury I*"), the court will recount only the background facts and procedural history necessary to understand the present decision.[1]

The Tax Reform Act of 1986 established the LIHTC program to provide tax credit subsidies for the development and ownership of affordable rental housing.  26 U.S.C. § 42. Generally, the statute offers tax credits as incentives to developers who construct or rehabilitate "qualified low-income housing project[s]."  26 U.S.C. § 42(g)(1).  According to ICP's amended complaint, Treasury is the federal agency charged with administering and regulating the LIHTC program.  It does so by, *inter alia*, regulating the federally-imposed

---

[1]In deciding defendants' Rule 12(b)(6) motion, the court construes the amended complaint in the light most favorable to ICP, accepts as true all well-pleaded factual allegations, and draws all reasonable inferences in ICP's favor.  *See, e.g., Lovick v. Ritemoney Ltd.*, 378 F.3d 433, 437 (5th Cir. 2004).  "The court's review [of a Rule 12(b)(6) motion] is limited to the [amended] complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint."  *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010).

A Rule 12(b)(1) motion can mount either a facial or factual challenge.  *See, e.g., Hunter v. Branch Banking & Trust Co.*, 2013 WL 607151, at *2 (N.D. Tex. Feb. 19, 2013) (Fitzwater, C.J.) (citing *Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. May 1981)). When a party makes a Rule 12(b)(1) motion without including evidence, the challenge to subject matter jurisdiction is facial.  *Id.*  The court assesses a facial challenge as it does a Rule 12(b)(6) motion in that it "looks only at the sufficiency of the allegations in the pleading and assumes them to be true.  If the allegations are sufficient to allege jurisdiction, the court must deny the motion."  *Id.*  (citation omitted) (citing *Paterson*, 644 F.2d at 523).

conditions and requirements governing the allocation of LIHTCs by state and local housing credit agencies ("HCAs") and jointly administering the LIHTC program with those HCAs. Treasury has not promulgated any regulation that prohibits LIHTCs from being used for units in racially segregated minority areas.

OCC is an independent bureau of Treasury. ICP alleges that OCC is responsible for approving national banks' investments in LIHTC projects under the public welfare investment ("PWI") authority established in 12 U.S.C. § 24 (Eleventh).[2] National banks are authorized to make investments in affordable housing because, under OCC regulations, projects that qualify for LIHTCs are acceptable PWIs. OCC is required to approve all national bank investments in LIHTC units by finding that the investment in question is designed primarily to promote the public welfare.

ICP is a non-profit organization that seeks racial and socioeconomic integration in the Dallas metropolitan area. In particular, ICP assists low-income, predominately African-American families who are eligible for the Dallas Housing Authority's Section 8 Housing Choice Voucher program in finding affordable housing in predominately non-minority concentrated areas free from the adverse effects of slum, blight, and distress.

ICP was the plaintiff in a lawsuit that sought relief from the Texas Department of

_____

[2]Under 12 U.S.C. § 24 (Eleventh), national banks are authorized to "make investments directly or indirectly, each of which is designed primarily to promote the public welfare, including the welfare of low- and moderate-income communities or families (such as by providing housing, services, or jobs)," so long as such investments do not "expose the association to unlimited liability."

Housing and Community Affairs ("TDHCA") for allegedly disproportionately allocating LIHTCs to developers proposing LIHTC units in non-Caucasian areas, thus perpetuating racial segregation in the location of LIHTC units in the Dallas Area.  *See, e.g., Inclusive Cmtys. Project, Inc. v. Tex. Dep't of Hous. & Cmty. Affairs*, 860 F.Supp.2d 312 (N.D. Tex. 2012) (Fitzwater, C.J.), *rev'd*, 747 F.3d 275 (5th Cir. 2014), *aff'd and remanded*, ___ U.S. ___, 135 S.Ct. 2507 (2015).  That lawsuit has been dismissed.  *See Inclusive Cmtys. Project, Inc. v. Tex. Dep't of Hous. & Cmty. Affairs*, 2016 WL 4494322, at *1 (N.D. Tex. Aug. 26, 2016) (Fitzwater, J.) ("*ICP VII*").

ICP now sues Treasury and OCC based on this same allegedly disproportionate allocation of LIHTCs in the city of Dallas, seeking to hold Treasury and OCC liable for their roles in "knowingly, consistently, and repeatedly allow[ing] and approv[ing] investments in LIHTC units that perpetuate racial segregation and unequal conditions."  Am. Compl. ¶ 1. ICP asserts that defendants' actions in regulating the LIHTC program and approving national bank investments in LIHTC units located in racially segregated minority areas violate 42 U.S.C. § 3608(d), 42 U.S.C. § 3604(a), 42 U.S.C. § 1982, and the Fifth Amendment.

In *ICP-Treasury I* the court granted in part and denied in part defendants' motion to dismiss that was addressed to ICP's complaint.  The court held that ICP had adequately pleaded standing; that ICP's claim under § 3608 was not subject to dismissal based on sovereign immunity or on the merits[3]; that ICP had failed to plead a plausible discriminatory

---

[3]The court declined to decide whether ICP could state a plausible claim under § 3608(d) via 5 U.S.C. § 706(2).  *ICP-Treasury I*, 2015 WL 4629635, at *4.

purpose claim under § 3604; and that ICP had failed to state a plausible claim under 42 U.S.C. § 1982 or the equal protection component of the Fifth Amendment. *ICP-Treasury I*, 2015 WL 4629635, at *3-5. The court declined to dismiss ICP's § 3604(a)-based disparate impact claim because the parties had not briefed the impact of the Supreme Court's decision in *Texas Department of Housing and Community Affairs v. Inclusive Communities Project, Inc.*, ___ U.S. ___, 135 S.Ct. 2507 (2015) ("*ICP VI*"), which was decided after defendants filed their briefs and the court heard oral argument on defendants' motion to dismiss. *ICP-Treasury I*, 2015 WL 4629635, at *5. The court granted ICP leave to amend, and ICP has filed an amended complaint.

Defendants now move to dismiss ICP's amended complaint based on sovereign immunity and the merits. ICP opposes the motion.

## II

Before turning to the grounds of defendants' motion to dismiss, the court will briefly set out the pertinent standards that govern whether dismissal should be granted under Rule 12(b)(1) or 12(b)(6).

"Federal courts are courts of limited jurisdiction, and absent jurisdiction conferred by statute, lack the power to adjudicate claims." *Stockman v. Fed. Election Comm'n*, 138 F.3d 144, 151 (5th Cir. 1998). A Rule 12(b)(1) motion can mount either a facial or factual challenge. *See, e.g., Hunter v. Branch Banking & Trust Co.*, 2013 WL 607151, at *2 (N.D. Tex. Feb. 19, 2013) (Fitzwater, C.J.) (citing *Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. May 1981)). When a party makes a Rule 12(b)(1) motion without including evidence,

the challenge to subject matter jurisdiction is facial. *Id.* The court assesses a facial challenge as it does a Rule 12(b)(6) motion in that it "looks only at the sufficiency of the allegations in the pleading and assumes them to be true. If the allegations are sufficient to allege jurisdiction, the court must deny the motion." *Id.* (citation omitted) (citing *Paterson*, 644 F.2d at 523). "The burden of proof for a Rule 12(b)(1) motion to dismiss is on the party asserting jurisdiction. Accordingly, the plaintiff constantly bears the burden of proof that jurisdiction does in fact exist." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001) (per curiam) (citations omitted).

In deciding a Rule 12(b)(6) motion, the court evaluates the sufficiency of the plaintiff's amended complaint "by accepting all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *Bramlett v. Med. Protective Co. of Fort Wayne, Ind.*, 855 F.Supp.2d 615, 618 (N.D. Tex. 2012) (Fitzwater, C.J.) (quoting *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007)) (internal quotation marks and brackets omitted). To survive a motion to dismiss under Rule 12(b)(6), the plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556); *see also Twombly*, 550 U.S. at 555 ("Factual allegations must be enough to raise a

right to relief above the speculative level[.]"). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'shown'—'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (quoting Rule 8(a)(2)) (brackets omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*. at 678. Furthermore, under Rule 8(a)(2), a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Although "the pleading standard Rule 8 announces does not require 'detailed factual allegations,'" it demands more than "'labels and conclusions.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). "[A] formulaic recitation of the elements of a cause of action will not do." *Id*. (quoting *Twombly*, 550 U.S. at 555).

## III

Defendants move to dismiss ICP's claim under 42 U.S.C. § 3608(d), contending that the claim is barred by sovereign immunity and on the merits. Section 3608(d) provides:

> Cooperation of Secretary and executive departments and agencies in administration of housing and urban development programs and activities to further fair housing purposes
>
> All executive departments and agencies shall administer their programs and activities relating to housing and urban development (including any Federal agency having regulatory or supervisory authority over financial institutions) in a manner affirmatively to further the purposes of this subchapter and shall cooperate with the Secretary to further such purposes.

42 U.S.C. § 3608(d) (bold font omitted).

A

"'It is well settled that the United States may not be sued except to the extent that is has consented to suit by statute.'" *Ala.-Coushatta Tribe of Tex. v. United States*, 757 F.3d 484, 488 (5th Cir. 2014) (quoting *Koehler v. United States*, 153 F.3d 263, 265 (5th Cir. 1998)). "'[W]here the United States has not consented to suit or the plaintiff has not met the terms of the statute the court lacks jurisdiction and the action must be dismissed.'" *Id.* (quoting *Koehler*, 153 F.3d at 266).

5 U.S.C. § 702 provides, in pertinent part:

> [1] [a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. [2] An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party.

*Id.* "Congress intended to broaden the avenues for judicial review of agency action by eliminating the defense of sovereign immunity in cases covered by § 702[.]" *Armendariz-Mata v. U.S. Dep't of Justice*, 82 F.3d 679, 682 (5th Cir. 1996) (citation omitted)). 5 U.S.C. § 704 provides, in pertinent part: "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review." *Id.*

In *ICP-Treasury I* the court recognized that claims can be brought under the sovereign

immunity waiver found in either the first or second sentence of § 702. *ICP-Treasury I*, 2015 WL 4629635, at *4. The court concluded that, "[i]n the absence of binding Fifth Circuit authority, . . . 'the conditions of § 704 affect the right of action contained in the first sentence of § 702, but they do not limit the waiver of immunity in § 702's second sentence.'" *Id.* (citations omitted). The court therefore held that "ICP's claim brought under § 3608 via the second sentence of § 702 is not subject to the requirement[s] of § 704." *Id.* Defendants maintain that this conclusion is erroneous and contrary to Fifth Circuit precedent and must be reconsidered. But even if the court were convinced that this reading of §§ 702 and 704 is erroneous, it need not reconsider this conclusion because it now holds that ICP cannot bring a § 3608(d) claim that falls within the scope of the second sentence of § 702.[4] This is so because there is no private right of action against the federal government for a violation of § 3608(d). *Latinos Unidos De Chelsea En Accion v. Sec'y of Hous. & Urban Dev.*, 799 F.2d 774, 793 (1st Cir. 1986) ("We therefore hold that a remedy against HUD for failure to comply with section 3608(d) is available only pursuant to the [Administrative Procedure Act ("APA")]."); *Jones v. Office of Comptroller of Currency*, 983 F. Supp. 197, 202 (D.D.C 1997) (holding there is no private right of action against federal government under § 3608 of the FHA; review is only available through APA), *aff'd*, 1998 WL 315581 (D.C. Cir. May 12, 1998). ICP must therefore bring its § 3608(d) claim under the first sentence of § 702, that is, under the APA. *See, e.g., MHANY Mgmt. Inc. v. Cnty. of Nassau*, 843 F.Supp.2d 287, 333

---

[4]ICP does not contend in its response brief that its § 3608(d) claim is brought under the second sentence of § 702.

(E.D.N.Y. 2012) ("Courts reviewing this statutory provision, as asserted against the *federal government*, have concluded that . . . the proper vehicle for relief under section 3608 lies not in a private right of action under the FHA, but rather through the [APA]."), *aff'd in part, vacated in part on other grounds*, 819 F.3d 581 (2d Cir. 2016).  And ICP must establish that the APA contains a waiver of sovereign immunity for its claim under § 3608(d).

Section 704 applies to the first sentence of § 702.  *See* Ds. Br. 9 ("[ICP] is therefore subject to the APA's limitations on its waiver of sovereign immunity set out in § 704.").  Under § 704, judicial review is available, and sovereign immunity is waived, for "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court."  The first option found in § 704 is not available to ICP because no statute makes reviewable an agency action concerning § 3608(d).  The question therefore becomes whether the second option found in § 704 applies, that is, whether defendants have taken a final agency action for which there is no other adequate remedy in a court.  *See Belle Co. v. U.S. Army Corps of Eng'rs*, 761 F.3d 383, 387-88 (5th Cir. 2014) ("Where, as here, no relevant agency statute provides for judicial review, the APA authorizes judicial review only of 'final agency action for which *there is no other adequate remedy in a court*.'" (emphasis added) (quoting 5 U.S.C. § 704)), *vacated and remanded sub nom. Kent Recycling Servs., LLC v. U.S. Army Corps of Eng'rs,* ___ U.S. ___, 136 S.Ct. 2427 (2016).  Defendants maintain that, because ICP does have an adequate remedy, sovereign immunity has not been waived.

- 10 -

B

To determine whether there is an "other adequate remedy in a court," courts consider the nature of the plaintiff's injury and whether the other remedies available to the plaintiff are "adequate" to redress the injury. *Garcia v. Vilsack*, 563 F.3d 519, 525 (D.C. Cir. 2009) ("The relevant question under the APA, then, is . . . whether the private suit remedy provided by Congress is adequate."); *S.T. ex rel. Trivedi v. Napolitano*, 2012 WL 6048222, at *4 (S.D. Tex. Dec. 5, 2012) (whether other judicial remedies are available "hinges on whether the alternative remedies are 'adequate' to redress the injury alleged, although the alternative need not be 'more effective' than APA review." (quoting *Council of & for the Blind of Del. Cnty. Valley, Inc. v. Regan*, 709 F.2d 1521, 1532-33 (D.C. Cir. 1983)). An alternative remedy will not be adequate under § 704 if the remedy offers only "doubtful and limited relief." *Bowen v. Massachusetts*, 487 U.S. 879, 901 (1988). The alternative remedy, however, need not provide relief identical to relief under the APA, so long as it offers relief of the "same genre." *El Rio Santa Cruz Neighborhood Health Ctr. v. U.S. Dep't of Health & Human Servs.*, 396 F.3d 1265, 1271 (D.C. Cir. 2005).

Defendants contend that because the FHA provides ICP with a private right of action directly against the entities allegedly discriminating in providing housing, ICP has an "other adequate remedy in a court" and cannot recover against them. The court disagrees. IPC has alleged that defendants' actions and inaction are a contributing cause of the racial segregation of LIHTC units in the city of Dallas. Thus even if TDHCA is the "sole entity with authority to award tax credits to developers," *Inclusive Communities Project, Inc. v. Texas Department*

*of Housing & Community Affairs*, 749 F.Supp.2d 486, 496 (N.D. Tex. 2010) (Fitzwater, C.J.), ICP has alleged that TDHCA is not the sole entity that has injured ICP. ICP is entitled to prove in this lawsuit that the relief it sought in its suit against TDHCA would have been insufficient to redress its injuries and that federal agency action is also required.[5] Additionally, as noted, several courts have held that, because there is no private right of action under § 3608(d), plaintiffs must pursue relief under the APA. *E.g., Latinos Unidos*, 799 F.2d at 793 ("We therefore hold that a remedy against HUD for failure to comply with section 3608(d) is available only pursuant to the APA."). It is reasonable to infer that these courts would not have identified the APA as the required alternate path if every plaintiff who followed that path would be met with the insuperable bar of sovereign immunity.

The court therefore holds that § 704 does not bar ICP's claim on the basis that ICP has an adequate alternative remedy.[6]

C

Defendants next contend that, even if the court holds that the APA waives sovereign

---

[5]Before the court dismissed ICP's suit against TDHCA, defendants acknowledged that such a dismissal would not affect whether ICP had an adequate remedy. *See* Ds. Br. 10 ("Even if it ultimately does not succeed, ICP's suit against the TDHCA is adequate, as is its ability to bring suit against project sponsors, or other actors directly engaged in discriminatory conduct.").

[6]Nor does the doctrine of judicial estoppel apply here. ICP's position in its lawsuit against TDHCA that TDHCA has the "sole authority" to grant or deny tax credits is not inconsistent with its position in the instant case that contributing causes of the disproportionate allocation of LIHTC units in predominantly minority areas are defendants' actions in approving investments in LIHTCs and their failing to take any actions to affirmatively further the purposes of the FHA.

immunity to review ICP's claims and that defendants' roles with respect to LIHTCs could be considered a federal "program" or "activity" under § 3608(d), the court should still conclude that the APA does not provide for review of ICP's claims under § 3608(d) because 3608(d) provides no judicially manageable standard for this court to review defendants' role with respect to LIHTCs.   Defendants maintain that any obligation to carry out the requirements of § 3608(d) is committed to agency discretion by law.

Section § 701 of the APA operates to limit judicial review by stating that its provisions apply "except to the extent that—(1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law." 5 U.S.C. § 701(a).  In *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971), the Supreme Court explained the distinction between § 701(a)(1) and (a)(2).  Subsection (a)(1) is concerned with whether Congress expressed an intent to prohibit judicial review; subsection (a)(2) applies "in those rare instances where 'statutes are drawn in such broad terms that in a given case there is no law to apply.'" *Overton Park*, 401 U.S. at 410 (citation omitted).  In *Heckler v. Chaney*, 470 U.S. 821 (1985), on which defendants rely, the Supreme Court explained what it means for an action to be "committed to agency discretion by law."  Under § 701(a)(2), even when Congress has not affirmatively precluded judicial oversight, "review is not to be had if the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Id.* at 830.

Defendants maintain that § 3608(d) does not supply judicially manageable standards for the court to review defendants' roles with respect to LIHTCs because the statute does not

mandate specific actions or remedial plans and does not require that defendants consider specific factors, make findings, or develop an evidentiary record.  Therefore, defendants maintain that § 3608 does not provide the court a basis to review defendants' compliance with the statute.

Several courts have held that 42 U.S.C. § 3608(e)(5),[7] which contains substantially similar language to § 3608(d), *does* contain a meaningful standard against which the court can measure an agency's action such that § 701(a)(2) of the APA does not present a barrier to suit for violation of that provision.  *See, e.g., NAACP v. Sec'y of Hous. & Urban Dev.*, 817 F.2d 149 (1st Cir. 1987); *Jones*, 983 F. Supp. at 203-04.  The Fifth Circuit has not addressed whether § 3608(d) contains a meaningful standard against which the court can measure an agency's action.  Considering that there are precedents that support the conclusion that § 3608(d) supplies judicially manageable standards and that the Fifth Circuit has not spoken to the contrary, the court concludes that ICP has pleaded a plausible claim under § 3608(d) and that the claim should not be dismissed on the basis that any obligation to carry out the requirements of § 3608(d) is committed to agency discretion by law.

Accordingly, the court denies defendants' motion to dismiss plaintiffs' APA claim on the basis that there is "no law to apply" regarding whether defendants have failed to fulfill the mandate of § 3608(d) with respect to public housing in the city of Dallas.

_____

[7] 42 U.S.C. § 3608(e)(5) provides that the Secretary of Housing and Urban Development shall "administer the programs and activities relating to housing and urban development in a manner affirmatively to further the policies of this subchapter."

D

Defendants next contend that § 706 of the APA precludes review of ICP's claim under

§ 3608(d).

1

Defendants challenge ICP's § 3608(d) claim under § 706(1).[8] They contend that the

_____

[8]5 U.S.C. § 706 provides:

> To the extent necessary to decision and when presented, the
> reviewing court shall decide all relevant questions of law,
> interpret constitutional and statutory provisions, and determine
> the meaning or applicability of the terms of an agency action.
> The reviewing court shall—
> (1) compel agency action unlawfully withheld or unreasonably
> delayed; and
> (2) hold unlawful and set aside agency action, findings, and
> conclusions found to be—
>> (A) arbitrary, capricious, an abuse of discretion,
>> or otherwise not in accordance with law;
>> (B) contrary to constitutional right, power,
>> privilege, or immunity;
>> (C) in excess of statutory jurisdiction, authority,
>> or limitations, or short of statutory right;
>> (D) without observance of procedure required by
>> law;
>> (E) unsupported by substantial evidence in a case
>> subject to sections 556 and 557 of this title or
>> otherwise reviewed on the record of an agency
>> hearing provided by statute; or
>> (F)  unwarranted by the facts to the extent that
>> the facts are subject to trial de novo by the
>> reviewing court.
> In making the foregoing determinations, the court shall review
> the whole record or those parts of it cited by a party, and due
> account shall be taken of the rule of prejudicial error.

Supreme Court held in *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55 (2004) ("*SUWA*"), that a "claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*." *Id.* at 64. Defendants maintain that because § 3608(d), like the statute at issue in *SUWA*, provides a mandatory objective to be achieved (affirmative furtherance of fair housing), but confers agencies with broad discretion in determining how best to achieve this objective, ICP is not entitled to an order compelling compliance with § 3608(d) and cannot maintain a claim for agency action under this provision. Defendants also challenge ICP's entitlement to judicial review under § 702(2)(a), which permits a reviewing court to hold unlawful and set aside agency action that is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. They posit that ICP has failed to specify a particular agency action that it is challenging; the focus of the amended complaint is on defendants' failure to act, including the failure to promulgate specific regulations under § 3608(d); and ICP's requested relief seeking implementation of new rules and guidelines that would govern future LIHTC projects "is exactly the type of wholesale relief that is foreclosed by *Lujan* [*v. National Wildlife Federation*, 497 U.S. 871 (1990),] and better addressed to Congress." Ds. Br. 17.

ICP does not respond to defendants' arguments under § 706, except to contend that Rule 12(g)(2) precludes defendants from moving to dismiss on grounds that were either argued in support of, or available to support, their first motion.

2

In *ICP-Treasury I* the court declined to dismiss ICP's § 3608(d) claim on the basis

- 16 -

that it was unreviewable under § 706 of the APA.  The court explained:

> Treasury and OCC contend that ICP's claim that they have violated § 3608(d) is unreviewable under the APA.  Without suggesting any other view on this issue, the court rejects this ground of defendants' motion because it is based on the premise that ICP cannot recover under 5 U.S.C. § 706(1), and ICP is proceeding under 5 U.S.C. § 706(2).  Although Treasury and OCC present arguments in their reply memorandum to support the contention that § 706(2) is inapposite, this court will not consider arguments raised for the first time in a reply brief.  Accordingly, the court is not deciding at this time whether ICP can state a plausible claim under 42 U.S.C. § 3608(d) via 5 U.S.C. § 706(2).

*ICP-Treasury I*, 2015 WL 4629635, at *4 (citations omitted).

Because ICP has already taken the position that intends to proceed solely under 5 U.S.C. § 706(2), the court, as in *ICP-Treasury I*, rejects defendants' argument that ICP's § 3608(d) claim should be dismissed because ICP cannot satisfy the requirements of § 706(1). *Id.*

To the extent defendants move to dismiss ICP's § 3608(d) claim brought under § 706(2), the court agrees that Rule 12(g)(2) precludes this ground for dismissal.  Rule 12(g)(2) provides: "[e]xcept as provided in Rule 12(h)(2) or (3), a party that makes a motion under this rule must not make another motion under this rule raising a defense or objection that was available to the party but omitted from its earlier motion."  Although ICP has amended its complaint, it has not changed any of the allegations related to its § 3608(d) claim.  As explained in *ICP-Treasury I*, defendants did not properly move to dismiss ICP's § 3608(d) claim brought via § 706(2) in their first motion to dismiss.  *ICP-Treasury I*, 2015 WL

4629635, at *4. They cannot do so now by filing a successive Rule 12 motion. *See, e.g., Stoffels ex rel. SBC Concession Plan v. SBC Commc'ns, Inc.*, 430 F.Supp.2d 642, 647-48 (W.D. Tex. 2006) ("'[T]he filing of an amended complaint will not revive the right to present by motion defenses that were available but were not asserted in timely fashion prior to the amendment of the pleading.'" (citation omitted)).   Although Rule 12(h)(2) permits defendants to raise ICP's failure to state a claim under § 3608(d) in any pleading allowed or ordered under Rule 7(a), by a motion under Rule 12(c), or at trial, they cannot do so in a successive motion under Rule 12(b)(6).  Accordingly, the court again declines to decide at this time whether ICP can state a plausible claim under § 3608(d) via 5 U.S.C. § 706(2).[9]

Defendants' motion to dismiss ICP's § 3608(d) claim is therefore denied.

IV

The court now turns to ICP's claim that defendants discriminated in the provision of housing, in violation of 42 U.S.C. § 3604(a), beginning with ICP's § 3604-based disparate impact theory.

A

In *Inclusive Communities Project, Inc. v. Texas Department of Housing & Community Affairs*, 747 F.3d 275 (5th Cir. 2014) ("*ICP V*"), *aff'd and remanded*, ___ U.S. ___, 135 S.Ct. 2507 (2015), the Fifth Circuit adopted the burden-shifting approach prescribed in 24 C.F.R.

---

[9]Nothing in today's opinion precludes defendants from contending in a motion brought under Rule 12(c), in a motion for summary judgment, or at trial, that ICP's § 3608(d) claim is unreviewable under 5 U.S.C. § 706(2).

§ 100.500 for claims of disparate impact under the FHA. *Id.* at 282. The panel explained:

> First, a plaintiff must prove a prima facie case of discrimination by showing that a challenged practice causes a discriminatory effect, as defined by 24 C.F.R. § 100.500(a). If the plaintiff makes a prima facie case, the defendant must then prove "that the challenged practice is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests. . . ." If the defendant meets its burden, the plaintiff must then show that the defendant's interests "could be served by another practice that has a less discriminatory effect."

*Id.* (citations omitted). The Supreme Court affirmed, holding that disparate impact claims are cognizable under the FHA. *ICP VI*, 135 S.Ct. at 2525. But the Court "prescribed several limitations on disparate impact liability." *ICP VII*, 2016 WL 4494322, at *4. For example, it cautioned that courts must "examine with care whether a plaintiff has made out a prima facie case of disparate impact," *ICP VI*, 135 S.Ct. at 2523, and it emphasized that disparate impact claims carry a "robust causality requirement" that "protects defendants from being held liable for racial disparities they did not create." *Id.*

In *ICP-Treasury I* the court declined to dismiss ICP's § 3604(a) disparate impact claim because defendants' brief had been written without the benefit of the Supreme Court's decision in *ICP VI*, and, consequently, did not adequately address that basis for relief.[10] *ICP-Treasury I*, 2015 WL 4629635, at *5. Defendants move anew to dismiss ICP's § 3604(a)-based disparate impact claim.

---

[10]The court further noted that *ICP VI* contained admonitions concerning limitations on FHA-based disparate impact claims, but "suggest[ed] no view on whether ICP can prevail on such a claim." *ICP-Treasury I*, 2015 WL 4629635, at *5.

B

Defendants contend that ICP has failed to plausibly allege that either the Internal Revenue Service ("IRS") or OCC is sufficiently involved in providing housing or providing services related to housing to have made housing "unavailable," as § 3604(a) requires.[11] They maintain that ICP has failed to state a prima facie case for discriminatory effects liability under § 3604(a), as the Supreme Court required in *ICP VI*, because ICP has failed to plausibly allege a causal nexus between defendants' actions and the alleged disparate impact on minorities. Defendants contend that, apart from alleging a failure to regulate, ICP does not identify a challenged policy or policies that caused the disparate impact; ICP has entirely ignored the roles played by project sponsors in proposing affordable housing projects for LIHTCs and by the TDHCA in selecting those projects for LIHTCs; once the roles of project sponsors and the TDHCA are taken into account, ICP is reduced to alleging that defendants have "accepted and condoned" the TDHCA's selection of those units for LIHTCs by their alleged failure to prevent TDHCA from selecting those units for LIHTCs or to block

_____

[11]Defendants contend that project sponsors are the ones who propose affordable housing construction or renovation projects to TDHCA, and that Congress gives TDHCA the authority to award LIHTCs to affordable housing projects based on point systems reflecting the state's priorities and the primary responsibility for monitoring compliance with LIHTCs. By contrast, Congress limits the IRS's role with respect to LIHTCs to responding to any noncompliance reported by TDHCA by denying or recapturing a LIHTC claimed by an investor (i.e., the IRS plays no role in selecting the location for LIHTC units) and limits OCC's role to reviewing national bank and federal saving association investments in LIHTC projects or LIHTC-equity funds under its PWI authority to ensure that such investments do not expose the association to unlimited liability (i.e., OCC does not have the authority to select the location of LIHTC units or second-guess a state HCA's determination that a particular project will benefit an area).

national banks from investing in individual LIHTCs and LIHTC equity funds; and no court

has ever allowed a discriminatory effects claim against a government entity to proceed based

on an alleged failure to prevent or remedy another party's policy or policies from imposing

a disparate impact.  In sum, defendants maintain that ICP cannot state a prima facie case for

discriminatory effects liability against because ICP is seeking to hold defendants liable for

racial disparities that they did not create.

ICP responds that the amended complaint shows that "OCC's approval of the national

bank investments in the ownership of and receipt of LIHTC funds for low income housing

perpetuates racial segregation by making units unavailable in Caucasian areas and thus

excludes Black LIHTC residents from Caucasian areas," in violation of § 3604(a).  P. Br. 12.

ICP alleges that

> it is Defendant OCC's decision and OCC's decision alone
> whether to approve a national bank investment in and purchase
> of an ownership or other equity investment in a LIHTC project
> that, because of its location, perpetuates the exclusion of
> affordable housing from Caucasian areas and perpetuates racial
> ghettos in Dallas.  Absent OCC's approval, the LIHTC backed
> investment cannot be made.

*Id*. at 9.  Thus "[t]he identified discriminatory housing practice for the disparate impact claim

. . . is the Defendant[] OCC's policy and practice [of] approving national bank investments

in minority concentrated areas marked by conditions of slum and blight."  *Id*. at 11.  ICP

contends that by not reviewing national bank investments or by reviewing them only for

financial viability, OCC has approved thousands of LIHTC units in Dallas-area locations

marked by high concentrations of minority residents, high poverty rates, and conditions of

slum and blight, and in doing so has subjected African-American LIHTC residents to conditions that are substantially unequal to the conditions in which Caucasian LIHTC residents are located.

In their reply, defendants argue that ICP has failed to offer any statistical allegations that OCC's policies for approving national bank investments in LIHTCs *cause* LIHTC units to be located in predominantly minority areas, and has failed to allege how OCC is or could be responsible for causing the allegedly disparate impact of disproportionately locating LIHTC projects in areas that perpetuate segregation given

> (a) the project sponsors' roles in proposing affordable housing projects for LIHTCs and the TDHCA's statutory role in selecting those projects for LIHTCs; (b) that, as a matter of law, Congress gives the TDHCA, not the OCC, authority to select projects for LIHTCs and monitor those projects for compliance, *see* 26 U.S.C. §§ 42(l)(3), (m)(1)(B)(iii); and (c) that the OCC has absolutely no statutory or regulatory role in administering LIHTCs[.]

Ds. Reply Br. 7.  Moreover, defendants contend that ICP has failed to allege any fact that would support a finding that the challenged LIHTC projects would not have gone forward with other investors had the OCC disapproved national bank investments in those projects.

C

The court begins by examining the recent guidance on FHA disparate impact claims provided by the Supreme Court in *ICP VI*.  The purpose of the FHA is to "provide, within constitutional limitations, for fair housing throughout the United States."  42 U.S.C. § 3601.  Section 3604(a) of the FHA provides:

- 22 -

> it shall be unlawful . . . [t]o refuse to sell or rent after the making
> of a bona fide offer, or to refuse to negotiate for the sale or
> rental of, or otherwise make unavailable or deny, a dwelling to
> any person because of race, color, religion, sex, familial status,
> or national origin.

42 U.S.C. § 3604(a).

"[V]iolation of the FHA can be shown either by proof of intentional discrimination or by proof of disparate impact." *ICP V*, 747 F.3d at 280 (citing *Artisan/Am. Corp. v. City of Alvin, Tex.*, 588 F.3d 291, 2295 (5th Cir. 2009)). "In contrast to a disparate-treatment case, where a 'plaintiff must establish that the defendant had a discriminatory intent or motive,' a plaintiff bringing a disparate-impact claim challenges practices that have a 'disproportionately adverse effect on minorities' and are otherwise unjustified by a legitimate rationale." *ICP VI*, 135 S.Ct. at 2513 (quoting *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009)). As explained above, to establish a prima facie case for disparate impact liability under the Act, a plaintiff must show that "a challenged practice causes a discriminatory effect, as defined by 24 C.F.R. § 100.500(a)." *ICP V*, 747 F.3d at 282.[12]

In *ICP VI*, although the Supreme Court held that disparate impact claims are cognizable under the FHA, it noted that "disparate-impact liability has always been properly limited in key respects[.]" *ICP VI*, 135 S.Ct. at 2522. For example, a plaintiff cannot prevail

---

[12] Under 24 C.F.R. § 100.500(a), "[a] practice has a discriminatory effect where it actually or predictably results in a disparate impact on a group of persons or creates, increases, reinforces, or perpetuates segregated housing patterns because of race, color, religion, sex, handicap, familial status, or national origin."

on a disparate impact claim "based solely on a showing of statistical disparity," but must, instead, "point to a defendant's policy or policies causing that disparity." *Id.* at 2522, 2523. "Governmental or private policies are not contrary to the disparate-impact requirement unless they are 'artificial, arbitrary, and unnecessary barriers.'" *Id.* at 2524 (quoting *Griggs v. Duke Power Co.*, 401 U.S. 424, 431 (1971)). And a plaintiff must prove a "robust causality" between the policy and the statistical disparity to ensure "that '[r]acial imbalance . . . does not, without more, establish a prima facie case of disparate impact,'" and to "protect[] defendants from being held liable for racial disparities they did not create." *Id.* at 2523 (quoting *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 653 (1989)). "Without adequate safeguards at the prima facie stage, disparate-impact liability might cause race to be used and considered in a pervasive way and 'would almost inexorably lead' governmental or private entities to use 'numerical quotas,' and serious constitutional questions could then arise." *Id.* (quoting *Wards Cove Packing Co.*, 490 U.S. at 653).

The Court emphasized the need for "adequate safeguards" at the prima facie stage and admonished lower courts to "examine with care whether a plaintiff has made out a prima facie case of disparate impact." *Id.* at 2523. It explained:

> A plaintiff who fails to allege facts at the pleading stage or produce statistical evidence demonstrating a causal connection cannot make out a prima facie case of disparate impact. For instance, a plaintiff challenging the decision of a private developer to construct a new building in one location rather than another will not easily be able to show that this is a policy causing a disparate impact because such a one-time decision may not be a policy at all. It may also be difficult to establish causation because of the multiple factors that go into investment

- 24 -

decisions about where to construct or renovate housing units.

*Id.* at 2523-24.

D

The court now turns to defendants' motion and decides whether ICP has plausibly alleged a § 3604(a)-based disparate impact claim.

Under *ICP VI*, ICP's disparate impact claim must "solely" seek to remove a policy that is "artificial, arbitrary, and [an] unnecessary barrier[]." *Id.* at 2524 (quoting *Griggs*, 401 U.S. at 431). "To prove a disparate impact claim, the plaintiff must first identify a facially-neutral policy that has resulted in the disparate impact." *ICP VII*, 2016 WL 4494322, at *6 (citing *ICP VI*, 135 S.Ct. at 2522-24; *City of Miami v. Bank of Am. Corp.*, 2016 WL 1072488, at *4-5 (S.D. Fla. Mar. 17, 2016)); *see id.* at *5 ("ICP must identify a specific policy or practice that causes a statistically significant disparity in the location of low-income housing," (citing *ICP VI*, 135 S.Ct. 2507)). But ICP has failed in its amended complaint to identify a policy or practice that has created an artificial, arbitrary, or unnecessary barrier.

In its brief, ICP contends that the challenged practice is "OCC's policy and practice [of] approving national bank investments in minority concentrated areas marked by conditions of slum and blight." P. Br. 11. But in ICP's amended complaint, it actually challenges OCC's *failure to act* to prevent LIHTC projects from being concentrated in minority areas. *See, e.g.*, Am. Compl. ¶ 188 ("OCC's policy and practice approving national bank investments in minority concentrated areas marked by conditions of slum, blight, and

- 25 -

distress is the OCC discriminatory housing practice challenged in this complaint. *OCC's approval process is conducted without standards that would prevent racial segregation and accomplish affirmatively furthering fair housing*." (emphasis added)).[13] In other words, ICP

---

[13]*See also, e.g.*, Am. Compl. ¶ 46 ("By not addressing these prevailing patterns of racial segregation, Defendants' programs have continued to concentrate the most impoverished and dependent segments of the population into the central-city ghettos[.]"); *id.* ¶ 58 ("The tax credit units and the national bank investments in the tax credit units have not resulted in neighborhood conditions, services, and facilities that are not marked by conditions of slum, blight, and distress."); *id.* ¶ 74 ("Defendant OCC, in its approval of LIHTC investments under the public welfare standard, does not make any determination whether a national bank or related banking entity investment or other involvement in the ownership of LIHTC units will perpetuate racial segregation and subject low income minority persons to conditions of slum, blight, and distress."); *id.* ¶ 75 ("OCC does not take the site and neighborhood conditions into account in its consideration of specific LIHTC projects in which a regulated bank or banking entity is going to invest or has invested. Defendants' form for submission of the request for the public welfare approval of an investment in a LIHTC project does not require any information from which it could be determined whether the location will subject residents to racial segregation in minority areas marked by conditions of slum, blight, and distress."); *id.* ¶ 76 (Neither Treasury nor OCC have any standards for the site and neighborhood conditions for specific LIHTC project[s] that would prevent racial segregation in low income minority areas marked by conditions of slum, blight, and distress."); *id.* ¶ 77 ("Neither Treasury nor OCC have any such requirements, reports, guidelines, audits or other program elements to further the national nondiscrimination policy and legal duty to overcome historic patterns of racial segregation in housing."); *id.* ¶ 78 ("Neither Defendant has any regulation, guideline, or process setting standards for site and neighborhood conditions in general or in connection with public welfare investment approval for LIHTC projects."); *id.* ¶ 79 ("OCC's public welfare approval process does not include any assessment of whether the proposed national bank or related banking entity's investment will use federal tax credits for housing units to be located in racially concentrated, high poverty, low income areas marked by conditions of slum, blight, and distress that will thereby perpetuate the national legacy of racial segregation."); *id.* ¶ 93 ("Neither Defendant uses comparable neighborhood standards to prevent the federally supported housing they regulate from contributing to the perpetuation of racial segregation in areas marked by conditions of slum, blight, and distress. Neither Defendant takes any action in the administration of the LIHTC program to further the national goal of open, racially integrated residential housing patterns and to prevent the increase of segregation of racial groups into ghettos."); *id.* ¶ 156 ("Defendants have continued to exclude the

alleges that the *lack* of a policy produced the disparate impact. But "ICP must identify a specific policy that has created barriers to fair housing." *ICP VII*, 2016 WL 4494322, at *6. The court has found no case in which a disparate impact claim was allowed based on a defendant's alleged failure to take action to prevent discrimination. Nor is there any authority that suggests that litigants can use disparate impact claims to impose new policies on government actors. "Guidance from the Supreme Court is unambiguous that disparate impact claims must solely seek to *remove* barriers." *City of Los Angeles v. Wells Fargo & Co.*, 2015 WL 4398858, at *8 (C.D. Cal. July 17, 2015) (citing *ICP VI*, 135 S.Ct. at 2522, 2524). Without identifying a specific policy or practice that creates a barrier, ICP cannot base its disparate impact claim on OCC's practice of approving investments in LIHTC projects without requiring that LIHTC projects not be located in segregated locations.

Moreover, the amended complaint fails to meet the "robust causality requirement" that

perpetuation of racial segregation from the exercise of their regulatory and supervisory authority over the LIHTC program and the public welfare program after the enactment of the [FHA]."); *id.* ¶ 157 ("Treasury and OCC officials consistently refused to use their legal authority to require the elimination of racial discrimination by national banks before the passage of the [FHA]. Treasury and OCC officials consistently refuse to use their legal authority to require the elimination of racial discrimination and end the perpetuation of racial segregation since the passage of the [FHA]."); *id.* ¶ 165 ("Defendants have continued their actions refusing to use their regulatory and supervisory authority to prevent the perpetuation of racial segregation in the LIHTC program."); *id.* ¶ 174 ("Treasury and OCC officials consistently refuse to use their legal authority to require an end to the perpetuation of racial segregation in the LIHTC program despite the passage of the [FHA] that imposed specific obligations upon these agencies to prevent the perpetuation of racial segregation under the Act."); *id.* ¶ 175 ("The Defendants took none of the procedural or substantive actions to prevent the perpetuation of racial segregation that would be expected from Federal agencies supervising the largest Federal low income housing production program.").

applies to a disparate impact claim. *See ICP VI*, 135 S.Ct. 2523. Under *ICP VI*, OCC can only be held liable for racial disparities that it actually created. *Id.* In the amended complaint, ICP makes the conclusory assertion that OCC's "actions approving national bank or national bank related entities['] investments and related involvement in LIHTC units in racially segregated minority locations subject to slum, blight, and distress *steers LIHTCs into those areas*." Am. Compl. ¶ 101 (emphasis added). But ICP provides no explanation for why OCC's after-the-fact approval of national bank investments in LIHTC units in racially segregated minority locations *caused* LIHTC projects to be located in racially segregated minority locations in the first place. For example, ICP does not allege that OCC only approves investments in LIHTC projects if the projects are located in racially segregated minority locations such that developers would seek out projects in these types of locations in order to obtain OCC approval. As far as the court can tell, OCC approves *all* bank investments in LIHTC projects—provided that other criteria are satisfied—regardless of whether the projects are located in minority locations subject to slum, blight, and distress or are instead located in integrated areas.

In addition, in *ICP VI* the Supreme Court warned that causation may be difficult to establish in FHA cases "because of the multiple factors that go into investment decisions about where to construct or renovate housing units." *Id.* at 2523-24; *see also id.* at 2524 ("if the ICP cannot show a causal connection between [TDHCA]'s policy and a disparate impact . . . that should result in dismissal of this case."). ICP does not dispute that LIHTCs will not be awarded to any affordable housing project unless (1) a project sponsor proposes the

- 28 -

affordable housing project for LIHTCs and (2) the TDHCA selects that project for LIHTCs. It alleges that "Defendants' actions make the LIHTCs used to perpetuate racial segregation in areas subject to slum, blight, and distress unavailable in other, non-minority concentrated areas without slum, blight, and distress."  Am. Compl. ¶ 101. This allegation, however, is undermined by the undisputed fact that it is the state and local agencies—not OCC—that decide which affordable housing developments will be awarded LIHTCs.  Am. Compl. ¶ 17 ("The state and local agencies award tax credits to eligible affordable housing developers."). *See ICP VII*, 2016 WL 4494322, at *13 ("ICP has also failed to prove that factors other than TDHCA's discretion—such as developers' preferences for building projects in certain areas, local and state laws, and the expressed needs of communities and local officials—have not caused or contributed to any disparity in the location of housing developments receiving 4% tax credits.").

Accordingly, the court concludes under the authority of *ICP VI* that ICP has not plausibly alleged a claim for disparate impact under § 3604(a), and it grants defendants' motion to dismiss this claim.

V

The court now considers together ICP's claims for intentional discrimination brought under the equal protection component of the Fifth Amendment, 42 U.S.C. § 1982, and 42 U.S.C. § 3604.

A

In *ICP-Treasury I* the court granted defendants' motion to dismiss ICP's § 3604-based

discriminatory purpose claim, concluding that "the complaint is too conclusory to plead discriminatory intent." *ICP-Treasury I*, 2015 WL 4629635, at *5. In its amended complaint, ICP has pleaded 54 additional paragraphs that it contends "add specific facts showing a claim for intentional discrimination." P. Br. 1.

Defendants move to dismiss the intentional discrimination claims pleaded in the amended complaint. They contend that the same causation problems that preclude ICP's § 3604 disparate impact claim foreclose ICP's intentional discrimination claims. Defendants also maintain that ICP's intentional discrimination claims fail because, although ICP alleges that defendants had *knowledge* of the discriminatory conduct of third parties and failed to address that discrimination, ICP's allegations do not rise to the level of intent required to show discriminatory intent in violation of the Fifth Amendment, 42 U.S.C. § 1982, or 42 U.S.C. § 3604.

B

The court turns first to defendants' contention that ICP's failure to plead causation in support of its § 3604(a) disparate impact claim also precludes ICP from establishing a claim for intentional discrimination under the Fifth Amendment, § 1982, and § 3604. Defendants' brief sets out the "robust causality requirement" of a prima facie case for discriminatory *impact* under § 3604(a) and argues that ICP has failed to "show sufficient causation between the alleged disparity in the location of LIHTC units and any IRS or OCC policy or policies." Ds. Br. 21. But defendants offer no arguments specifically tailored to the causation showing that is required in the context of a claim for intentional discrimination brought under the Fifth

- 30 -

Amendment, § 1982, or § 3604. The entirety of defendants' argument on this point is as follows: "Plaintiff's claims of intentional discrimination also fail because of the causation problems set out above." Ds. Br. 22-23. Accordingly, without expressing a view on whether defendants can obtain dismissal of this claim at a later procedural stage, the court declines to dismiss ICP's intentional discrimination claims on the basis that ICP has insufficiently pleaded causation.

## C

The court now considers defendants' contention that ICP has failed to plausibly allege discriminatory intent.

## 1

To prove claims under § 1982 and the Fifth Amendment,[14] ICP must demonstrate discriminatory intent, not merely discriminatory effect. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977) ("Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause."); *Save Our Cemeteries, Inc. v. Archdiocese of New Orleans, Inc.*, 568 F.2d 1074, 1078 (5th Cir. 1978) ("A finding of racial discrimination is a necessary prerequisite to a grant of relief pursuant to . . . [§] 1982."). Similarly, although a § 3604(a) claim can be brought under a disparate impact theory, a plaintiff proceeding on disparate treatment theory must prove discriminatory

---

[14]"Equal protection analysis in the Fifth Amendment area is the same as that under the Fourteenth Amendment." *Buckley v. Valeo*, 424 U.S. 1, 93 (1976) (citing *Weinberger v. Wiesenfeld*, 420 U.S. 636, 638 n.2 (1975)).

intent.  *See ICP VI*, 135 S.Ct. at 2527 (noting that in disparate-treatment case, plaintiff "must

establish that the defendant had a discriminatory intent or motive." (internal quotation marks

and citations omitted).  A discriminatory purpose, as a motivating factor, implies that the

decisionmaker "selected or reaffirmed a particular course of action at least in part 'because

of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Personnel Adm'r

of Mass. v. Feeney*, 442 U.S. 256, 279 (1979).

"Because direct evidence of discriminatory purpose is rarely available, courts must

make 'a sensitive inquiry into such circumstantial and direct evidence of intent as may be

available.'"  *Jim Sowell Constr. Co. v. City of Coppell, Tex.*, 61 F.Supp.2d 542, 546 (N.D.

Tex. 1999) (Fitzwater, J.) (quoting *Arlington Heights*, 429 U.S. at 266).  "The court must

therefore look at the totality of the relevant evidence to determine whether invidious

discriminatory purpose was a motivating factor for the decision."  *Id*. (citing *Washington v.

Davis*, 426 U.S. 229, 242 (1976)).  "In making this determination, the court is guided by a

non-exhaustive list of factors[.]"  *Id.*  The so-called *Arlington Heights* factors include:

> (1) the discriminatory effect of the official action, (2) the
> historical background of the decision, (3) the specific sequence
> of events leading up to the challenged decision, (4) departures
> from the normal procedural sequence, (5) departures from the
> normal substantive [standards], and (6) the legislative or
> administrative history of the decision.

*Id*. at 546-47 (citing *Arlington Heights*, 429 U.S. at 266-68).  "When a court is faced with an

aggregation of many decisions made by different administrators . . . the impact or effect of

the choices made is 'an important starting point' in determining purposeful discrimination."

*Clients' Council v. Pierce*, 711 F.2d 1406, 1409 (8th Cir. 1983) (quoting *Crawford v. Bd. of Educ.*, 458 U.S. 527, 544 (1982)).  "The inquiry is a practical one which is designed to determine whether the decisionmaker's actions . . . could not 'reasonably be explained without reference to racial concerns.'"  *Id.* (quoting *Columbus Bd. of Educ. v. Penick*, 443 U.S. 449, 461 (1979)).  To establish discriminatory intent does not require proof that discrimination is the sole purpose behind each failure to equalize services.  *See id.*  "It is, rather, the cumulative evidence of action and inaction which objectively manifests discriminatory intent."  *Dowdell v. City of Apopka*, 698 F.2d 1181, 1185 (11th Cir. 1983) (citing *United States v. Tex. Educ. Agency*, 564 F.2d 162 (5th Cir. 1977)).  "There must be a 'correlation between . . . disparities and racially tainted purposiveness to mandate a finding of discriminatory intent.'"  *Ammons v. Dade City, Fla.*, 783 F.2d 982, 987 (11th Cir. 1986) (per curiam) (quoting *Dowdell*, 698 F.2d at 1185-86) (addressing municipal service disparities).  Although official action is not necessarily unconstitutional because it has a racially disproportionate impact, the size of the disparity and the nature of the practice at issue can alone give rise to an inference of discriminatory intent.  *See id.* at 988.  Courts have found, for example, that the magnitude of the disparities in municipal services is "explicable only on racial grounds."  *See id.*; *Dowdell*, 698 F.2d at 1186.

2

ICP contends that the allegations in the amended complaint are sufficient to plausibly allege intentional discrimination under *Arlington Heights*.  It argues that the amended complaint states the specific facts showing the extent of racial segregation in the LIHTC

program; that the facts alleged show that the LIHTC racial segregation kept LIHTC units out of Caucasian areas to the same degree as the *de jure* racial segregation in the Dallas public housing program kept public housing units out of Caucasian areas; that defendants' supervision of banks and other financial institutions was a cause of the country's racial ghettos, defendants took no regulatory or supervisory action to prevent or end the perpetuation of the ghettos, and defendants have continued this same policy of refusing to take regulatory or supervisory action to prevent or end the perpetuation of segregation in the LIHTC program and in the public welfare program; that defendants departed from normal procedural sequences and substantive standards by failing to enact standards to prevent racial segregation in either the LIHTC program or the public welfare program and failing to collect reports of their own on the distribution of units in Caucasian or minority areas before or after approving the national bank investments under the public welfare program; that defendants have admitted ignorance concerning the location of the national bank investments in LIHTC units and whether those locations perpetuate racial segregation; that defendants have no requirements for the provision of adequate neighborhood services, facilities, and conditions as a condition of the allocation of LIHTCs or the approval of bank ownership of LIHTC units and took no action to require minimum conditions of habitability until 2000, which was 11 years after Congress enacted the requirement that the LIHTC would not be available unless the units were in compliance with local health and building codes; that despite the increasing racial segregation in the LIHTC and public welfare program, defendants have not enacted a system of requirements to further the national policy to eliminate the racial segregation of

the ghettos, even though they have done so for schools; and that credible complaints were

made to defendants that their administration of the LIHTC program was contributing to the

perpetuation of racial segregation,[15] yet neither defendant took any action to prohibit the

perpetuation of racial segregation under its administration of the public welfare program.

ICP maintains that these facts involve direct actions by defendants in the administration of

the LIHTC and public welfare programs, citing as an example the fact that

> it is [OCC]'s decision and OCC's decision alone whether to
> approve a national bank investment in and purchase of an
> ownership or other equity investment in a LIHTC project that,
> because of its location, perpetuates the exclusion of affordable
> housing from Caucasian areas and perpetuates racial ghettos in
> Dallas. Absent OCC's approval, the LIHTC backed investment
> cannot be made.

P. Br. 9.

3

Without suggesting any view on whether ICP will be able to overcome a summary

judgment motion addressed to these claims or prove its intentional discrimination claims at

---

[15]These "credible complaints" include a finding in 1993 by the Government
Accounting Office that federal LIHTC units were more likely than traditional public housing
to be developed on sites in predominantly minority neighborhoods, public reports by HUD
showing the perpetuation of racial segregation in the LIHTC program administered by
defendants, a petition for rulemaking that ICP submitted to Treasury alleging that the LIHTC
program was being operated in a manner that violated the FHA and perpetuated racial
segregation; evidence submitted to Treasury by the Poverty & Race Research Action Council
in 2010 that showed the LIHTC program was being administered in a manner that
perpetuated racial segregation; and a 2011 recommendation by a Federal Rental Policy
Working Group that standards be adopted to reduce the concentration of LIHTC units in
minority low income areas including the adoption of site and neighborhood standards.

trial, the court holds that ICP has plausibly alleged discriminatory intent under the *Arlington Heights* factors.

ICP has alleged a historical background that shows that the FHA was enacted, in part, because federal agencies, including Treasury and OCC, had "consistently refused to use their legal authority to require the elimination of racial discrimination by national banks." Am. Compl. ¶ 157. ICP asserts, *inter alia*, that defendants

> exclud[ed] the perpetuation of racial segregation from the exercise of their regulatory and supervisory authority prior to the enactment of the [FHA]. Congress made these actions illegal with the enactment of the [FHA] because of the racially discriminatory intent and results of the actions wilfully perpetuating racial segregation in Federal programs.

*Id.* at ¶ 156; *see also id.* at ¶ 150 ("The conditions of slum and blight inflicted on the residents of the LIHTC units are equivalent to the conditions in racial ghettos that were the basis for the enactment of the [FHA]."). ICP also alleges that defendants were aware that the LIHTC program (including the allocation of LIHTCs and the approval of national bank and banking related entities' funding of LIHTC projects) was being administered in a way that resulted in a discriminatory effect—i.e., LIHTC projects were being disproportionately located in racially segregated locations marked by conditions of slum, blight and distress. *See, e.g.,* Am. Compl. ¶ 151 ("Defendants are reasonably assumed to have knowledge of the racial segregation and the conditions of slum and blight in the Dallas area as a result of their administration of the Home Mortgage Disclosure Act, . . . the information used to supervise compliance with the Community Reinvestment Act, . . . as well as their general supervision

- 36 -

of the national banks in the Dallas area.  Defendants base their supervision of the national banks on information that includes the existence, extent, and conditions in the concentrated low-income minority neighborhoods in the Dallas area.").  And it alleges that OCC "took none of the procedural or substantive actions to prevent the perpetuation of racial segregation that would be expected from Federal agencies supervising the largest Federal low income housing program," Am. Compl. ¶ 175, despite the fact that 42 U.S.C. § 3608(d) expressly charges OCC with the obligation to operate its programs "in a manner affirmatively to further the purposes of [the FHA]."  These allegations are sufficient to plausibly allege discriminatory intent under the *Arlington Heights* framework at the Rule 12(b)(6) stage of this case, where the court must construe ICP's complaint in the light most favorable to ICP, accept all well-pleaded factual allegations, and draw all reasonable inferences in ICP's favor.

Other than the arguments addressed in this memorandum opinion and order, defendants provide no other arguments in support of their motion to dismiss ICP's intentional discrimination claims.  Accordingly, because ICP has plausibly alleged discriminatory intent under the *Arlington Heights* framework, the court denies defendants' motion to dismiss ICP's intentional discrimination claims under the equal protection component of the Fifth Amendment, 42 U.S.C. § 1982, and 42 U.S.C. § 3604.

\*       \*       \*

For the foregoing reasons, the court grants defendants' motion to dismiss to the extent of dismissing ICP's disparate impact claim under 42 U.S.C. § 3604(a) and otherwise denies the motion.

**SO ORDERED**.

October 28, 2016.

SIDNEY A. FITZWATER
UNITED STATES DISTRICT JUDGE

- 38 -