IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| The Inclusive Communities Project, Inc., | * | |
| Plaintiff, | * | |
| | * | Civil Action No. 3:14-3013-D |
| v. | * | |
| | * | |
| The United States Department of | * | |
| Treasury and | * | |
| Office of Comptroller of the Currency, | * | |
| Defendants. | * | |

PLAINTIFF INCLUSIVE COMMUNITIES PROJECT, INC.
BRIEF IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

**Table of Contents**

Table of authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

I. Affirmatively further fair housing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Scope of the obligation to affirmatively further fair housing . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

The LIHTC racial segregation and the attendant injuries from unequal
LIHTC neighborhood conditions demonstrate that Defendants have not
taken meaningful action to overcome the legacy of segregation,
unequal treatment, and historic lack of access to opportunity in housing . . . . . . . . . . . . . . . . . . 3

The unequal neighborhood conditions and the likely injuries from those conditions . . . . . . . . . 3

South Dallas - unequal LIHTC neighborhood conditions .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

LIHTC projects that created racial segregation and unequal neighborhood conditions . . . . . . . 11

Summit Place LIHTC project in a majority White non-Hispanic tract . . . . . . . . . . . . . . . . . . . . 12

Suburban LIHTC locations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

The LIHTC racial segregation and the resulting conditions are the
functional equivalent of de jure racial segregation in the
Dallas area LIHTC program . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

The pattern of LIHTC racial segregation and unequal conditions,
over time, show that Defendants have not taken
meaningful action to address those conditions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

A. U.S. Department of Treasury . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

1. Treasury, in the administration and regulation of the housing and
housing development provided by the LIHTC program,
is subject to and bound by the 42 U.S.C. § 3608(d)
executive agency obligation to affirmatively further fair housing . . . . . . . . . . . . . . . . . . . . . . . 15

2. The substantive obligation under the duty to affirmatively
further fair housing is to take meaningful actions to overcome
the legacy of segregation, unequal treatment, and historic lack of
access to opportunity in housing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

3. Treasury has taken no actions to overcome the legacy of segregation,
unequal treatment, and historic lack of access to opportunity in housing
in its regulation and supervision of the LIHTC program
for housing and housing development . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

4. Treasury has no regulation or other guidance implementing the
affirmatively furthering fair housing obligation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

5. Treasury's list of steps to promote and support fair housing do not
substitute for compliance with its obligation to affirmatively further fair housing . . . . . . . . . . 23

6. Treasury's failure to take meaningful actions to prevent the legacy of segregation
from applying to LIHTC program dates from the beginning of the
LIHTC program to the present . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

7. Treasury's failure to affirmatively further fair housing in the LIHTC program
has significantly diminished the supply of open housing
and increased racial segregation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

8. Treasury's stated reason for not regulating on the subject of LIHTC
locations is not a lawful reason for its refusal to affirmatively further fair housing
in the LIHTC program . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

B. The Office of the Comptroller of the Currency . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

1. OCC denies that 42 U.S.C. § 3608(d) applies to its administration
of the Public Welfare Investment program involving bank ownership
of LIHTC projects and denies that it has ever taken any action to apply
42 U.S.C. § 3608(d) in that regard . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

2. The Office of the Comptroller of the Currency's regulation and administration
of national bank investments and ownership of LIHTC projects is subject to
and bound by the 42 U.S.C. § 3608(d) executive agency obligation
to affirmatively further fair housing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

3. OCC's regulation and administration of national bank ownership of
LIHTC projects is a program relating to housing and thus subject to
42 U.S.C. § 3608(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

4. OCC's obligation to address the legacy of segregation applies
in its regulation of the national bank decisions to own or invest in LIHTC projects . . . . . . . . . 49

5. OCC's position on LIHTCs is a specific instance of OCC's consistent denial
that it has any obligation under 42 U.S.C. § 3608(d)
to affirmatively further fair housing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

6. OCC subjects national bank ownership in and investment in the
provision of non-LIHTC affordable housing to a detailed review to
determine public welfare and exempts LIHTC investments from the review . . . . . . . . . . . . . . . 54

7. OCC's activities and program related to the bank ownership of LIHTC
are a cause of the perpetuation of racial segregation in the Dallas area . . . . . . . . . . . . . . . . . . . 58

8. The OCC failure to affirmatively further fair housing in the
public welfare investment program subjects LIHTC families
to seriously unequal conditions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

C. Both Defendants have violated the affirmatively further fair housing obligation . . . . . . . . . . 61

II. Standing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

Injury is traceable to Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

The injury can be remedied . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

Zone of interests . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67
III. The evidence submitted can be presented in a form that would be
admissible in evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

Signature . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

Certificate of service . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

**Table of authorities**

**Cases**

*Adams v. Richardson*, 480 F.2d 1159 (D.C. Cir. 1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

*Austin Apartment Ass'n v. City of Austin*, 89 F.Supp.3d 886 (W.D.Tex. 2015),
*appeal dismissed* (5th Cir. 15-50186) (Aug. 06, 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

*Bank of Am. Corp. v. City of Miami, Fla.*, ___ U.S. ___, 137 S. Ct. 1296 (2017) . . . . . . . . 61, 67

*City of Boston v. U.S. Dep't of Hous. & Urban Dev.*, 898 F.2d 828 (1st Cir. 1990) . . . . . . . . . 27

*Clients' Council v. Pierce*, 711 F.2d 1406 (8th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . 1, 25, 65

*Gautreaux v. Romney*, 448 F.2d 731 (7th Cir. 1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

*Hills v. Gautreaux*, 425 U.S. 284 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

*Inclusive Cmtys. Project, Inc . v. Tex. Dep't of Hous. & Cmty. Affairs*,
749 F. Supp. 2d 486 (N.D. Tex. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

*Jones v. Office of Comptroller of Currency*, 983 F.Supp. 197 (D. D.C. 1997)
*aff'd* 1998 WL 315581 (D.C. Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49, 54

*Miller v. City of Dallas*, 2002 WL 230834 (N.D. Tex. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*N.A.A.C.P. v. Harris*, 567 F.Supp. 637 (D.C. Mass. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65
reversed on other grounds, *N.A.A.C.P*, 817 F.2d. 149

*N.A.A.C.P. v. Sec'y of Hous. & Urban Dev.*,
817 F.2d 149 (1st Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . 1, 15, 20, 29, 37, 53, 56, 57, 58, 65, 66

*Nat'l Assn. of Home Builders v. Def. of Wildlife*, 551 U.S. 644 (2007) . . . . . . . . . . . . . . . . . . . . 40

*Shannon v. U.S. Dep't of Hous. & Urban Dev.,*
436 F.2d 809 (3d Cir. 1970) . . . . . . . . . . . . . . . . . . . . . . . 1, 2, 7, 15, 22, 25, 29, 38, 42, 44, 56, 57

*Texas Dept. of Hous. & Cmty. Affairs v. Inclusive Comtys Project, Inc.,* ___ U.S. ___,
135 S. Ct. 2507 (2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Thompson v. U.S. Dept. of Hous. & Urban Dev.,* 348 F. Supp. 2d 398 (D. Md. 2005) . . . . . . . 25

*Thompson v. U.S. Dept. of Hous. & Urban Dev.,* 2006 WL 581260 (D. Md. 2006) . . . . . . 25, 66

*Walker v. City of Mesquite,* 169 F.3d 973 (5th Cir. 1999),
*cert. denied*, 528 U.S. 1131 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Walker v. HUD*, 734 F.Supp. 1289 (N.D. Tex. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Williams v. City of Dallas*, 734 F.Supp. 1317 (N.D. Tex. 1990) . . . . . . . . . . . . . . . . . . . . . . . 15

*Young v. Pierce*, 628 F.Supp. 1037 (E.D. Tex. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

**Statutes**

12 U.S.C. § 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

12 U.S.C. §1(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

12 U.S.C. § 1818 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

12 U.S.C. § 24 (Eleventh) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43, 45, 46, 48, 61

12 U.S.C. § 3301 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

12 U.S.C. § 3303 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 555

26 U.S.C. § 42 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 40, 42

26 U.S.C. § 42(d)(3)(ii)(II) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 64

26 U.S.C. § 42(e)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 64

26 U.S.C. § 42(g) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

26 U.S.C. § 42(h)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

26 U.S.C. § 42(h)(6)(B)(ii) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

26 U.S.C. § 42(h)(6)(B)(iv) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 39, 62

26 U.S.C. § 42(h)(6)(B)(vi) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

26 U.S.C. § 42(h)(6)(E) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

26 U.S.C. § 42(h)(6)(F)(ii) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 64

26 U.S.C. § 42(h)(6)(G)(ii) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 64

26 U.S.C. § 42(h)(6)(K) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 64

26 U.S.C. § 42(l) (3) (C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 64

26 U.S.C. § 42(m)(1)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38, 42

26 U.S.C. § 42(m)(1)(A)(ii) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

26 U.S.C. § 42(m)(1)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 38

26 U.S.C. § 42(m)(1)(B)( i) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

26 U.S.C.§42(m)(1)(B)(ii)(III) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

26 U.S.C.§42(m)(1)(B)(ii) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

26 U.S.C.§42(m)(1)(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

26 U.S.C. § 42(m)(2)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

26 U.S.C. § 42(m)(2)(C)(i)(III) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

26 U.S.C. § 42(n) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 64

26 U.S.C. § 103 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

42 U.S.C. § 1975(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

42 U.S.C. § 1982 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

42 U.S.C. § 3604 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 62

42 U.S.C. § 3605. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

42 U.S.C. § 3606 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

42 U.S.C. § 3617 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

42 U.S.C. § 3608(d) . . . . . . . . . . . . . . . . . . . 15, 16, 24, 25, 40, 41, 43, 44, 45, 46, 49, 50, 53, 62

42 U.S.C. §§ 5301-5321 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

42 U.S.C. § 5311 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

42 U.S.C. § 5311(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

42 U.S.C. § 5311(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Depository Institutions Disaster Relief Act of 1992, PL 102–485,
October 23, 1992, 106 Stat 2771 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

PL. 99-514, Title II, § 252(a), Oct. 22, 1986, 100 Stat. 2189 . . . . . . . . . . . . . . . . . . . . . . . . . . 52

PL 100–430 (HR 1158), PL 100–430, September 13, 1988, 102 Stat . . . . . . . . . . . . . . . . . . . . 41

H.R. REP. 100-711, 32, 1988 U.S.C.C.A.N. 2173 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40, 46

P.L. 101-239, Title VII, §§ 7108(a)(1), (b) 1989 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

Tex. Gov't Code § 2306.269(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39, 62

Tex. Local Gov't Code § 250.007 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

**Regulations**

10 TAC § 11.9(c)(4)(B)(i)(VII) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

10 TAC § 11.9(c)(4)(B)(ii)(V) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

10 TAC § 11.9 (d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

10 TAC §11.9(e)(3)(G)(I) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 70

10 TAC § 204 (7 )(D) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

10 TAC § 204 (7 )(E) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

10 TAC § 401(a) - (d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

10 TAC § 402(j) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

10 TAC §402(j)(3)(B)(xxvii) - (xxix). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

12 C.F.R. § 24.1(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

12 C.F.R. § 24.2(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

12 C.F.R. § 24.3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

12 C.F.R. § 24.6(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

24 C.F.R. § 5.150 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 15, 29

24 C.F.R. § 5.152 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 15, 29

24 CFR § 92.202(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

24 C.F.R. Part 100 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 25

24 C.F.R. §905 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

24 CFR § 891.680 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

24 CFR § 891.840 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

24 CFR § 983.57(d), (e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

24 CFR § 982.401(l) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

24 CFR § 905.602(d)(7) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

26 C.F.R. § 1.103-8(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 33

26 C.F.R. § 1.42-1 through 1.42-18 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

26 C.F.R. § 1.42-5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17

26 C.F.R. § 1.42–9 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 25

26 C.F.R. § 1.42-10 .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 16

**Federal Rules of Evidence**

Fed. R. Evid § 803(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

Fed. R. Evid. § 803(8) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

Fed. R. Evid. 803(16) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

Fed. R. Evid. 803(17) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

Fed. R. Evid. § 901(a)(7)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

Fed. R. Evid. 901(a)(8) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

Fed. R. Evid. § 902(5) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

Fed. R. Evid. 1006 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

**Federal Register**

36 Fed. Reg 25167 (1971)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

HUD, Affirmatively Further Fair Housing, Final Rule,
80 Fed. Reg. 42272, July 16 2015 .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2 15, 26, 38

Treasury, 52 Fed. Reg. 42116 (Nov. 3, 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Treasury, 55 Fed. Reg. 21187 (May 23, 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

60 Fed. Reg. 54819, 54820 (October 8, 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

60 Fed. Reg. 67049, 67050 (December 28, 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

64 Fed. Reg. 70986 (December 20, 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

**Other**

Emerson, *Affirmatively Furthering Equal Protection: Constitutional*
*Meaning in the Administration of Fair Housing*, 65 Buff. L. Rev. 163 (2017) . . . . . . . . . . . . . . 2

Fed. R. Civ. P. § 56(c)(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

H.R. REP. 100-711, 1988 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41, 46

H.R. REP. 101-247, 1989 1989 U.S.C.C.A.N. 1906 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Nagel, and St. Onge, *Housing Bonds and Tax Reform:*
*The Perils of a Partial Analysis of Low-Income Housing Programs,*
Yale Law & Policy Review, Vol. 6: Iss. 2, Article 3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Roisman, *Mandates Unsatisfied: The Low Income Housing Tax Credit*
*Program and the Civil Rights Laws*, 52 U. Miami L. Rev. 1011 (1998) . . . . . . . . . . . . . . . . . . 20

Senate Report 99-313, 99th Congress, 2d Sess., Tax Reform Act of 1986 . . . . . . . . . . . . . . . . . 17

I. Affirmatively further fair housing

**Scope of the obligation to affirmatively further fair housing**

The scope of Defendants' duty to affirmatively further fair housing in its programs and activities relating to housing and urban development is two fold. First, Defendants have the duty to prevent illegal housing discrimination by those it regulates and to avoid illegal discrimination in its own actions. *Clients' Council v. Pierce*, 711 F.2d 1406, 1425 (8th Cir. 1983). Second, Defendants have the additional duty to take and require meaningful actions that:

• address significant disparities in housing needs and in access to opportunity,

• replace segregated living patterns with truly integrated and balanced living patterns,

• transform racially and ethnically concentrated areas of poverty into areas of opportunity, and

• foster and maintain compliance with civil rights and fair housing laws. *N.A.A.C.P. v. Sec'y of Hous. & Urban Dev.*, 817 F.2d 149, 156 (1st Cir. 1987); *Shannon v. U.S. Dep't of Hous. & Urban Dev.*, 436 F.2d 809, 819, 821-822 (3d Cir. 1970); 24 C.F.R. § 5.150, § 5.152; HUD, Affirmatively Further Fair Housing, Final Rule, 80 Fed. Reg. 42272, July 16 2015.

HUD and the courts recognize the balance struck by the obligation to affirmatively further fair housing. The obligation is not violated by actions that will improve conditions in minority concentrated neighborhoods and thereby reduce disparities in access to opportunity between impacted neighborhoods and the rest of the city. Nor is it violated by efforts to maintain and preserve the existing affordable rental housing stock. The obligation does require consideration of the effects of these actions as perpetuating racial segregation. In areas with a history of segregation such as Dallas, federal and local governments have refused to create a reasonable

number of opportunities outside of segregated, low-income areas in favor of investments in the segregated low-income areas. This action precludes a choice of neighborhoods to historically segregated groups and is a failure to affirmatively further fair housing as required by the Fair Housing Act. *Shannon*, 436 F.2d at 822; HUD, 80 Fed. Reg. at 42279.

The consideration of race required by the obligation to affirmatively further fair housing does not transgress constitutional limitations. The awareness and acknowledgment of race in attempting to solve the problems caused by long standing racially segregated housing patterns by fostering diversity and combating racial isolation is not unconstitutional. *Texas Dept. of Hous. & Cmty. Affairs v. Inclusive Comtys Project, Inc.*, ___ U.S. ___, 135 S. Ct. 2507, 2525 (2015). While the affirmatively further fair housing obligation "requires race-conscious policy formulation, it does not require, and cautions against, the use of racial criteria to carry out those policies." Emerson, *Affirmatively Furthering Equal Protection: Constitutional Meaning in the Administration of Fair Housing*, 65 Buff. L. Rev. 163, 165 (2017).

The Defendants, in their administration of the LIHTC program, neither seek to prevent illegal discrimination by the state entities and national banks they regulate nor to take and require meaningful action to overcome the legacy of segregation, unequal treatment, and historic lack of access to opportunity in housing. Had Defendants taken such action, the LIHTC units in the City of Dallas would not be more racially segregated than the de jure racially segregated public housing projects. In 1994, of DHA's approximately 6,400 public housing units, 6,100, 95%, were in minority areas and 300 were in predominantly white areas. App. 897.[1] In 2017 of the 28,874

---

[1] "App. _" is the page cite to the Appendix in Support of ICP's Motion for Partial Summary Judgment.

LIHTC units in the City of Dallas, 27,823, 96%, were in predominantly minority areas. App. 9.

Defendants' failure to affirmatively further fair housing is a cause of the extreme unequal conditions that accompany the LIHTC segregation in the City of Dallas. The LIHTC racial segregation subjects Black LIHTC tenants to unequal neighborhood living conditions which are not inflicted upon White non-Hispanic LIHTC tenants. App. 66, TDHCA HSR 2015 LIHTC Occupancy Data by race of occupants; App. 76-597, Neighborhood Conditions for LIHTC Projects: Map, Summary, Tables for each neighborhood. Defendants' refusal to affirmatively further fair housing has ensured that children living in the tax credit units will be injured by a destructive environment totally unknown to most White Americans. The attendant neighborhood disadvantages to the children's current well-being and future life chances are the same as if they and their families were being subjected to de jure racial segregation. App. 622, Owens expert report page 1, citing National Advisory Commission on Civil Disorders [1968] 1988:1-2.

**The LIHTC racial segregation and the attendant injuries from unequal LIHTC neighborhood conditions demonstrate that Defendants have not taken meaningful action to overcome the legacy of segregation, unequal treatment, and historic lack of access to opportunity in housing**

**The unequal neighborhood conditions and the likely injuries from those conditions.**

Congress enacted the 1968 Fair Housing Act responding to the record it created demonstrating the existing racial segregation, the legacy of segregation, the conditions of unequal treatment, and the historic lack of access to opportunity in housing. The same record documented and recognized the federal government's role in creating and perpetuating the racial segregation and the accompanying unequal conditions. App. 2809-2822, Excerpts Cong. Rec. Congress specifically recognized the role of the OCC and its failure to take any affirmative action to eliminate discrimination by the financial institutions it regulated. App. 2823, 2834, Hearings

Senate Subcommittee 1967.

The record upon which Congress based the 1988 amendments to the FHA show that little had changed in 20 years. See pages 20-21 below.

The federal Defendants' administration and regulation of the federal LIHTC program have been a contributing cause recreating the pre-FHA conditions in the post FHA low income housing tax credit program. App. 2809-2834. The resulting racial segregation in the LIHTC program has increased in the Dallas area. 26% of the non-elderly LIHTC units were in 75% to 100% White non-Hispanic tracts in the four county area as of 1999. Only 7% were in  75% to 100% White non-Hispanic tracts in the four county area as of 2017. App. 23. The maps show the increase in segregation. App. 24, 25, 31, 32, 40, 41. The LIHTC racial segregation and location in high poverty areas has been more severe in the Dallas area than the national average for the LIHTC program. In 2010, 48% of the national LIHTC units were in minority census tracts and 27% in high poverty tracts.  82% or more of the seven county Dallas area LIHTC units were in minority census tracts and 42% were in high poverty tracts. The disparity was similar five years later. App. 54.

The pattern of unequal conditions to which Black LIHTC residents in the Dallas area are disproportionately subjected by the racial segregation is undisputable. The Appendix documents show the unequal conditions in each of the predominantly minority, City of Dallas census tracts in which at least one LIHTC project is located. Several of the indicators such as race and poverty are compared to City wide and Dallas Metropolitan Division wide data. Several of the indicators such as illegal dumping violations, loose and roaming dog cases, and presence of registered sex offenders are compared to the rates of such conditions in predominantly White non-Hispanic

areas.  App. 76-82 (Sources); 2882-2887 (Lopez Declaration); 2871-2877 (Self Declaration).

These conditions frequently increased in severity even as additional LIHTC units were added to

the census tracts. App. 83-597.  Neighborhood Conditions for LIHTC Projects: Map, Summary,

Tables for each neighborhood. The Treasury's own Distress Index using economic indicators

confirms the unequal conditions. App. 598, 599, 2859.

The racial segregation, unequal housing and economic conditions in the minority LIHTC

census tracts in the City of Dallas match those the Fair Housing Act was enacted to eliminate.

App. 2809-2854. Like the families portrayed in the Fair Housing Act record, the families

currently in these LIHTC units in the segregated neighborhoods are prevented from obtaining

LIHTC housing in better neighborhoods in integrated communities.

The effects of the LIHTC locations on children show increasing childhood poverty rates

in these areas in Dallas. For example, the childhood poverty rate for children under 5 increased

from 61% in 1990 to 88% in tract 93.04 (Part of Jim Miller area). App. 88.This tract has four

LIHTC projects of which two are owned by national banks. The first LIHTC 230 unit project

opened in 1996. The other three LIHTC projects opened in 2001 and 2004. There are 898 LIHTC

units in the tract. App. 84. All four projects are located in a City of Dallas designated high crime

area. App. 85. The concentration of poverty surrounding these units is by race, Black and

Hispanic. App. 84.The racial concentration of children in poverty results in racially segregated

public schools in which 90% or more of the students are economically disadvantaged in tract

93.04. App. 87. The schools serving the children in the tract 93.04 LIHTC projects fall far below

the HUD measured average school proficiency rating for low-income White non-Hispanic

children elsewhere in the City. App. 92.

The effect of the racial segregation on the lives and futures of children living in these areas has been well documented by social science researchers. One of the most influential researchers in current times is a Stanford University economist, Dr. Raj Chetty. App. 835-836. Dr. Chetty conducted a major research project by contract with the Treasury and in concert with Treasury/IRS employees on the effects of neighborhood conditions on children. App. 717-771. Based on this research he stated:

> Individuals who live in high-poverty areas fare worse than those who live in lower-poverty neighborhoods on a wide range of economic, health, and educational outcomes.
> . . .
> Chetty and Hendren (2015) study more than five million families that move across areas and find that neighborhoods have causal exposure effects on children's outcomes using quasi-experimental methods. In particular, every year spent in a better area during childhood increases college attendance rates and earnings in adulthood, so the gains from moving to a better area are larger for children who are younger at the time of the move. App. 659-660, Chetty study attached to Owens's Expert Report.

Dr. Chetty's research confirmed what has long been the general agreement of social science and government findings on the subject. Dr. Ann Owens' expert report chronicles the consensus from the Report of The National Advisory Commission on Civil Disorders (Kerner Commission Report) to the current social science consensus. App. 619-633.[2]

> A large research literature indicates that growing up in socioeconomically disadvantaged, racially segregated neighborhoods is disadvantageous for children's well-being and future life chances. App. 629.

The Defendants have completely failed to take these circumstances of racial segregation, unequal neighborhood conditions, and have failed to consider the attendant injuries to children in

---

[2] Dr. Owens is an associate professor of sociology at University of Southern California. Her research centers on the causes and consequences of social inequality. She focuses on urban neighborhoods, housing, education, and geographic and social mobility. App. 619.

their regulation and administration of the LIHTC program and national bank ownership and investment in LIHTC projects. The Defendants confess ignorance in their responses to these allegations in the First Amended Complaint. Defendants then deny the existence of the unequal conditions by race of the occupants. First Amended Complaint ¶ ¶ 60, 65, 66 and Defendants' Answer ¶ ¶ 60, 65, 66. Document No. 29, pages 26, 29; Document No. 49, pages 11-12.

Since *Shannon v. HUD* in 1970, the impact of housing decisions on racial concentrations has required federal agencies administering housing programs to know the existing neighborhood conditions and to consider the likely effects of their decisions on those conditions. *Shannon*, 436 F.2d at 821 - 822. The neighborhood living conditions ignored by Defendants are set out in the Appendix. The Appendix contains the data for numerous indicators of racial segregation and the attendant unequal conditions in each City of Dallas census tract with at least one LIHTC project. App. 83-353, 372-467. In addition, the Appendix contains similar data to show the superior conditions in four City of Dallas White non-Hispanic census tracts and four predominantly White non-Hispanic, suburban  census tracts with a LIHTC project. App. 354-371, 468-477, 549-559 (City); 560-568, 579-597, 2895-2905 (suburbn). The evidence clearly shows the unequal conditions endured by the Black LIHTC tenants in the minority census tracts. White LIHTC tenants are substantially less likely to be subjected to these conditions. Approximately 49% of Black tax credit family tenants live in Collin, Dallas, and Denton county census tracts marked by poverty rates of 30% or more of the population while approximately 19% of White non-Hispanic tax credit family tenants live in such census tracts. 72% of Black tax credit families live in census tracts with the highest distress level while approximately 42% of White non-Hispanic tax credit families live in census tracts with the highest distress level. App. 66.

There is not space in this brief to describe or summarize the conditions in each tract or collection of tracts. Instead, the Appendix includes a map locating the census tract and LIHTC project in the City, a summary of the conditions, and a set of data tables for each tract or collection of tracts showing the segregation and specific unequal conditions. The tables include: race, poverty, and childhood poverty for 1990, 2000, 2010, and 2015; crime data from the City of Dallas and the crime data the Texas Department of Housing and Community Affairs (TDHCA) requires as part of the LIHTC application process; illegal dumping violations as shown by the number and rate of citations; loose and roaming dog cases as shown by the number and rate by population; registered sex offenders who have moved into the tract by number and rate; the Treasury Distress Index rating for the tract, the Home Mortgage Disclosure Act (HMDA)[3] home loan data for several points in time; school proficiency ratings; poverty and race of students; the number of LIHTC units and projects; the race and ethnicity of the occupants of the LIHTC units; the presence of other assisted housing; and the change in the number of housing vouchers in the tract and in the LIHTC projects over time. App. 76-95, 2882-2887, 2871-2877.

Not every living condition in every minority LIHTC tract is worse than every condition in the few majority White non-Hispanic LIHTC tracts.  However, there are consistently more neighborhood conditions in the minority tracts that are worse than the same conditions in the White tracts. App. 83-353, 372-467 (minority); 549-568, 579-597, 2895-2905 (White non-Hispanic). There are minority LIHTC census tracts in which every condition is substantially unequal to the conditions in the White LIHTC census tracts. App. 83-331.

---

[3] National banks regulated by OCC must collect racial data on home loan applicants and the locations of the properties for which the application was made. The OCC states that the HMDA data "play a critical role in the OCC's fair lending and Community Reinvestment Act (CRA) examination process." App. 2187, 2189.

The census tract to census tract comparison of the neighborhood conditions show the same degree of inequality found by the Kerner Commission in 1968.

> Segregation and poverty have created in the racial ghetto a destructive environment totally unknown to most white Americans. App. 622, Owens' Report citing Kerner Report.

The conditions affecting most of the LIHTC units in minority census tracts, like the conditions found by the Kerner Comission: "converge on the young to destroy opportunity and enforce failure." App. 622 Owens' Report citing Kerner Report.

Some examples from the record of neighborhood living conditions in LIHTC locations are set out next.

**South Dallas - unequal LIHTC neighborhood conditions**

The South Dallas area was a de jure racially segregated community. App. 2717-2756, housing segregation news articles from Dallas Morning News; App. 2757-2773, City of Dallas Minority Housing Resources, excerpt, App. 2775-2781, Bartholomew Master Plan for the City of Dallas: A System of Parks and Schools. The population has long been less than 5% White non-Hispanic. App. 103. There are seven LIHTC projects with 1,054 units in the area. Four of the seven are national bank investments. App. 97. Two South Dallas census tracts had 2015 poverty rates over 50%. App. 98. The childhood poverty rates are far above the City and the metropolitan area childhood poverty rates. Some tracts have childhood poverty rates in excess of 80%. App. 104. 100% of children under five were below poverty in South Dallas tract 39.01 in 2015. App. 99.

All seven LIHTC projects in these tracts are located in City of Dallas Police Department Crime Hot Spot - Target Action Area Grid high crime areas. App. 99, 105.  Using the crime data

source required by TDHCA as part of the LIHTC application process[4], the South Dallas tracts are among the most dangerous neighborhoods in the country. App. 105.

All seven projects are in economically distressed areas according to the U.S. Treasury's Community Development Financial Institution Fund Distress Index (CDFI) or Investment area designations. The 2010 Treasury Distress Index rated all the tracts at level 4 distress, the highest level of distress.[5] App. 100, 106.

The illegal dumping incidents as measured by City citations for such conduct range from 2.5 to 22 times the rate in the White non-Hispanic Zip Codes. App. 99-100. Registered sex offenders of all races moved to the Zip Codes in which these projects are located at 2017 yearly rates that were from 6 to 33 times the rate of such movers to Dallas County Majority White Zip. The rate of loose and roaming dog cases per 1,000 persons in these tracts exceed the rate in majority White non-Hispanic census tracts (4.6) by multiples of 9 to 13. Industrial zoned areas are located in the census tract of all seven LIHTC projects. App. 100.

The number and amount of home loans in these census tracts per owner occupied units are consistently few and small and have been insubstantial since 2000. App. 101.

The public elementary schools serving each census tract have a 87% or greater economically disadvantaged Black or Hispanic student population. App. 101.

HUD ranks all of the elementary schools serving all of the census tracts at low levels, 13 and 15, on its School Proficiency Index except for one, tract 203. This school is a Learning

---

[4] Neighborhoodscout.com (Location Inc.) provides the market reports including crime data and is a commercial service upon which TDHCA relies for this data. 10 TAC §11.9(e)(3)(G)(I).

[5] This information is not used in the LIHTC program. App. 2334-2371.

Center and ranks 94. App. 101, 108.

There are 1,336 total LIHTC, public housing, and HUD assisted units in the South Dallas census tracts. The units at the LIHTC projects are and have been 90% or more occupied by Black tenants with the exception of Eban Village 1 in 2015 at 77% Black. App. 111.

The number of housing vouchers in the four tracts has increased from 174 in 2000 to 476 in 2016. Many of the vouchers are in the LIHTC projects. App. 101.

The location of the LIHTC units in South Dallas had the clear effect perpetuating the racial segregation and poverty created by the previous de jure racial segregation. There is no evidence that either Defendant took any action to discourage, inhibit, or prevent this result.

**LIHTC projects that created racial segregation and unequal neighborhood conditions**

Tract 166.05 in far Southern Dallas was not a de jure racially segregated area but became just as segregated and high poverty an area as LIHTC units were placed in the tract.

In 1990 the population was 49% White non-Hispanic, 13% Black and 36% Hispanic. App. 118. There were no LIHTC units in the tract until 1996. Since 1996, a total of 1,648 LIHTC units in eight project including four national bank investment properties, have been developed. App. 114, 122. The number of housing vouchers increased from 121 in 2000 to 639 in 2016. App. 117. Over 500 of the vouchers were in the LIHTC projects in 2015. App. 124. In 2015 the projects were from 87% to 98% Black occupied. App. 121. The population of the census tract in 2015 was 10% White non-Hispanic, 56% Black, and 34% Hispanic. App. 118.

The poverty rate for tract 166.05 has increased from 19% in 1990 to 46% in 2015. The childhood poverty rates have increased over this time period. The childhood poverty rate for children under 5 increased from 13% in 1990 to 74% in 2015. The childhood poverty rate for

children 5 to 17 increased from 27% in 1990 to 57% in 2015. App. 118.

The four LIHTC projects in tract 166.05 that are in the City of Dallas are located in a City of Dallas Police Department Crime Hot Spot - Target Action Area Grid high crime area. App. 119.

The neighborhoodscout.com market compilation of the risks of violent crime generally relied upon by the Texas Department of Housing and Community Affairs, 11 TAC § 11.9(e)(3)(G)(i), reports tract 166.05 is consistently unsafe as measured by the Violent Crime Index. The tract ranks 87 on the scale of 0 being the most safe and 100 being the least safe. App. 115.

Registered sex offenders of all races moved to the area at a 2017 yearly rate that was higher than the rate of such movers to Dallas County Majority White Zip Codes. The rate of loose and roaming dog cases per 1,000 persons in tract 166.05 (18) exceeds the rate in majority White non-Hispanic census tracts (4.6). App. 116.

Tract 166.05 is an economically distressed area according to the U.S. Treasury's CDFI Distress Index. The 2010 Distress Index rated the tract a level 4distress, the highest level of distress. App. 116. The number and amount of home loans as shown in HMDA date for census tract 166.05 per owner occupied units are consistently low and have declined since 2000. App. 117.

The census tract has areas zoned for industrial use. App. 116.

**Summit Place LIHTC project in a majority White non-Hispanic tract**

The LIHTC Summit Place  project was developed in City of Dallas census tract 132 in 2013. This is one of the few LIHTC projects in a majority White, non-Hispanic census tract in

the City of Dallas. The tract is and has been majority White non-Hispanic with low poverty. App. 550. The school has a proficiency index score of 54 compared to the average index score of 44.57 for low income White children and 22.82 for low income Black children. App. 1591. The conditions in the tract are substantially better than the same conditions in the minority concentrated LIHTC tracts.

Tract 132 was 95% White non-Hispanic in 1990 and is 79% White non-Hispanic in 2015. The 1990 poverty rate was 1%. The 2015 poverty rate is 10%.  The childhood poverty rate for children under 5 was 0% in 1990 and 9% in 2015. The childhood poverty rate for children 5 to 17 was 0% in 1990 and 26% in 2015. App. 554, The LIHTC project is in a City of Dallas Crime Hot Spot but the 2015 neighborhoodscout.com violent crime score is 65, substantially less than that in the LIHTC concentrated minority census tracts. App. 555; 85, 115, 219 (minority tract examples).

There were no illegal dumping violations as measured by city citations in 2014 and in 2015. The rate of registered sex offenders of any that had moved to the Zip Code was 0.7. This was slightly higher than the rate for Dallas County Majority White Zip Codes (0.51) and substantially lower than the average rate of all Dallas County Majority Minority Zip Codes (2.3). The loose and roaming dog case rate, 2.4, was less than the average rate in majority White non-Hispanic census tracts, 4.6. App. 551. There are no industrial zoned areas in the tract. App. 552. The tract is not an economically distressed area according to the U.S. Treasury's CDFI Investment area eligibility designations. App. 552.

**Suburban LIHTC locations**

ICP's advocacy efforts have resulted in a few, four, LIHTC projects in predominantly

White non-Hispanic suburban census tracts: 181.04, 304.06, 305.13, 306.01. App. 894, 896, 900, 901, 903; *Dews v. Town of Sunnyvale, Tex.*, 109 F. Supp. 2d 526, 529 (N.D. Tex. 2000).  The poverty, crime, sex offender, schools, Distress Index, and home mortgage lending (HMDA) for these tracts show that the children in these LIHTC units are not exposed to the injuries of racial segregation. App. 560-568 (Sunnyvale); 579-587 (Frisco); 588-597 (McKinney Millennium); 2895-2905 (McKinney Post Oak).

**The LIHTC racial segregation and the resulting conditions are the functional equivalent of de jure racial segregation in the Dallas area LIHTC program.**

One measure of the effects of Defendants' actions is the comparison with the distribution and conditions of an the de jure system of federally assisted housing, public housing. The racial segregation and unequal conditions in the federally supported public housing regime were created by de jure and other purposeful segregation starting decades before the passage of the Fair Housing Act. The racial segregation was extreme. 96% of the public housing units were in minority areas. App. 894-896, 897-898. *Walker v. City of Mesquite,* 169 F.3d 973, 976, 976 n. 4 (5th Cir. 1999), *cert. denied*, 528 U.S. 1131 (2000). The conditions in which the public housing units were located were the conditions of a ghetto.

> Whether or not most public housing projects illustrate a benign or forced ghetto is open to debate. The fact that they are a ghetto is not. App. 1557, 1566-1567, Excerpts of Proposed Housing Plan for the City of Dallas August 1977.

The segregation and the unequal conditions in the LIHTC program are the functional equivalent of the results of such de jure and purposeful segregation. App. 83-353.

**The pattern of LIHTC racial segregation and unequal conditions, over time, show that Defendants have not taken meaningful action to address those conditions.**

There is history of racial segregation in the Dallas area  including federally assisted

-14-

housing. *Walker v. HUD*, 734 F.Supp. 1289, 1293 - 1308 (N.D. Tex. 1989) (housing); *Williams v. City of Dallas*, 734 F.Supp. 1317, 1320 - 1321, 1332 - 1339, 1401 - 1408 (N.D. Tex. 1990) (voting); *Miller v. City of Dallas*, 2002 WL 230834, *4 - *10 (N.D. Tex. 2002) (zoning and municipal services). The racial segregation and unequal conditions continue. App. 83-341. The racial segregation is a matter of public, government records. App. 1613-1696 (HUD reports of LIHTC locations). The racial segregation and the unequal conditions have been brought to attention of Treasury officials. App. 1471-1486, 1576-1589, 2835-2849.

There is no reasonable basis in fact to support a conclusion that the federal officials regulating and administering the LIHTC program since 1986 have done so by taking meaningful action meaningful actions that:

• address significant disparities in housing needs and in access to opportunity,

• replace segregated living patterns with truly integrated and balanced living patterns,

• transform racially and ethnically concentrated areas of poverty into areas of opportunity, and

• foster and maintain compliance with civil rights and fair housing laws. *N.A.A.C.P.*, 817 F.2d at 156; *Shannon*, 436 F.2d at 819, 821-822; 24 C.F.R. § 5.150, § 5.152; HUD, 80 Fed. Reg. 42272.

**A. U.S. Department of Treasury**

**1. Treasury, in the administration and regulation of the housing and housing development provided by the LIHTC program, is subject to and bound by the 42 U.S.C. § 3608(d) executive agency obligation to affirmatively further fair housing.**

The Fair Housing Act requires all executive departments and agencies shall administer their programs and activities relating to housing and urban development (including any Federal

agency having regulatory or supervisory authority over financial institutions) in a manner affirmatively to further the purposes of the Fair Housing Act. 42 U.S.C. § 3608(d).

Defendant U.S. Department of Treasury (Treasury) is the federal executive department that administers, regulates, and supervises the LIHTC program. 26 U.S.C.A. § 42(d)(3)(ii)(II), (e)(6), (h)(6)(F)(ii), (h)(6)(G)(ii), (h)(6)(K), (l) (3) (C), (n). Treasury has enacted LIHTC program regulations that specifically relate to housing and housing development. See *e.g.*, 26 C.F.R. § 1.42-5 (habitability and extended low income housing commitment); 1.42-10 (setting utility allowance determinations for tax credit units).

The Federal Low Income Housing Tax Credit (LIHTC) program is a program relating to housing and urban development. Treasury explicitly describes the LIHTC program as relating to housing and urban development.

> LIHTCs are the Federal Government's largest vehicle supporting the construction and rehabilitation of affordable housing. Department of the Treasury, General Explanations of the Administration's Fiscal Year 2017 Revenue Proposals, February 2016. App. 1506, 1519.

Treasury admits the LIHTC program is related to housing development and cannot be administered in a manner inconsistent with the obligation to affirmatively further the purposes of the Fair Housing Act.

> AFFH was firmly established Federal housing policy when § 42 was enacted, and there is no suggestion that Congress intended § 42 to diverge from that policy. Section 42(m)(1)(A)(ii), therefore, does not require or even encourage conduct inconsistent with that policy. App. 1597, Rev. Rul. 2016–29.

The LIHTC statute clearly describes the LIHTC as a program or activity relating to housing development. The statute requires the housing developed using the tax credits to be a "qualified low income housing project." To meet this standard, the housing must be for low

income individuals whose rent is restricted in amount including a utility allowance for the unit.

26 U.S.C. § 42(g). The statute regulates the minimum conditions of habitability that must be

satisfied to keep the tax credits. 26 U.S.C. § 42(m)(1)(B). The statute limits the housing owner's

rights to evict the tenants by imposing a good cause for eviction standard. 26 U.S.C. §

42(h)(6)(E)(ii). The statutory program requires the tax credit developed housing to be controlled

by "minimum long-term commitment to low-income housing" guaranteed by a deed restriction

enforceable by the tenants. The deed restriction must prohibit the owner and recipient of the tax

credits from refusing to lease to a federal voucher participant. 26 U.S.C. § 42(h)(6)(B)(ii), (iv),

(vi). Treasury's regulations, like the statute, make it clear that Treasury is regulating and

supervising a program and activity relating to housing and housing development. 26 C.F.R. §

1.42-5 (habitability and extended low income housing commitment); 1.42-10 (setting utility

allowance determinations for tax credit units)

 The legislative history describes the LIHTC program as an affordable housing program.

> The committee is concerned that the existing tax preferences for
> low-income rental housing have not been effective in providing affordable
> housing for low-income individuals. The committee believes a more efficient
> mechanism for encouraging the production of low-income rental housing can be
> designed than the variety of subsidies existing under present law. Senate Report
> 99-313, 99th Congress, 2d Sess., Tax Reform Act of 1986, 758. App. 1494, 1495.

 The legislative history of the statute making the LIHTC program permanent re-confirmed

the program as one related to housing and housing development.

> The committee is concerned about the lack of affordable housing for people of
> low-income and considers it appropriate that the Federal Government play a
> significant role in the development of additional housing. The committee believes
> the low-income housing credit is a useful incentive for the increase in the housing
> stock available to low-income tenants.
> . . .
> The committee considers it desirable for the credit to be used to increase the

-17-

> housing stock available to low-income tenants.
> . . .
> The committee believes that encouraging the provision of low-income housing is an important goal of national housing policy. The Federal Government can foster this goal through several means, and, at this time, the committee believes that providing tax incentives to private investors to invest in low-income housing projects is the most appropriate way to achieve this aim. HOUSE REPORT NO. 101-247 H.R. REP. 101-247, **1187-1188, 1989 U.S.C.C.A.N. 1906,**2657-2658 (1989). App. 2226, 2235-2236.

The Office of the Comptroller of the Currency (OCC) states the following:

> The Low-Income Housing Tax Credit (LIHTC) is the federal government's primary program for encouraging the investment of private equity in the development of affordable rental housing for low-income households. Since its creation in 1986, the LIHTC has helped to finance more than 2.4 million affordable rental-housing units for low-income households.1 This Insights report describes how LIHTCs are used to finance the development of affordable housing and how national banks and federal savings associations (collectively, banks) can participate as investors and lenders in LIHTC-financed projects. The report outlines the risks and regulatory considerations of LIHTC investments, including the considerations these investments receive in Community Reinvestment Act (CRA) examinations.
> . . .
>
> The LIHTC is an indirect federal subsidy that finances low-income housing. . . The equity raised with LIHTCs can be used for newly constructed and substantially rehabilitated and affordable rental-housing properties for low-income households, and for the acquisition of such properties in acquisition/rehabilitation deals. OCC, Community Developments Insights, Low-Income Housing Tax Credits: Affordable Housing Investment Opportunities for Banks, March 2014 [Revised April 2014]. App. 1697-1698.

The United States Government Accountability Office (GAO) states the LIHTC program

is a housing program.

> The Low-Income Housing Tax Credit (LIHTC) program, established under the Tax Reform Act of 1986, is the largest source of federal assistance for developing affordable rental housing and cost an estimated $8 billion in forgone revenue in 2014.App. 1117, GAO-15-330.

Treasury agrees that the "LIHTC" is the largest source of federal assistance for

developing affordable rental housing." App. 1244, GAO-15-330, Treasury comment.

Treasury's regulation and supervision of the low income housing tax credit program is an activity relating to housing and housing development.

**2. The substantive obligation under the duty to affirmatively further fair housing is to take meaningful actions to overcome the legacy of segregation, unequal treatment, and historic lack of access to opportunity in housing**.

Treasury, in a Revenue Ruling, cites the U.S. Department of Housing and Urban Development for the proposition that the affirmatively further fair housing obligation requires meaningful actions to be taken to overcome the legacy of segregation, unequal treatment, and historic lack of access to opportunity in housing. Treasury further states "AFFH was firmly established Federal housing policy when § 42 was enacted, and there is no suggestion that Congress intended § 42 to diverge from that policy." App. 1597.

The affirmatively further fair housing obligation requires meaningful action to increase the supply of genuinely open LIHTC  housing outside areas of racial segregation and unequal neighborhood conditions. To accomplish this result, Treasury must implement an institutionalized method whereby the impact of LIHTC allocation decisions on the racial segregation and the socio-economic attributes of the neighborhoods and cities in which the projects are to be located is considered before the decisions are made. Compliance with the obligation requires, at a minimum, an obligation to assess negatively those aspects of a proposed course of action that would further limit the supply of genuinely open housing and to assess positively those aspects of a proposed course of action that would increase that supply. If the Treasury is doing so in any meaningful way, one would see, over time, if not in any individual case, Treasury activity that tends to increase, or at least, that does not significantly diminish, the

supply of open housing. *N.A.A.C.P.*, 817 F.2d at 156.

The substantive and procedural obligations under the affirmatively further fair housing statutory obligation have been settled for many decades by judicial decisions, agency interpretations and Presidential declarations and statements. The obligation applies to Treasury. Roisman, *Mandates Unsatisfied: The Low Income Housing Tax Credit Program and the Civil Rights Laws*, 52 U. Miami L. Rev. 1011, 1025 (1998).

**3. Treasury has taken no actions to overcome the legacy of segregation, unequal treatment, and historic lack of access to opportunity in housing in its regulation and supervision of the LIHTC program for housing and housing development.**

Congress enacted the LIHTC program in 1986. Treasury issued its first temporary regulations in 1987 and its first permanent regulations in 1990. Treasury, 52 Fed. Reg. 42116 (Nov. 3, 1987); Treasury, 55 Fed. Reg. 21187 (May 23, 1990). During this same period, Congress held 1987 hearings and found that  racial segregation in housing had changed little from the racial segregation that was in place in 1968. The Chair of the House Judiciary stated that "Despite the present law, discrimination persists and highly segregated housing patterns still exist across the Nation.  App. 1525-1526. The hearings included a Congressional Research Service report that found:

> Like the results obtained from a similar study published in 1966 based on the 1960 Census of Housing, this study finds that the proportion of poor quality units in housing obtained by blacks, and now also Hispanics, is considerably higher than in housing obtained by white households, when they pay the same rent for units of the same size. App. 1527, Cf. 1530-1534.

In a subsequent 1988 hearing, the Judiciary Committee took testimony by two experts on racial segregation, Professors Nancy Denton and Douglas Massey. The testimony and the report concluded that Black residential segregation remained high. App. 1540-1546. The proportion of

Blacks living in the Dallas suburbs had increased by only 0.027 percent, from .126 to .153. App. 1551.

The undisputed facts set out below show that Treasury did not take any actions to comply with its duty to affirmatively further fair housing in the LIHTC housing and housing development program. As a result, the LIHTC program in Dallas is racially segregated. Black LIHTC tenants are subjected to unequal neighborhood conditions. White LIHTC tenants are not as likely to be in the same neighborhood conditions. App. 66.

**4. Treasury has no regulation or other guidance implementing the affirmatively furthering fair housing obligation**.

Treasury has no regulation implementing the affirmatively further fair housing obligation in the LIHTC program. Treasury has no regulation or other guidance requiring meaningful action to increase the supply of genuinely open LIHTC  housing outside areas of racial segregation and unequal neighborhood conditions. Treasury has no regulation or other guidance requiring the use of an institutionalized method whereby the impact of LIHTC allocation decisions on the racial segregation and the socio-economic attributes of the neighborhoods and cities in which the projects are to be located is considered before the decisions are made. Defendants' Answer to First Amended Complaint ¶ 182,[6] Document 49, page 34.Treasury's Responses to ICP Interrogatories 16, 17, and 5 (Response 5 by incorporation). App. 2425, 2430-2432, 2436-2457.

Treasury's responses to ICP's discovery requests for any requirements relating to affirmatively furthering fair housing did not refer to any Treasury regulation that included the phrase "affirmatively further fair housing." The only Treasury revenue ruling or notice in a

---

[6] Defendants' Answer admitted " that Treasury has not promulgated requirements governing the geographic distribution of LIHTC units." Answer to First Amended Complaint ¶ 182. Document No. 49, page 34.

-21-

response that included the phrase "affirmatively further fair housing." was Revenue Ruling

2016–29 issued on December 12, 2016. The Ruling was on the subject whether a local

government approval veto on the allocation of LIHTCs was required or encouraged by 26 U.S.C.

§ 42(m)(1)(A)(ii). App. 1592-1597. The only other Treasury document produced that included

the phrase "affirmatively further fair housing" was the Treasury Dep't, Gen. Explanations of the

Admin.'s Fiscal Year 2017 Revenue Proposals (Feb. 2016). App. 1517, 1519, 1521. Neither the

Revenue Ruling nor the General Explanations imposed any affirmatively further fair housing

obligation on Treasury or the State agencies.

One prerequisite for Treasury taking meaningful action to overcome the legacy of

segregation, unequal treatment, and historic lack of access to opportunity in housing is to have

before it the relevant racial and social information necessary to determine what constitutes

meaningful action. *Shannon,* 436 F.2d at 821-822. Treasury, according to its Answer to the First

Amended Complaint lacks knowledge of any of this information for the country or for the Dallas

area. Defendants' Answer to First Amended Complaint ¶¶ 28-29 (Dallas segregation), 38 (Dallas

segregation and Treasury CDFI Index), LIHTC funding for segregation, 40 (Dallas segregation),

42 - 42 (Dallas area poverty rates), 52 - 53 (unequal conditions by race of neighborhood), 57

(Dallas area segregation), 65-66 (racially segregated occupancy in Dallas area LIHTC projects),

83 (increase in racial segregation of LIHTC units in Dallas area 2000 to 2012). Document No.

49, pages 7-12, 16.

Treasury has only limited information on the number of location of LIHTC projects and it

does not use the information it collects to assess the program. GAO-15-330, 23, 24. Treasury has

no regulation or other requirement that the state Housing Credit Agencies collect the data

showing the racial composition of the locations of the LIHTC projects. Treasury has no regulation or other requirement that the state Housing Credit Agencies collect or use the data showing racial composition of the tenant populations of the LIHTC projects. 26 C.F.R. § 1.42-1 through 1.42-18.

**5. Treasury's list of steps to promote and support fair housing do not substitute for compliance with its obligation to affirmatively further fair housing.**

Treasury's Responses to ICP's Interrogatories did not identify any regulation or other guidance implementing affirmatively furthering fair housing. The responses did not identify any facts upon which an assertion that either Defendant affirmatively furthered fair housing. App. 2396-2408. The responses instead relied upon an assertion that Treasury "has taken a number of steps to promote and support fair housing." The listed steps are:

• issuing 26 C.F.R. § 1.42–9, Rev. Rul. 2016–29, and Notice 2016–77;

• the Memorandum of Understanding with the U.S. Department of Housing and Urban Development and the U.S. Department of Justice; and

• recommending to Congress that it add an allocation preference favoring projects that affirmatively furthering fair housing to state Qualified Allocation Plans (QAP).

These are the only specific actions Treasury identified in its response to Interrogatory No. 5 and the interrogatories incorporating the Response to Interrogatory No. 5. App. 2430-2437

None of the actions substitute for compliance with Treasury's obligation to affirmatively further fair housing by taking meaningful actions to overcome the legacy of segregation, unequal treatment, and historic lack of access to opportunity in housing.

26 C.F.R. § 1.42–9 is the regulation requiring each existing LIHTC unit to be "rented in a a manner consistent with housing policy governing non-discrimination" as evidenced by HUD

rules and regulations. The regulation applies only to units already constructed and being rented and does not include any guidance whether a location perpetuates racial segregation. The penalty for a violation of the regulation is merely technical. Race discrimination in the rental of the unit does not directly affect the availability of the tax credits. The unit will be just be treated as a regular residential unit in the determination whether the project is renting to enough low income tenants to maintain eligibility for the tax credits. 26 C.F.R. § 1.42-9(c).

ICP asked Treasury to state whether 26 C.F.R. § 1.42-9 applies to prevent the use of federal tax credits for housing units to be located in racially concentrated, high poverty, low income areas marked by conditions of slum, blight, and distress thereby perpetuating racial segregation. Treasury admitted in that response that it had not issued regulations that govern the location of LIHTC units. App. 2425-2430.

The regulation incorporates HUD rules and regulations governing non-discrimination. 26 U.S.C. § 1.42-9. The rules and regulations are used to "determine whether the unit is rented in a manner consistent with non-discrimination. *Id*. Among the rules and regulations incorporated are the HUD regulations defining the substantive violations of the Fair Housing Act: 42 U.S.C. § § 3604, 3605, 3606, and 3617. 24 C.F.R. Part 100. There is no mention of federal, state, local, or private entity obligation to comply with 42 U.S.C. § 3608(d) and affirmatively further fair housing in 24 Part 100. While LIHTC siting approval decisions by local agencies may violate those substantive provisions, the decisions would not be relevant to determine whether the unit is rented in a manner consistent with non-discrimination, the charge of 26 C.F.R. § 1.42-9. Similarly, Treasury or state related decisions that violated 42 U.S.C. § 3608(d) would not be relevant to determine whether the unit is rented in a manner consistent with non-discrimination,

the charge of 26 C.F.R. § 1.42-9.

The examples of discriminatory conduct set out in 24 C.F.R. Part 100 do not include actions violating the obligation to affirmatively further fair housing. Actions that violate the substantive provisions of the Fair Housing Act or other civil rights laws and the U.S. Constitution also violate 42 U.S.C. § 3608(d) if done by a party subject to that act. *Clients' Council*, 711 F.2d at 1425. But the scope of the 3608(d) is not limited to such violations. The obligation to affirmatively further fair housing goes beyond the obligation not discriminate or not to provide federal assistance to entities engaged in racial discrimination. *NAACP*, 817 F.2d at 154-156; *Shannon*, 436 F.2d at 816, 820-821. For example, both HUD and the City of Baltimore avoided liability under the substantive provisions of the Fair Housing Act and the Constitution. *Thompson v. U.S. Dept. of Hous. & Urban Dev.*, 348 F. Supp. 2d 398, 439, 441, 451, 453, 464 (D. Md. 2005). Yet the District Court found the Federal Defendants were liable for violations of the Fair Housing Action of 1968, 42 U.S.C. § 3608(e)(5). *Thompson*, 2006 WL 581260, at *12 (D. Md. 2006).

The HUD Regulations referred to in 26 C.F.R. § 1.42-9 does include the HUD Affirmatively Further Fair Housing Regulations since it includes all of the HUD regulations in the Code of Federal Regulations.[7] Treasury asserts that since the state agencies receive HUD funds, the agencies are thus subject to HUD's affirmatively furthering fair housing rule.

> Additionally, Treasury understands that most or all state HCAs receive Federal funds independent of the HCAs' role in administering LIHTCs. As a result, they would be subject to HUD's Affirmatively Furthering Fair Housing ("AFFH") rule.

---

[7] "residential rental unit is for use by the general public if the unit is rented in a manner consistent with housing policy governing non-discrimination, as evidenced by rules or regulations of the Department of Housing and Urban Development (HUD) (24 CFR subtitle A and chapters I through XX)." 26 C.F.R. § 1.42-9.

See HUD, AFFH, 80 Fed. Reg. 42272, 42298 (July 16, 2015). App. 2429-2430.

The initial barrier to transferring affirmatively furthering fair housing to HUD is that GAO has found that Congressional authorization and funding are currently unsatisfied prerequisites for HUD involvement in the administration of the LIHTC program. App. 1154-1155, GAO, Low-Income Housing Tax Credit, GAO-15-330, page 39.

In addition, there is vigorous state opposition to the HUD position that the HUD affirmatively furthering rules apply to non-HUD funded programs such as the LIHTC program. App. 1598-1605, TDHCA comment in opposition.

Even assuming that the HUD position is correct, Congress has limited the remedial options to the specific state programs funded by HUD. If, for example, it is the State of Texas' receipt of funds pursuant to one or more of the HUD Community Development Block Grant or related programs, the remedial statute is 42 U.S.C. § 5311. The Secretary of HUD's remedial actions are limited to the funds in the program affected. LIHTC funding is not a CDBG funded program. 42 U.S.C. §§ 5301-5321. If the HUD Secretary found that TDHCA was violating its affirmatively furthering fair housing obligation by the manner in which it was operating the LIHTC program, the Secretary could:

(1) terminate CDBG payments to TDHCA, or

(2) reduce CDBG payments to TDHCA by an amount equal to the amount of such payments which were not expended in accordance with the CDBG affirmatively furthering fair housing obligation, or

(3) limit the availability of CDBG payments to TDHCA programs, projects, or activities not affected by such failure to comply. 42 U.S.C. § 5311(a). If HUD convinces the Attorney

General to seek judicial relief, the stated relief would be to recover the amount of the CDBG assistance which was not expended in accordance with the affirmatively further fair housing obligation. 42 U.S.C. § 5311(b).

The denial of unrelated CDBG funds for actions affecting a program not funded or even administered by HUD would raise the due process concerns that 42 U.S.C. § 5311 was passed to avoid. *City of Boston v. U.S. Dep't of Hous. & Urban Dev.*, 898 F.2d 828, 833 (1st Cir. 1990).

None of these issues are presented by the straightforward administration of the LIHTC program by Treasury in compliance with Treasury's obligation to affirmatively further fair housing.

The second action Treasury cites as an alternative to affirmatively furthering fair housing is the publication of Rev. Rul. 2016-29 discussing the racially discriminatory effect of local approval or veto LIHTC selection critieria. The Ruling was published on December 12, 2016, two years after the filing of this lawsuit and eight years after ICP petitioned Treasury's IRS for rule making and raised the issue. App. 1576, 1583. The Ruling, while affirming the continued applicability of the affirmatively furthering fair housing obligation to the LIHTC program, nevertheless allows the continued use of QAP selection criteria setting out local veto provisions by tax credit agencies despite Treasury's determination that such provisions violate the national fair housing policy enacted in the Fair Housing Act. App. 1592-1597.

The Ruling discusses four local veto selection criteria with racially discriminatory effects:

• support by neighborhood organizations;

• commitment of funding by the local political subdivision;

• support from the state legislator; and

• approval of the locality where the project is proposed. App. 1593, 1595.

GAO found that the use of one or more of these provisions was common in many of the state Qualified Allocation Plans. App. 1184, 1201-1203. GAO stated that HUD's fair housing concerns about the use of these provisions had been directly communicated to Treasury.

> Moreover, research conducted by HUD and others has analyzed how scoring criteria (like letters of local support) can influence project location and HUD officials have expressed fair housing concerns about these letters. Specifically, officials from HUD's Office of Fair Housing and Equal Opportunity and Office of General Counsel have cited fair housing concerns in relation to any preferences or requirements for local approval or support because of the discriminatory influence these factors could have on where affordable housing is built.25 In 2013, HUD and other participants in the Rental Policy Working Group—which was established by the White House to better align the operation of federal rental policies  across the administration—shared these concerns with Treasury. These HUD officials suggested that eliminating local approval or support requirements or preferences from QAPs should be top priorities for Treasury and IRS, based on fair housing concerns. App. 1203-1204.

Instead of eliminating these local approval or support requirements as recommended, the Ruling just states that the tax code does not require or encourage such provisions. App. 1597.Texas or any other state can continue to use QAP selection criteria that include these local veto provisions that have the effect of perpetuating racial segregation. Texas has continued to use all four of the local veto policies in its QAP. 10 TAC § 11.9 (d)(1), (Local Government support for up to 17 points);  10 TAC § 11.9 (d) (2), (commitment of development funding by local political subdivision for 1 point);  10 TAC § 11.9 (d) (4), (quantifiable community participation showing support by local neighborhood organizations for up to nine points); 10 TAC § 11.9 (d) (5), (support from state representative for up to eight points).  Thus, Texas awards up to 34 total points for these local veto provisions. Once developers know that one of the veto provisions will be used, they will often not file complete applications. App. 897. Lack of local support prevents

applications in White areas from receiving allocations. App. 897. This Revenue Ruling is not a

substitute for affirmatively furthering fair housing. *N.A.A.C.P.*, 817 F.2d at 156; *Shannon*, 436

F.2d at 819, 821-822; 24 C.F.R. § 5.150, § 5.152.

The third step Treasury claims shows its support for fair housing is its publication of

Notice 201-77 on December 12, 2016. The notice "reminds taxpayers" that a project is not

entitled to the third preference in 26 U.S.C.§42(m)(1)(B)(ii)(III) unless its development

contributes to a concerted community revitalization plan. The Notice does not mention

affirmatively furthering fair housing. It does admits that:

> Placing LIHTC projects in qualified census tracts risks exacerbating
> concentrations of poverty. Therefore, § 42(m)(1)(B)(ii)(III) grants a preference to
> that placement only when there is an added benefit to the neighborhood in the
> form of the project's contribution to a concerted community revitalization plan.
> Notice 2016–77. App. 1450.

The notice states that the preference does not apply unless "not later than the allocation, a

plan exists that contains more components than the LIHTC project itself." The notice explains

that the Department has not defined the term "concerted community revitalization plan" and

requests comments on the subject. App. 1450. The Notice imposes no penalty for granting the

preference without a concerted community revitalization in place. The Notice imposes no remedy

for the persons adversely by the granting the preference without a concerted community

revitalization in place. App. 1449-1451.

Treasury has no knowledge whether LIHTC projects contribute to revitalization since

Treasury does consider the location of the LIHTC projects. App 1141-1142.  Treasury's Answer

establishes that it does not know whether or not the LIHTC units in the Dallas  neighborhoods

have  contributed to or been accompanied by community revitalization. Document 49, page 11, ¶

58. The neighborhood conditions show the continued, worsening conditions in the Dallas neighborhoods and few signs of revitalization. App. 83-341, 598-614.

The fourth step asserted by Treasury to support fair housing is The Memorandum of Understanding with the U.S. Department of Housing and Urban Development and the U.S. Department of Justice (MOU). The MOU does not mention affirmatively furthering fair housing but is directed at  remedying Fair Housing Act violations by LIHTC property owners who refuse to rent on the basis of race or other protected categories. App. 1569-1575. The MOU reduces Treasury's role in remedying these Fair Housing Act violations by LIHTC property owners to either denying a taxpayer's current claimed LIHTCs and/or recapturing previously claimed LIHTCs, as may be appropriate under the circumstances. App. 2427-2428.

The Treasury staff memo recommending that Treasury Secretary Summers sign the Memorandum made clear that the process applied only to existing property owners' refusal to rent units in compliance with the Fair Housing Act. App. 1452.  The MOU does not include any standards which would help avoid placement of housing in highly minority and poverty concentrated areas. App. 1490, Rental Policy Working Group, 12/31/2011. The White House convened this interdepartmental group that recommended a revision of the MOU to include such siting standards for LIHTC projects. App. 1492. The group reported that the MOU's focus has been limited to improving inter-agency technical operations issues, rather than focusing on addressing substantive civil rights policy concerns. App. 1489.

The 2000 Memorandum does not include any reference to the obligation to affirmatively further fair housing. App. 1569-1575. This omission differs from the Memorandum of Understanding between HUD and the U.S. Department of Agriculture signed in 1998. The

HUD/USDA MOU includes procedures for processing Fair Housing Act complaints as does the HUD/Treasury/DOJ MOU.  Then the HUD/USDA MOU goes on to recognize USDA's obligation to affirmatively further fair housing in its programs and activities relating to housing. App. 1440. The USDA/HUD MOU includes an entire section setting out USDA's obligation to affirmatively further fair housing in all of its programs relating to housing and urban development. USDA agreed to undertake a review of all its related programs, identify impediments to fair housing, and revise the documents as necessary. App. 1441-1442.

The last action referred to in the interrogatory response was Treasury's 2016 recommendation to Congress that Congress add an allocation preference favoring projects that affirmatively furthering fair housing to state Housing Finance Agencies' QAPs. App. 1506-1522. This document,  "General Explanations of the Administration's Fiscal Year 2017 Revenue Proposals," contains the following references to affirmatively furthering fair housing:

> None of these criteria or factors, however, unambiguously requires States to allocate housing credit dollar amounts in a manner that affirmatively furthers fair housing, even though Federal agencies administering housing programs or activities are subject to such a requirement. App. 1517.
> . . .
>  LIHTCs are the Federal Government's largest vehicle supporting the construction and rehabilitation of affordable housing. Because Federal law has made State agencies responsible for allocating the potential to earn LIHTCs, there should be no doubt that these agencies must do so in a manner that affirmatively furthers fair housing. App.  1519.
>
> Add furthering fair housing and preservation of publicly assisted affordable housing to allocation criteria The proposal would add a fourth required allocation preference to clarify States' responsibilities to make allocations in a manner that affirmatively furthers fair housing. The proposal would also add preservation of publicly assisted affordable housing as an eleventh selection criterion that QAPs must include. App. 1521.

The recommendation has not been enacted. There are still only three statutory

preferences. 26 U.S.C. § 42(m)(1)(B)(ii).

None of the actions Treasury cites as steps to promote and support fair housing have enacted a regulation or other guidance requiring meaningful action to increase the supply of genuinely open LIHTC  housing outside areas of racial segregation and unequal neighborhood conditions. None of the actions Treasury cites as steps to promote and support fair housing have enacted a regulation or other guidance requiring implementation of an institutionalized method whereby the impact of LIHTC allocation decisions on the racial segregation and the socio-economic attributes of the neighborhoods and cities in which the projects are to be located is considered before the decisions are made. App. 2430-2432, 2436. None of the actions cited by Treasury requires meaningful actions to be taken to overcome the legacy of segregation, unequal treatment, and historic lack of access to opportunity in housing. None of the actions cited have either reduced racial segregation or increased the supply of open housing.

**6. Treasury's failure to take meaningful actions to prevent the legacy of segregation from applying to LIHTC program dates from the beginning of the LIHTC program to the present.**

The obligation to affirmatively further fair housing in all federal department or agency actions relating to housing and urban development was part of the original Fair Housing Act and pre-dates the LIHTC program. App. 1597. Prior to the enactment of the LIHTC program in 1986, Treasury was regulating and administering another program relating to housing. This was the multifamily tax exempt bond program to provide affordable rental housing to low and moderate income individuals. 26 U.S.C. § 103; 26 C.F.R. § 1.103-8(b).  Nagel, and St. Onge, *Housing Bonds and Tax Reform: The Perils of a Partial Analysis of Low-Income Housing Programs*, Yale Law & Policy Review, Vol. 6: Iss. 2, Article 3. Treasury did not enact any regulations or other

requirements implementing affirmatively furthering fair housing for its administration of this program. 26 C.F.R. § 1.103-8.

There have been no affirmatively further fair housing regulations in Treasury's initial or subsequent LIHTC regulations.

From 1990 through the present, racial segregation in the distribution of LIHTC units has increased.

The racial segregation in the national LIHTC units increased from 41% in minority areas to 48% in minority areas. The HUD reports and other HUD data show that:

• from 1995 to 2002, 41% of the U.S. total LIHTC units were in tracts with over 50% minority population. App. 1613, 1623.

• from 1995 to 2006, 43.6% of the U.S. total LIHTC units were in tracts with over 50% minority population. App. 1661, 1672, HUD, "Updating the Low-income Housing Tax Credit (LIHTC) Database: Projects Placed in Service Through 2006," January, 2009, page 44.

Using other HUD LIHTC data, by 2015, 49% of the U.S. total LIHTC units were in tracts with over 50% minority population.  App. 54.

The increases in racial segregation of  LIHTC units in the Dallas Metropolitan Area were greater. Racial segregation in the Dallas area increased from 65% in predominantly minority areas to over 80% by 2015. The HUD reports show that:

• from 1995 to 2002, 65% of the Dallas metropolitan area (PMSA) LIHTC units were in tracts with over 50% minority population. There were 14,706 total LIHTC units placed in service during these years, App. 1634;

• from 1995 to 2006, 69% of the Dallas PMSA LIHTC units were in tracts with over 50%

minority population. App. 1683.

Using other HUD LIHTC data, by 2015, 80% or more of the LIHTC units in the Dallas seven county metropolitan area were in census tracts that were 50% or more minority in population. App. 54.

During this period, other government entities and a national fair housing panel called attention to the racial segregation in the LIHTC program. As set out in the following paragraphs, these entities recommended actions that would have affirmatively furthered fair housing in the LIHTC program. Treasury refused to adopt any affirmatively furthering fair housing regulation to overcome the legacy of segregation, unequal treatment, and historic lack of access to opportunity in housing.

In 1993 the U.S. Government Accounting Office studied public housing authorities that had developed public housing and LIHTC projects. The GAO found that the federal LIHTC units were more likely than traditional public housing to be developed on sites in predominantly minority neighborhoods. App. 904, 907=908, 913, GAO/RCED-93-31. GAO found that in the early 1970s HUD had placed restrictions on the location of public housing units to prevent the perpetuation of racial segregation for low income and minority households but no such restrictions existed in the LIHTC program.

> In addition, more tax credit projects than public housing projects were developed in predominantly low-income neighborhoods, and more were located in predominantly minority neighborhoods. App. 908.

In December 2008, the National Commission on Fair Housing and Equal Opportunity issued the Future of Fair Housing Report.[8] The Commission made several findings and

---

[8] The Commission was formed by national civil rights organizations and chaired by two former HUD Secretaries, Jack Kemp and Henry Cisneros. Future, at page 2 Executive

recommendations relevant to affirmatively furthering fair housing in the LIHTC program.

> The Low Income Housing Tax Credit (LIHTC) program, administered by the Internal Revenue Service and state housing agencies is the nation's largest low-income housing production program and yet has operated with little or no civil rights oversight since its inception in 1986. This program must be reformed to include fair housing requirements for site selection, affirmative marketing, and reporting of racial/ethnic data to ensure that this program works to further fair housing goals. App. 1480.
> . . .
> As Professor Florence Roisman testified, "Neither Treasury nor the housing finance agencies have taken effective steps to require even that racial segregation be taken into account when decisions are made about where to site LIHTC developments. There are also no affirmative marketing, racial data reporting or other fair housing requirements in the Department of Treasury's LIHTC regulations and decisions about which projects to fund are entirely delegated to the states. App. 1484.

In 2008, ICP filed a petition with Treasury's Internal Revenue Service for regulations that would affirmatively further fair housing in the LIHTC program.  App. 1576-1589. The only government response was a request that ICP withdraw the petition. ICP did not withdraw the petition. App. 1590.

The national civil rights law and policy organization Poverty Race Research Action Council submitted letters informing Treasury officials of the racial segregation in the LIHTC program and requesting administrative action by Treasury to take meaningful action including regulating to address the segregation. App. 2835-2849.

The Rental Policy Working Group - which was established by the White House to better align the operation of federal rental policies – found that Treasury, and other agencies, needed to address

> 6) the lack of consistent site and neighborhood standards in the low-income

---

Summary. The report is available athttp://nationalfairhousing.org/wp-content/uploads/2017/04/Future_of_Fair_Housing.pdf .

> housing credit program which would help avoid placement of housing in highly
> minority and poverty concentrated areas. App. 1490

and

> the lack of consistent application of affirmative fair housing marketing in the
> low-income housing credit program that are utilized in other Federal housing
> programs; . . . App. 1490.

In 2013, HUD and other participants in the Rental Policy Working Group suggested that

Treasury eliminate local approval or support requirements or preferences from QAPs should be

top priorities for Treasury and IRS, based on fair housing concerns.  App. 1203-1204.

Dr. Raj Chetty, author of a research project done along with Treasury's IRS, made

recommendations  that Treasury and other agencies take racial integration into account in the

administration of their housing programs.

> We spend about $45 billion in the U.S. on affordable housing programs.  Housing
> vouchers, affordable housing, provision by the government, when we are thinking
> about those policies its extremely important to think about residential integration
> as something we want to achieve because  that matters for long-term success areas
> for children.
> . . .
> At the practical level, what might you do? In the section eight housing voucher
> program, 80% of people who have those vouchers are using them in high poverty,
> low opportunity areas. Working to develop a set of pilot programs that change that
> number so that people can find affordable areas that deliver much better
> opportunities for their kids. Using the same assistance that they get from system
> stays in from the government. You increase integration and improve outcome
> without greater expense. A real opportunity bargain that can be achieved. That is
> one example of a simple change that does not require additional expenditure,
> figuring out how to get families better information or assistance in renting in areas
> that will provide better opportunities. Another example, the big tax credit in the
> U.S. for long-term housing credit to build affordable housing. The way it works is
> that developers get larger credits to build in areas with lower levels of income.
> What that entity is that it amplifies segregation because rather than having more
> affordable housing and mixed income areas, you have additional affordable
> housing in what are already high poverty areas. You're further segregating
> communities by income going in the opposite direction. Thinking about some
> changes in the housing policy context can be quite valuable.

App. 2855-2856.

The questions answered were those proposed by Treasury to Dr. Chetty before the forum. App. 2496, 2499, 2502. Treasury has taken no action to implement Dr. Chetty's recommendations and findings. App. 2452-2453, Treasury 30(b)(6) No. 14.

In 2015, GAO recommended Treasury eliminate local approval or support requirements or preferences from Qualified Allocation Plans used by state agencies because of the racially discriminatory effects of the provisions.   App. 1203-1204.

**7. Treasury's failure to affirmatively further fair housing in the LIHTC program has significantly diminished the supply of open housing and increased racial segregation.**

If a Federal executive agency activity affirmatively furthers fair housing, then this would increase the supply of open housing and prevent the diminution of that supply.  *N.A.A.C.P.* 817 F.2d at 156. Treasury's failure to affirmatively further fair housing has caused a diminution of that supply as set out above. Treasury has also failed affirmatively further fair housing by promoting the use of LIHTC housing in Dallas to contribute to the revitalization of the areas in which the LIHTC units have been placed as set out above. Treasury could have prevented both results.

Racial segregation in the LIHTC program has increased over time in the Dallas area as set out above. However, during this period, there were a substantial number of units in applications for LIHTC projects to be located in majority White non-Hispanic areas. From 2009 through 2017, there were 21,954 units in applications for LIHTC projects to be located in Dallas metropolitan Division majority White non-Hispanic census tracts. Only 3,750 units were in applications allocated LIHTCS, 21% of the units in applications. During this period, 6,883units in applications for locations in minority concentrated areas received allocations. App. 67. Had

the same number of units in applications for majority White locations been approved, the percentage of LIHTC units would have increased open housing in White areas from by over 3,000 units even with no decrease in the number of units in minority areas. A regulation prohibiting the use of local approval vetos would have at least kept many units in applications for majority White non-Hispanic areas in the running for allocations in the Dallas areas. App. 897. A regulation enforcing the obligation to provide revitalization in return for a low income area preference would have more weight than Treasury's "reminder" in causing revitalization. App. 1449-1451. A Qualified Allocation Plan that did not properly allocate units with the preference could receive $0 in housing tax credits allocated by Treasury. 26 U.S.C. § 42(m)(1)(A), (B).

The continued absence of a reasonable number of housing opportunities outside of historically segregated and blighted low-income areas is itself evidence that the neighborhood blight accompanying racial segregation will continue and increase. *Shannon*, 436 F.2d at 819-821, 822; HUD, 80 Fed. Reg. at 42279. The specific evidence of the conditions in the racially segregated, blighted, and low income areas of Dallas with LIHTC units confirms the continuation and increase in the urban blight affecting the residents of the LIHTC units and the surrounding neighborhoods. Because of the failure to create the reasonable number of units in White neighborhoods, the conditions of blight will continue to bear more heavily on Black LIHTC tenants than on White non-Hispanic LIHTC tenants. App. 66.

The first 21 listed neighborhoods in the conditions exhibit are the location for 19,425 of the 26,009 units in the City of Dallas. App. 83-341, 9. All of the neighborhoods are predominantly minority in population. All of the neighborhoods have poverty and childhood poverty rates in excess of the City or the metropolitan area. All are in high crime areas. All are at

the highest Treasury Distress Index rating of 4.  The elementary schools have high percentages of financially disadvantaged students and low HUD rankings. All have large numbers of housing vouchers, many of which are in the LIHTC projects. App. 83-341.

The listed 1,051 units in majority White locations are in four census tracts. App. 21-22. These tracts range from 54% White non-Hispanic to 79% White non-Hispanic.[9] Three of the LIHTC projects are located in downtown locations. App. 363, 468. All of these locations show substantially different and better neighborhood conditions than the census tracts in which the LIHTC units have been concentrated. App. 363-371, 468-477, 549-559.

The failure to affirmatively further fair housing in the LIHTC program has also diminished the supply of open housing for the housing choice voucher program in the Dallas area. Federal and state law prohibit LIHTC projects from discriminating against voucher participants. 26 U.S.C. § 42(h)(6)(B)(iv); Tex. Gov't Code § 2306.269(b). However, since LIHTC units are disproportionately located in minority areas marked by conditions of slum, blight, and distress voucher tenants must rely on the private market for units in the low poverty, non-minority concentrated areas. Many of the private market landlords in those areas refuse to accept vouchers. There are several Dallas area suburbs in which there are no multifamily landlords who will state they accept voucher tenants. App. 843-861.

The racial segregation of the LIHTC units contributes to the racial segregation of the voucher units. Given the lack of housing opportunities in White areas, a substantial number of LIHTC units in minority areas are and have been occupied by housing voucher households. Given the number of LIHTC units in some minority tracts, the number of voucher units in the

---

[9] The White Rock Creek Apartments in tract 81 have been demolished. App. 461.

LIHTC projects may be a substantial number of the vouchers in the census tract. The increase in LIHTC units can be accompanied by an increase in vouchers in the same area. From 2000 to 2016 vouchers increased by 518 in tract 166.05 (App. 117), 396 in West Dallas, (App. 255), 358 in combined tracts 109.02/109.03/109.04 (App. 130), 300 in South Dallas (App. 101), 292 in 123.02 (App. 187), and 119 in Jim Miller Road (App. 87). If racial segregation in the LIHTC units is avoided, so is the segregation in the voucher program.

**8. Treasury's stated reason for not regulating on the subject of LIHTC locations is not a lawful reason for its refusal to affirmatively further fair housing in the LIHTC program.**

Treasury's failure to implement its affirmatively further fair housing is not justified by any conflict with provisions in the LIHTC related sections of the Tax Code. 26 U.S.C. § 42. Treasury argues the LIHTC provisions of the Tax Code provide that the decision on project approvals including consideration of the project location is for the State agencies. The local decision provisions do not conflict with the obligations of 42 U.S.C. § 3608(d). There are no explicit or implied statutory or legislative history provisions that would support the argument that 42 U.S.C. § 3608(d) was repealed by the LIHTC provisions of the Tax Code. Repeals by implication are not favored and will not be presumed. *Nat'l Assn. of Home Builders v. Def. of Wildlife*, 551 U.S. 644, 662 - 664 (2007).

There are no specific provisions of the LIHTC statute or its legislative history that would limit or prevent the application of 42 U.S.C. § 3608(d).  There has been no "silent"reversal of the application of the obligation to the LIHTC program.

> AFFH was firmly established Federal housing policy when § 42 was enacted, and there is no suggestion that Congress intended § 42 to diverge from that policy. App. 1597.

In addition, the specific provision of the Fair Housing Act at issue, 42 U.S.C. § 3608(d) was amended and clarified to specifically include financial regulatory agencies after the LIHTC statute was initially enacted. The LIHTC statute was enacted in 1986. App. 1494-1505. 42 U.S.C. § 3608(d) was clarified by adding the provision that federal agencies having regulatory or supervisory authority over financial institutions are covered in 1988. PL 100–430 (HR 1158), PL 100–430, September 13, 1988, 102 Stat; H.R. REP. 100-711, 32, 1988 U.S.C.C.A.N. 2173, 2193.

When the LIHTC program was made permanent in 1989, neither the statute nor the legislative history contained any provisions on the the effect of the Tax code on the Fair Housing Act, the other civil rights laws, and federal judicial jurisdiction to remedy violations of those laws. H.R. CONF. REP. 101-386 (1989); House Report 101 - 247. App. 2226-2242.

The operation of 42 U.S.C. § 3608(d) is consistent with local housing site selection decisions. A compelling example is the operation of the HUD affirmatively furthering fair housing site selection regulation in conjunction with the statutes setting out the various HUD programs requiring local government and private site selection decisions.

There is no doubt that HUD must comply with its obligation to affirmatively further fair housing in its administration of the public housing program even though it is neither the developer, builder, or owner of the projects. App. 2192-2194.

> The Department of Housing and Urban Development (HUD) does not plan, select sites for or build any housing. Public and private sponsors submit proposals for federal housing assistance to HUD based on their own plans for building on sites they select. HUD's function is to react to their initiatives in accordance with constitutional and statutory limitations. App. 2193.

HUD's 42 U.S.C. § 3608(d) obligation applies to public housing which has an explicit local government approval requirement that is more specific and restrictive than the LIHTC

provision of authority to state Housing Finance Agencies. 42 U.S.C. § 1437(c)(e), public

housing; 26 U.S.C. § 42(m)(1)(B)( i), LIHTC local criteria. No grants can be made for public

housing development unless the local governing body has approved the application by the public

housing authority and entered into an agreement to provide the necessary local cooperation in the

development of the public housing. 42 U.S.C. § 1437(c)(e)(1), (2).

Unless there is a qualified allocation plan, one that complies with 26 U.S.C. § 42, no tax

credits can be awarded. 26 U.S.C. § 42(m)(1)(A). Treasury has not regulated the content of the

qualified allocation plan required selection criteria. 26 C.F.R. § 1.42-17. These selection criteria

include "project location." U.S.C. § 42(m)(1)(C). The LIHTC Statute does not give more detail.

The legislative history adds a parenthetical list of examples for the phrase. The list is "e.g., broad

geographic distribution, designated targeted areas such as inner cites, Community Development

Block Grant neighborhoods, distressed communities, pockets of poverty, and rural areas." House

Report 100 - 247 at 1196. The reference to "broad geographic distribution" is first in the list. A

state agency could list all of the examples as well as other factors in its selection criteria and

comply with 26 U.S.C. § 42(m)(1)(C). Treasury controls the LIHTC allocation to the states and

can require affirmatively furthering fair housing through its regulation of the allocation process.

In addition to not regulating the content of the required selection criteria QAP provisions,

Treasury has not monitored or otherwise taken action to determine state compliance with this

provision of the LIHTC Statute. GAO 15-330, pages 18-19. Regulation of project locations is a

fundamental part of taking meaningful action to meaningful action to overcome the legacy of

racial segregation, unequal treatment, and historic lack of access to opportunity in housing.

*Shannon*, 436 F.2d at 816, 819-822. Treasury's refusal to use its power to provide for the

affirmatively furthering fair housing obligation with regard to project location violates 42 U.S.C. § 3608(d).

**B. The Office of the Comptroller of the Currency**

**Introduction**

National bank or national bank investment related entities own 54 LIHTC projects in the City of Dallas with a total 9,220 LIHTC units that are located in racially segregated, low income concentrated, high poverty census tracts. More than ninety percent (90%) of the national bank owned LIHTC units in the City of Dallas are in predominantly minority census tracts. The bank owned, minority located LIHTC units are 55% of the LIHTC units in these census tracts that have been approved since 1995.[10] App. 772. The bank owned LIHTC units are 2,820 more units than the 6,400 public housing non-elderly units that were in the racially segregated public housing program for the City of Dallas. App. 897.  Like the public housing projects, the bank owned LIHTC projects are disproportionately located in census tracts marked by unequal conditions of blight compared to the LIHTC units in which White LIHTC tenants reside.App. 84-298, 310-341, 372-394, 527-537 (minority tracts), 549-569 (majority White non-Hispanic tracts). Like the public housing units, the national bank owned LIHTC units are racially segregated. App. 84-298, 310-341, 372-394, 527-537.

The national bank investments in LIHTC projects must be designed primarily to benefit the public welfare. 12 U.S.C. § 24 (Eleventh). OCC regulates and administers national bank ownership of and investments in LIHTC units under the Public Welfare Investment standard (PWI). The Comptroller of the Currency stated that these investments are critical to the success

---

[10] 1995 is the first year a national bank investment is made in Dallas after the initial Public Welfare Regulations were passed by OCC. App. 773.

of the low income housing tax credit program.

> Public welfare investment is also critical to the success of several Federal tax credit programs that support low-income housing, new markets economic development, historic renovation, and renewable energy facilities. In order to receive tax credit benefits a bank must be an owner or leaseholder, which is possible only because the public welfare investment authority allows a bank to invest in and hold real estate—an activity that typically would not be permissible under the National Bank Act. Remarks by Thomas J. Curry, Comptroller of the Currency, February 27, 2013, page 4.

National banks and related entities purchased 85% of the LIHTCs in the country in 2012 under the public welfare investment program. App. 718. Document No. 49, page 5, ¶ 22.

OCC has chosen to regulate national bank LIHTC ownership by exempting most national bank investments from any form of OCC review under the Public Welfare Investment standard. 12 C.F.R. § 24.6(a)(4);12 C.F.R. § 24.6(a); App. 2348-2349.  OCC made this choice to encourage bank LIHTC ownership by eliminating federal review. 60 Fed, Reg. 67049, December 1995. Whether or not this choice is legal under the Public Welfare Investment Act, it violates 42 U.S.C. § 3608(d). *Shannon*, 436 F.2d at 816. OCC has taken no action to implement the obligation for meaningful action to overcome the legacy of racial segregation, unequal treatment, and historic lack of access to opportunity in housing  in the national bank ownership of and investment in LIHTC projects.

**1. OCC denies that 42 U.S.C. § 3608(d) applies to its administration of the Public Welfare Investment program involving bank ownership of LIHTC projectsand denies that it has ever taken any action to apply 42 U.S.C. § 3608(d) in that regard.**

OCC's Responses to ICP's Interrogatories establishes the following facts.

A. The OCC denies that it is required to utilize some institutional method whereby it would have before it the  relevant racial and socio-economic information necessary for compliance with its duties under 42 U.S.C. § 3608(d).

refus[ed] to utilize some institutional method whereby, . . . [the] OCC would have before it the relevant racial and socio-economic information necessary for compliance with its duties under the U.S. Constitution, 42 U.S.C. § 3604, and 42 U.S.C. § 3608(d)," because the OCC denies that the Constitution, 42 U.S.C. § 3604, and 42 U.S.C. § 3608(d) require that it utilize any such institutionalized method. The OCC does not understand either the Constitution or the Fair Housing Act to require the OCC to take any particular action in considering applications for PWIs involving LIHTC projects. App. 2489-2490.

B. OCC denies that it has any duties under 42 U.S.C. § 3608(d) with respect to LIHTCs because no such duties are contained in the National Bank Act, 12 U.S.C. §§ 1(a), 24, 1818. In addition, OCC denies it has any duties under 42 U.S.C. § 3608(d) with regard to LIHTC because LIHTC recipients propose and state HCAs select the affordable housing projects for LIHTCs. OCC asserts that as part of the selection process, state HCAs require recipients to demonstrate compliance with federal, state, and local fair housing law.App. 2490 OCC Response to ICP Interrogatory No. 4. OCC admits that it has no regulation or other requirement governing the geographic distribution of LIHTC units. Document No. 49, page 34-35, ¶ 184.

C. OCC identified no action it took to affirmatively further fair housing in the administration of the public welfare approval of national banks' investments in LIHTC projects. When asked to do so, OCC listed no activity that involved the OCC's administration of the public welfare investment program with regard to LIHTC's and no activity that involved LIHTCs. The only mention of the public welfare investment program was that

> The OCC considers a bank's compliance with anti-discrimination statutes and regulations, in addition to a number of other factors, to determine whether it is eligible to file after-the-fact notification of a PWI. See 12 C.F.R. § 24.2(e). App. 2428-2489, 2491-2493.

**2. The Office of the Comptroller of the Currency's regulation and administration of national bank investments and ownership of LIHTC projects is subject to and bound by the 42 U.S.C. § 3608(d) executive agency obligation to affirmatively further fair housing.**

The Fair Housing Act as enacted in 1968 requires that all executive departments and agencies shall administer their programs and activities relating to housing and urban development in a manner affirmatively to further the purposes of the Fair Housing Act. 42 U.S.C. § 3608(d). OCC is a Federal executive department or agency that administers a program and engages in activities relating to the  LIHTC housing program.

The phrase "(including any Federal agency having regulatory or supervisory authority over financial institutions)" was added to 42 U.S.C. § 3608(d) by the Fair Housing Amendments Act of 1988. See Pub. L. 100-430, § 7(b), 102 Stat. 1623 (1988).  H.R. REP. 100-711, at 2193.

All executive departments and agencies shall administer their programs and activities relating to housing and urban development **(including any Federal agency having regulatory or supervisory authority over financial institutions)** in a manner affirmatively to further the purposes of this subchapter and shall cooperate with the Secretary to further such purposes. 42 U.S.C. § 3608(d) (emphasis added).

OCC is a Federal executive department or agency that has regulatory or supervisory authority over financial institutions. 12 U.S.C. § 1.

## 2. OCC's regulation and administration of national bank ownership of LIHTC projects is a program relating to housing and thus subject to 42 U.S.C. § 3608(d).

OCC has a specific program with activities relating to housing. The program for national bank public welfare investments in housing is established by 12 U.S.C. § 24 (Eleventh). OCC administers the Public Welfare Investment program by setting the procedural and substantive rules that govern national bank investments in the ownership of and the ownership of LIHTC rental housing projects. 12 C.F.R. § 24.1. OCC asserts that its authority to regulate and supervise this program relating to housing  is pursuant to 12 U.S.C. 24(Eleventh), 93a, and 481.12 C.F.R. § 24.1(a). Absent OCC action that approves or at least does not disapprove the investment, national banks do not have the legal authority to invest in the ownership or own LIHTC projects. App.

2255, 2329-2332.

OCC's regulation specifically encourages national banks to make  investments eligible under 12 C.F.R. § 24.3 and sets out the standards and procedures that apply to these investments. 12 C.F.R. § 24.1(b). The eligibility for public welfare investments set out in 12 C.F.R. § 24.3 include investments that primarily benefit low- and moderate income individuals, areas, areas targeted by governments for redevelopment or investments that "would receive consideration under 12 C.F.R. 25.23 as a 'qualified investment.'" 12 C.F.R. § 24.3. OCC by regulation finds that LIHTC projects meet the requirements of 12 C.F.R. § 24.3 and are public welfare investments. 12 C.F.R. § 24.6(a)(4). The regulation makes this determination without regard to any specific characteristics of any specific LIHTC project. Unless a bank investment is a threat to the financial viability of the bank, all LIHTC investments are deemed to meet the public welfare standard.

> Investments that primarily support the following types of activities are
> examples of investments that meet the requirements of § 24.3:
> (a) Affordable housing activities, including:
> (1) Investments in an entity that finances, acquires, develops, rehabilitates,
> manages, sells, or rents housing primarily for low- and moderate-income
> individuals;
> (2) Investments in a project that develops or operates transitional housing for the
> homeless;
> (3) Investments in a project that develops or operates special needs housing for
> disabled or elderly low- and moderate-income individuals; and
> (4) Investments in a project that qualifies for the Federal low-income housing tax
> credit; . . . 12 C.F.R. § 24.6 (a).

OCC's public welfare investment program is a program and activity relating to housing. OCC has the authority to regulate all aspects of the program. 12 C.F.R. § 24.1(a). OCC has chosen in the past to regulate many aspects of the program. For example, the 1993 regulation included a public welfare-based requirement that the profits, dividends, tax credits and other

distributions from equity investments or interest income from debt investments received by the bank from the public welfare investment be devoted to activities that primarily promote the public welfare as determined by the OCC. 12 CFR § 24.4(a) (4). 58 FR 68464. OCC based this restriction on its past practice restricting a bank's use of profits, dividends, and other distributions from such investments to activities and programs that fulfill public purposes.[11] The OCC believed these bank investments, not normally permissible under law, are permissible only because they meet the public welfare test of 12 U.S.C. 24 (Eleventh). 58 FR 68464. This requirement and all other non-financial OCC requirements were all eliminated. The last remaining non-financial regulatory requirements for public welfare eligibility in the 2003 amendments. 68 FR 1394; 68 FR 48771.

The Comptroller of Currency recognizes that the public welfare investment program is more than just an OCC program to monitor financial viability program of bank investments. See:

> The genius of the public welfare investment authority lies both in its flexibility and its alignment with other public policy objectives. page 3.
> . . .
> The public welfare investment authority has attracted a significant amount of private capital to address social and economic problems in our communities. Banks and thrifts have used the authority to foster innovation and complement other programs designed to spur certain types of development, such as tax credits.
> . . .
> For our part, the OCC's Community Affairs Department devotes a good deal of energy to providing the information that bankers need to use the program successfully. App. 2329-2332, Remarks by Thomas J. Curry, Comptroller of the Currency, February 27, 2013.

The Comptroller's description of the OCC's public welfare investment program as an activity and program related to housing and urban development contradicts the OCC's stated

---

[11] The restriction was based on a different provision of the National Bank Act, 12 U.S.C. § 24 (Eighth), not (Eleventh).

basis for refusing to affirmatively further fair housing in its activities related to LIHTC projects, bank ownership of LIHTC projects, and the public welfare.

**3. OCC's obligation to address the legacy of segregation applies in its regulation of the national bank decisions to own or invest in LIHTC projects.**

OCC justifies its refusal to comply with its obligation to affirmatively further fair housing in its regulation of national bank LIHTC investments by citing the Tax Code, the National Banking Act, and the Fair Housing Act. App. 2486-2493.

ICP is not relying on either the Tax Code or the National Banking Act as the source of the OCC obligation to affirmatively further fair housing. The obligation applies under 42 U.S.C. § 3608(d) to federal departments and agencies with programs and activities relating to housing. The Fair Housing Act does not exempt OCC from affirmatively furthering fair housing, it requires it. *Jones v. OCC*, 983 F.Supp. 197, 203-204 (D. D.C. 1997) *aff'd* 1998 WL 315581 (D.C. Cir. 1998) .

OCC justifies its refusal to comply with its obligation to affirmatively further fair housing in its regulation of national bank LIHTC investments by pointing out that the OCC does not select the sites for, approve the allocation of tax credits for or develop the LIHTC units. ICP does not assert that OCC engages in any of those activities related to housing. The relevant OCC activity is its actions allowing national banks to provide the financing for LIHTC projects in return for the ownership of the project and the receipt of the tax credits. It is at this point that OCC's obligation to affirmatively further fair housing comes into effect and applies to the decision to approve national banks' ownership of low income housing projects. HUD, with an extensive and comprehensive affirmatively furthering fair housing policy for privately owned but HUD assisted projects, neither selects sites nor develops the housing. HUD does react to the

private owner initiatives in accordance with constitutional and statutory obligations including affirmatively furthering fair housing. App. 2193.

HUD passed its affirmatively furthering fair housing site selection criteria for privately owned and financed rental housing that was aided by HUD mortgage insurance or tenant subsidies or both in 1972. The enactment relied in part on both the *Shannon* decision and President Nixon's statement on affirmatively furthering fair housing by federal agencies involved in housing programs.  App. 2198-2199. David Maxwell, HUD's General Counsel at the time of the regulation, emphasized that HUD's obligation was not based on any HUD plans for housing, HUD site selections, or HUD development of housing. Rather, HUD's obligation was to react to the private initiatives in "accordance with constitutional and statutory limitations." App. 2193 A purpose to provide low income housing to those in need was not enough to justify violation of those civil rights obligations. App. 2200.

**5. OCC's position on LIHTCs is a specific instance of OCC's consistent denial that it has any obligation under 42 U.S.C. § 3608(d) to affirmatively further fair housing.**

From the passage of the Fair Housing Act to the present, OCC continues to deny it has the obligation to affirmatively further fair housing. The denial is contradicted by the explicit wording of the statute. 42 U.S.C. § 3608 as enacted included the requirement that all executive departments and agencies shall administer their programs and activities relating to housing and urban development in a manner affirmatively to further the purposes of the Fair Housing Act. 42 U.S.C. § 3608(d). 42 U.S.C. § 3608(d) as clarified in 1988 made it plain that OCC, as an institution that regulated financial institutions was covered by 42 U.S.C. § 3608(d). The legislative history of the Fair Housing Act made it clear that the need for the Act was caused by the refusal of federal agencies to enforce civil rights provisions. App. 2135, 2140, 2823-2834.

In 1969 HUD informed the federal financial regulatory agencies of the necessity of adopting specific HUD recommendations for compliance with the obligation to affirmatively further fair housing. The Comptroller of the Currency received these recommendations. App. 2186.

In 1970 *Shannon v. HUD* was decided holding that 42 U.S.C. § 3608 required affirmatively furthering fair housing.

In 1971 President Nixon called attention to the injuries and costs of racial segregation and the federal role in creating and maintaining racial segregation. App. 2304-2306, Richard M. Nixon, Statement About Federal Policies Relative to Equal Housing Opportunity. June 11. He then made this statement about the federal  affirmatively further fair housing obligation related to housing.

> I interpret the "affirmative action" mandate of the 1968 act to mean that the administrator of a housing program should include, among the various criteria by which applications for assistance are judged, the extent to which a proposed project, or the overall development plan of which it is a part, will in fact open up new, nonsegregated housing opportunities that will contribute to decreasing the effects of past housing discrimination.
>
> This does not mean that no federally assisted low- and moderate-income housing may be built within areas of minority concentration. It does not mean that housing officials in Federal agencies should dictate local land use policies. It does mean that in choosing among the various applications for Federal aid, consideration should be given to their impact on patterns of racial concentration.
>
> In furtherance of this policy, not only the Department of Housing and Urban Development but also the other departments and agencies administering housing programs-the Veterans Administration, the Farmers Home Administration, and the Department of Defense-will administer their programs in a way which will advance equal housing opportunity for people of all income levels on a metropolitan areawide basis. App. 2312.

In 1971, the U.S. Commission on Civil Rights published its finding that the federal regulatory agencies, including OCC, had taken no action to incorporate the agencies Title VIII

responsibilities into the agencies' compliance activities. App. 2372-2373.

Public interest groupds petitioned OCC to issue non-discrimination regulations. OCC published a proposed regulation in 1971 that would have enacted HUD's recommendations for the information necessary to affirmatively further fair housing in lending. 36 Fed. Reg 25167-69. The OCC regulation was never adopted. 12 C.F.R. Parts 1 - 199.

In 1976, the National Urban League and other public interest groups sued the federal financial regulatory agencies including OCC for their failure to affirmatively fair housing in their regulation of banks and other lending entities. App. 2142, 2170 2172. The Settlement Agreement with OCC required OCC to collect information on the racial composition of the loan applicants of the banks it regulated for three years. App. 2214-2215, 2218-2219. OCC did collect the information. App. 2182-2183.

In 1979,  the U.S. Commission on Civil Rights published its finding that the OCC had neither issued nor proposed any fair housing regulations.[12] OCC's response was it was not required to issue regulations or base an enforcement action on Title VIII of the Civil Rights Act of 1968. App. 2249.The Commission published the "overwhelming body of opinion" that supported the obligation of federal financial regulatory agencies to issues Title VIII regulations. The body of opinion cited included the U.S. Department of Justice and the Senate Committee on Banking, Housing, and Urban Affairs. App. 2243, 2250.

Congress enacted the Low Income Housing Credit statute in 1986 and made it permanent in 1989. Pub.L. 99-514, Title II, § 252(a), Oct. 22, 1986, 100 Stat. 2189;  Pub.L. 101-239, Title VII, §§ 7108(a)(1), (b). Between the initial enactment and the permanent enactment of the

---

[12] The U.S. Commission on Civil Rights is a federal commission charged with the duty to investigate and report civil rights violations. 42 U.S.C. § 1975(a)(1).

LIHTC statute, Congress enacted the clarification that the Fair Housing Act, 42 U.S.C. § 3608(d), included an obligation that federal agencies having regulatory or supervisory authority over financial institutions shall affirmatively further fair housing. Pub. L. 100-430, § 7(b), 102 Stat. 1623 (1988); See Report 100-711, *Id* at 32.

In 1987, the Court of Appeals for the First Circuit decided *N.A.A.C.P.*, 817 F.2d between the initial enactment and the permanent enactment of the LIHTC statute. OCC did not enact any affirmatively furthering fair housing regulations at this time.

The Public Welfare Investment (PWI) statute allowing national banks to own and invest in housing was enacted in 1992. Depository Institutions Disaster Relief Act of 1992, PL 102–485, October 23, 1992, 106 Stat 2771. OCC did not enact any affirmatively further fair housing regulations at this time. The PWI statute explicitly made activities related to housing part of  OCC's responsibilities. The PWI statute did not abrogate any provision of the Fair Housing Act or any other law. PL 102–485, 1992 HR 6050, Sec. 8.  OCC's Public Welfare Investment regulations incorporate activities related to housing. 12 C.F.R. § 24.6(a). OCC did not enact any regulations or other affirmatively furthering fair housing requirements applicable to bank ownership of housing at this time.

In 1997, OCC defended a lawsuit alleging OCC had failed to affirmatively further fair housing in its monitoring of national banks' lending practices. The defense was based on evidence related solely to OCC's efforts to "promote fair lending." The OCC Declaration set out the specific guidelines for detecting unlawful discriminatory lending practices and for referring suspected unlawful discrimination to the Attorney General. OCC participated in fair lending education efforts, and task forces. OCC used matched pair testing to detect possible lending

discrimination and encouraged banks to self-test for lending discrimination. *Jones v. Office of Comptroller of Currency*, 983 F.Supp. at 204 n. 10. The pro se plaintiff did not dispute the evidence. 983 F.Supp. at 204. The District Court dismissed the case and the Court of Appeals affirmed. 1998 WL 315581 (D.C. Cir. 1998).

OCC has no such evidence of compliance with its obligation to affirmatively further fair housing in its public welfare investment program involving national bank proposed ownership of and investments LIHTC projects. App. 246-2477, 2486-2495. Instead, OCC has exempted national bank LIHTC investments from the review process that applies to all other national bank public welfare investments in affordable housing projects.

**6. OCC subjects national bank ownership in and investment in the provision of non-LIHTC affordable housing to a detailed review to determine public welfare and exempts LIHTC investments from the review.**

OCC reviews in detail non-LIHTC affordable housing public welfare investment approval requests. The OCC Public Welfare Investments Manual Community Affairs' Internal Manual describes this review:

> . . . a CA Analyst must use his or her best judgement to determine whether the PWI would meet the public welfare beneficiary criteria of§ 24.3 of the Regulation. The following is a list of factors the CA Analyst should consider:
> • When a bank states an investment qualifies because it primarily benefits low and
> moderate-income individuals, the submission should include a clear description of the incomes of the impacted individuals or households and should state how the individuals and households will benefit.
> • When a bank states an investment qualifies because it primarily benefits low and moderate-income areas, the submission should include the exact address or area income data at the census tract level and should state how the area will benefit from the investment.
> • When a bank states an investment qualifies because it primarily benefit areas targeted for redevelopment by a government entity, the submission should clearly identify the government program or government initiative associated with the area (empowerment zone, local redevelopment area, etc.) and should

state how the area will benefit from the investment. App. 2349, OCC Public Welfare Investments Manual Community Affairs' Internal Manual page 13.[13]

OCC recommends the use of the Federal Financial Institutions Examination Council (FFIEC) geocode tool as part of the research on public welfare. The results are included in the Public Welfare Investment decision package. App. 2349, 2352. The site is http://www.ffiecgov/cra/ default htm. The Geocoding tool is found at https://geomap.ffiec.gov/FFIECGeocMap/GeocodeMap1.aspx.

Had OCC reviewed the national bank ownership of the LIHTC project Wahoo Frazier at 4700 Hatcher in Dallas Texas, the following information would have been available. Entering this address into the FFIEC GeoCode tool returns the map of the location and a chart showing the address, census tract,

> the tract Income Level "Low",
> the 2017 MSA Median Family Income of $73,400 compared to
> the tract 2017 Median Family Income of $22,504 and 2010 Median Family Income of $21,821,
>  the tract Median Family Income % 30.66,
>  the tract Minority % of 99.80,
> the tract Minority population of 3,027,
> Owner occupied units of 325, and
> 1- to 4- Family Units of 816.
>  https://geomap.ffiec.gov/FFIECGeocMap/GeocodeMap1.aspx.[14]  App. 2587-2588.

This information clearly states that the location is predominantly minority and very low income. Given the degree of racial segregation in the City of Dallas and elsewhere, this data alone indicates racial segregation and the need to determine whether there are conditions that are

---

[13] The cover page of the manual says "draft." OCC states the manual is in use despite the "draft" on the cover. App. 2423.

[14] The Comptroller of the Currency is a member of FFIEC, the Federal Financial Examination Council. 12 U.S.C. § 3303. FFIEC establishes priniciples and standards for the federal agencies to use in the review of financial institutions.12 U.S.C. § 3301.

seriously detrimental to family life or in which other undesirable elements predominate affecting

the site of the LIHTC project and units. *N.A.A.C.P.*, 819 F.2d at 156; *Shannon*, 436 F.2d at 820-

822. This FFIEC information, including census tract maps, is available for each census tract in

which there are LIHTC projects including bank owned LIHTC projects. App. 2571-2716.

     OCC does not subject LIHTC affordable housing projects to this review. OCC exempts

national bank ownership and investments in LIHTC units from the best judgment, Public Welfare

Investment benefit review. The only Public Welfare Investment requirement applied to LIHTC

investments is to determine whether the investment would expose the bank to unlimited liability.

> For PWIs involving LIHTCs, NMTCs, and SBICs, a CA Analyst must still
> consider how the bank is structuring the investment. Under§ 24.4(b), the
> investment must not expose the bank to unlimited liability. App. 2348-2349,
> Manual, page 13.

     If LIHTC projects were subject to this review based on best judgment, the requirements

to show how individuals and households will benefit, how the area will benefit, and how an area

targeted for redevelopment will benefit, could involve many of the factors usually considered

important in assessing the proposed locations of low or moderate income affordable housing

projects. These factors take into account whether conditions that are seriously detrimental to

family life or in which other undesirable elements predominate affect the site and the

neighborhood of the proposed units. 24 C.F.R. §905; 24 CFR § 905.602(d)(7); HOME housing

program, 24 CFR § 92.202(b); non-elderly handicapped housing, 24 CFR § 891.680; supportive

housing, 24 CFR § 891.840; project based Section 8 housing, 24 CFR § 983.57(d), (e); housing

choice vouchers, 24 CFR § 982.401(l). This could be the starting point for an affirmatively

furthering fair housing review and decision process.

     The only other review for the national bank investments in LIHTC projects is primarily

financial. Each national bank investing in a LIHTC project must submit the CD-1 review package. App. 2123-2127. The information provided is cursory and includes nothing on neighborhood conditions, racial concentrations, poverty, public or private investments in the neighborhood, crime rates, or existing concentrations of existing low income housing units. App. 2486, 2456-2461. Many of the LIHTC investments are subject to no review or OCC actual approval. These are the after-the-fact notification investments. OCC takes the position that these LIHTC investments already meet the public welfare and no review is required. App. 2469. discovery. Whether or not this meets the public welfare investment standard, it does not satisfy the procedural obligation to at least consider the facts of racial concentration unequal conditions before approving the location of federal assistance in a racially segregated area. *N.A.A.C.P.*, 817 F.2d at 156; *Shannon*, 436 F.2d at 820-821

The national bank investments in the Dallas area include the ownership of LIHTC projects that are in low income minority concentrated areas marked by conditions that are seriously detrimental to family life or in which other undesirable elements predominate. There are no redevelopment plans and programs for these areas. Absent such plans and programs, the refusal to consider the impact on the perpetuation of racial segregation by accepting national bank investments in these areas does not affirmatively further fair housing. *Id*.

OCC's exemption of the Public Welfare Investment review from the affirmatively furthering review does not inflict the same injuries upon the occupants of LIHTC projects in non-minority areas. Those areas are not marked by conditions that are seriously detrimental to family life or in which other undesirable elements predominate  of slum and blight. App. 549-569.

-57-

**7. OCC's activities and program related to the bank ownership of LIHTC are a cause of the perpetuation of racial segregation in the Dallas area.**

OCC admits that bank ownership and investment is a critical factor in the development of LIHTC projects throughout the country. App. 1697, 1702, 2264, 2330.

OCC has consistently acted on the practical and plausible theory that geographic restrictions and federal review requirements for national bank investments in LIHTC projects pursuant to the public welfare investment program will limit such investments in LIHTC projects. Prior OCC approval was a limit on bank public welfare investments. 58 Fed. Reg. 38474 (July 16, 1993).  Restrictions on the use of the profits from LIHTC public welfare investments reduced banks' incentives to participate in LIHTC investments. 60 Fed. Reg. 54819, 54820 (October 8, 1995); 60 Fed. Reg. 67049, 67050 (December 28, 1995). Approval requirements for LIHTC public welfare investments that included demonstrating community benefits and community support for the investment was likely to constrict national banks from making such investments. 64 Fed. Reg. 70986, 70987 - 70989 (December 20, 1999). The presence of affirmatively furthering fair housing requirements would be just as likely to affect where national banks will consider LIHTC ownership and investment. As President Clinton stated:

> If all of our executive agencies affirmatively further fair housing in the design of their policies and administration of their programs relating to housing and urban development, a truly nondiscriminatory housing market will be closer to achievement.  MEMORANDUM ON FEDERAL LEADERSHIP OF FAIR HOUSING 01-17-94, 1994 WL 11404 (White House). App. 1608.

If OCC affirmatively furthered fair housing, then:

> one would see, over time, if not in any individual case, Department  activity that tends to increase, or at least, that does not significantly diminish, the supply of open housing. *N.A.A.C.P.*, 817 F.2d at 156.

-58-

The timing of the LIHTC allocation decision by the state agency does not eliminate the causal effect of OCC's failure to affirmatively furthering fair housing. The availability of national bank investment in the ownership of the project and the tax credits is part of the LIHTC application process that is a prerequisite for an eventual allocation of tax credits. The application must identify the sources of the bank investment and provide a term sheet setting out the expected amount of tax credits. 10 TAC § 204 (7 )(E), (D). The applications are based on either "Firm" or "Conditional" bank or other investor commitments to purchase the project and provide the tax credit based equity investment. App. 780-781, Greens of HTA (firm commitment from national bank investment); App. 782-784, Eban Village II (conditional commitment from NationsBank),

OCC is arguing that there is no point in affirmatively furthering fair housing in its public welfare investment review since the tax credits will have already been allocated. This compressed view of the process does not describe the actual process. There is no final allocation of tax credits  until the housing finance agency has made each of three determinations that the amount of the proposed allocation complies with the Tax code. 26 U.S.C. § 42(m)(2)(B), (C)(i)(III). In Texas, the determination requires initial cost certification documentation that includes all bank or other investor tax credit and financing arrangements. The applicant does not have to file the documentation for the final allocation of tax credits until January 15 of the first year of the credit period. 10 TAC § 402(j). That documentation must show that the tax credit financing is in place.

> (xxvii) Summary of Sources and Uses of Funds;
> (xxviii) Financing Narrative;
> (xxix) Final Limited Partnership Agreement with all amendments and exhibits; . . . 10 TAC §402(j)(3)(B)(xxvii) - (xxix).

The tax credit allocation process remains accountable to the decision whether to make or allow a national bank investment on affirmatively furthering fair housing grounds. The initial state determination means only that if all requirements are met, the housing finance agency will make an allocation of credits. 10 TAC § 401(a) - (d).

**8. The OCC failure to affirmatively further fair housing in the public welfare investment program subjects LIHTC families to seriously unequal conditions.**

The evidence on unequal neighborhood conditions includes the existence of national bank owned LIHTC projects in racially segregated, high poverty, low income tracts in which living conditions are in a state of decline. App. 84-298, 310-341, 372-394, 527-537. OCC admits to having approved all of these national bank investments in the ownership of LIHTC projects in the City of Dallas. App. 2211. The two national bank owned projects in City of Dallas census tract 87.01 show the deleterious consequences of OCC's actions for the predominantly minority residents of the LIHTC units. App 217-226. The tract has been predominantly Black and in poverty for decades past. The poverty rates have ranged from 39% in 1990 to 50% in 2015. The childhood poverty rates have consistently increased. The childhood poverty rate for children under 5 was 70% in 2015. The childhood poverty rate for children 5 to 17 was 56% in 2015. App. 222.

Both of these bank LIHTC projects are in a City of Dallas Crime Hot Spot. The violent crime index for the tract is 96.86 on a 0 to 100 scale with 100 being the least safe. The rate of loose and running dog cases per 1,000 persons is 41.4, almost ten times the rate in majority White non-Hispanic census tracts (4.6). Tract 87.01 is rated at the highest distress level, 4, by the Treasury Distress Index. App. 223. There are two non-LIHTC, HUD assisted rental projects in the census tract. There is another national bank owned LIHTC project, Rosemont at Oak Hollow,

just across the street in census tract 87.04. App. 217, 287. The number of housing vouchers in the

tract has increased from 213 in 2000 to 256 in 2016.  App. 226. The projects have been occupied

since 1996 and 1999. App. 226. None of the data show any sign that the area is being revitalized.

App. 222-226. Whether or not these national bank investments are designed primarily to benefit

the public welfare pursuant to 12 U.S.C. § 24 (Eleventh), there is no evidence that the program

allowing the investments affirmatively furthers fair housing. These projects increase racial

segregation and unequal conditions.

### C. Both Defendants have violated the affirmatively further fair housing obligation.

Each Defendant has violated both the procedural and substantive obligation to

affirmatively further fair housing in the housing related programs they administer and regulate.

Neither Defendant has an institutionalized process to examine the racial and socio-economic

impacts of the LIHTC allocation process or the approval of national bank ownership of LIHTC

projects. As a result the Defendants are a contributing cause of the perpetuation of racial

segregation in Dallas. The lack of meaningful action to overcome the legacy of racial

segregation, unequal treatment, and historic lack of access to opportunity in housing has caused

Black LIHTC tenants to live in racially segregated and unequal neighborhood conditions.

### II. Standing

The general standard for standing requires the plaintiff to show an injury in fact that is

fairly traceable to the defendant's conduct and "that is likely to be redressed by a favorable

judicial decision."  In addition, the plaintiff must show interests that fall within the zone of

interests protected by the law invoked. *Bank of Am. Corp. v. City of Miami, Fla.*, ___ U.S. ___,

137 S. Ct. 1296, 1302–03 (2017). ICP is seeking to invoke the substantive protections of 42

U.S.C. § 1982, 42 U.S.C. § 3604(a); 42 U.S.C. § 3608(d) through the Administrative Procedure Act; and the Fifth Amendment to the Constitution of the United States.

**Injury is traceable to Defendants**

ICP is injured because the concentration of LIHTC units in minority concentrated census tracts causes ICP to spend more money and more time to locate non-LIHTC units in non-minority concentrated census tracts. Only LIHTC landlords are prohibited by law from refusing to rent to voucher holders. 26 U.S.C. § 42(h)(6)(B)(iv); Tex. Gov't Code § 2306.269(b). If a LIHTC project has a vacancy or a waiting list, the landlord cannot refuse to consider the ICP client as a tenant simply because the client wants to use a housing voucher. Non-LIHTC landlords are not prohibited from refusing to rent to voucher households and may either decline to rent or require the payment of higher security deposits or landlord incentive payments as a condition of renting to ICP's voucher client. App. 838-839, 842.

For every additional LIHTC unit made available to ICP's clients, ICP would save between $950 and $350 per client move based on the difference in financial assistance paid to obtain LIHTC units for client compared to the financial assistance paid to obtain non-LIHTC units for clients during that period. For every 100 additional LIHTC units made available to ICP's clients per year, ICP would save between $95,000 and $35,000 per year based on the difference in financial assistance paid to obtain LIHTC units for client compared to the financial assistance paid to obtain non-LIHTC units for clients during that period. App. 838-839, 842.

ICP has spent $275,399 in financial assistance to help its clients obtain LIHTC units and $3,004,370 in financial assistance to help its clients obtain non-LIHTC units from 1/1/2008 through November 30, 2017. App. 839.

ICP also provided financial assistance to its clients prior to August 22, 2008 with similar results. The financial assistance to obtain LIHTC units was substantially less than the financial assistance to obtain non-LIHTC units. App. 840.

ICP's counselors spend more time assisting clients because of the lack of LIHTC units in majority White non-Hispanic areas. ICP's employees do not keep time and activity logs. The assessment of time is based on the day to day experience of the ICP Mobility Assistance Program counselors. In general, the time usually spent to help a client who is able to locate a unit in a LIHTC project is an hour or two less than the time usually spent to help a client who is able only to find a non-LIHTC unit. One difference in time is that searching for units in majority White census tracts where there is a lack of LIHTC units causes more time to be spent in searching for available units than would be spent if there were substantially more LIHTC units in those areas. Another difference in time is the additional time that may be required to negotiate with a non-LIHTC landlord on the financial terms for the unit compared to a LIHTC landlord. App. 840.

The average difference in the time spent on LIHTC compared to non-LIHTC clients is multiplied by the larger number of non-LIHTC placements. For example, ICP provided mobility counseling and financial assistance to 84 clients who obtained LIHTC units compared to 379 clients who obtained non-LIHTC units from January 2017 through November 2017. App. 840.

In addition to assisting individual ICP clients find housing units in majority White non-Hispanic areas, ICP also attempts to create additional LIHTC units in those areas. ICP, through a subsidiary, also uses its funds and other resources to encourage the development of LIHTC units for its clients' use in non-minority concentrated areas free from the adverse effects of slum,

blight, and distress. App. 894, 896-897, 899-903.

ICP's injuries were directly stated in the First Amended Complaint.  ¶¶ 6 - 11. Document No. 29, pages 3-6. The Defendants answered by claiming they lacked knowledge or information sufficient to form a belief about the truth of the factual allegations and therefore denied the allegations. Document No. 49, pages 2-3.  Defendants produced no evidence to contradict the allegations in the complaint concerning the injuries to ICP. App. 2375-2496. The Declarations of Demetria McCain and Ann Lott and the other evidence cited shows the existence of the injuries as a matter of law. App. 834-841 (McCain), 842, 894-898 (Lott), 899-903.

ICP's injuries are fairly traceable to Defendants. The need for this effort and expense is a direct result of the racial segregation of the LIHTC units in the Dallas area. Treasury administers the allocation of the low income housing tax credits to the State of Texas every year. 26 U.S.C. § 42(h)(3). Treasury has the statutory power and responsibility to regulate the State of Texas' use of the low income housing tax credit allocation received from Treasury. 26 U.S.C.A. § 42(d)(3)(ii)(II), (e)(6), (h)(6)(F)(ii), (h)(6)(G)(ii), (h)(6)(K), (l) (3) (C), (n). The provision of the funding and the power to regulate the use of the funding makes the racial segregation of the LIHTC units fairly traceable to the Treasury.

 The efforts and expenses are necessary because Treasury failed to take specific regulatory actions. For example, one of the barriers to the development of LIHTC units in majority White non-Hispanic areas of Dallas is the continued use of local approval requirements for municipal, legislator, and neighborhood associations in the Texas Qualified Allocation Plans. App. 897, 899-903. Treasury admits the discriminatory effects of these requirements and that the use of the requirements violates the Affirmatively Furthering fair housing policy set out in the

Fair Housing Act. App. 1595-1597, Rev. Rul. 2016-29. Treasury has taken no action to prohibit the continued implementation of the local approval requirements by the State of Texas. The provisions remain in the Texas Qualified Allocation Plan. See pages 28-29 above.

OCC has the direct authority to regulate and administer the use of national bank funds to own LIHTC projects and, in the process, to provide the equity funding for the development of the projects. OCC has taken no action to use this authority to prevent racial segregation in the LIHTC program. OCC has even exempted LIHTC funding from the perfunctory public welfare investment public benefit review that it uses for other affordable housing national bank investments.

Federal agencies providing funding for and regulating discriminatory actions by state and local entities are a cause of that discrimination. *Clients' Council*, 711 F.2d at 1425; *Adams v. Richardson*, 480 F.2d 1159, 1162 (D.C. Cir. 1973); *Gautreaux v. Romney*, 448 F.2d 731, 739 (7th Cir. 1971); *Young v. Pierce*, 628 F.Supp. 1037, 1052 (E.D. Tex. 1985) ; *N.A.A.C.P. v. Harris*, 567 F.Supp. 637, 644 (D.C. Mass. 1983), reversed on other grounds, *N.A.A.C.P,* 817 F.2d. 149.

The nature of the federal violation - funding, regulating, and approving - state or local government racial discrimination contradicts any argument that there can only be a single cause of state or local racial segregation.

If ICP is injured by the existing distribution of low-income housing, and Defendants' actions directly and significantly affect that distribution, it follows that ICP has established causation. *Gautreaux*, 448 F.2d at 739; *Inclusive Cmtys. Project, Inc . v. Tex. Dep't of Hous. & Cmty. Affairs*, 749 F. Supp. 2d 486, 496 (N.D. Tex. 2010). The participation of more than one

actor in a scheme of racial segregation in federally assisted housing does not excuse the liability

of either. Both the Chicago Housing Authority and HUD were liable for racial segregation in

Chicago's public housing. *Hills v. Gautreaux*, 425 U.S. 284, 288-89 (1976). Nor did the Chicago

city council approval of the segregated public housing sites excuse HUD's involvement in also

approving those sites and providing the funding for the public housing developed on the

segregated sites. Gautreaux, 448 F.2d at 739. HUD, the Dallas Housing Authority, and the City

of Dallas were all and each liable for public housing segregation in the City of Dallas.*,* 169 F.3d

at  981–82.

 ICP's First Amended Complaint set out the allegations of racial segregation and unequal

conditions affecting the LIHTC units in the Dallas area. Document No. 29, pages 13-21, ¶¶ 25-

35, 37-44. The Defendants answered by claiming they lacked knowledge or information

sufficient to form a belief about the truth of the factual allegations contained in these paragraphs

and denied the allegations. Document No. 49, pages 6-9.  Defendants produced no evidence to

contradict the allegations in the complaint concerning the racial segregation and unequal

conditions affecting the LIHTC units in the Dallas area. App. 2375-2496. Defendants contested

their liability for the conditions but not the existence of the racial segregation. ICP's evidence set

out in this brief and in its Appendix establish the existence of the segregation and its conditions

as a matter of law.

 **The injury can be remedied**.

 Courts can effectively remedy an agency's failure to affirmatively further fair housing.

*N.A.A.C.P.*, 817 F.2d at 158-160; *Thompson*, 2006 WL 581260 at *9-10. The Defendants' failure

to affirmatively further fair housing is redressable. Actions can be taken to address the

-66-

segregation in the LIHTC program in Dallas.

### Zone of interests

ICP's claims of financial injury from Defendants' failure to follow the statutory mandate of the Fair Housing Act are within the "zone of interests" protected by the Act. *Bank of America*, 137 S.Ct. at 1301-1304; *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982).

### III. The evidence submitted can be presented in a form that would be admissible in evidence

ICP's summary judgment evidence includes evidence that is admissible as presented or that would be admissible upon the testimony and evidence presented in the declarations.

The government reports from the U.S. Census Bureau, Treasury, OCC, the Federal Reserve System's National Information Center, HUD, GAO, USDA, the Texas Department of Housing and Community Affairs, the Texas Secretary of State business records site, the Texas Department of Education, Texas Department of Public Safety, and the City of Dallas are reports on matters that those government entities are authorized to observe and report. Fed. R. Evid. § 803(8). Many of the reports from the government agencies include a cover and other indicators of authenticity. For examples see App. 48-64, 69-89.  Fed. R. Evid. § 901(a)(7)(B), § 902(5). The other reports would be authenticated by testimony paralleling the written declarations on the source of the government data such as the U.S. Census Bureau American Factfinder website or the City of Dallas at Dallasopendata.com website. App. 2835, 2850-2894.

The *National Urban League v. Office of the Comptroller of the Currency* are Library of Congress documents available at the University of Michigan Civil Rights Litigation Clearinghouse . https://www.clearinghouse.net/detail.php?id=10094. The documents show the imprimt of the Library of Congress. App. 2142-2178, 2214-2222.

The tables and charts are offered as summaries of the voluminous records of government data and other documents. The data has been produced to the defendants. ICP's disclosures and production has included many of the worksheets combining the underlying data with the formulas making the calculations based on the data. The Declarations of Katy Lopez,  Abigail Self, and Deanna Theobalt state where the reports or data was obtained, the computer applications used to process the data, and the calculations made to produce the charts, tables, and maps covered by their declarations. App.2851-2894. The summaries are admissible. Fed. R. Evid. 1006.

The ICP related facts are set out in the Declarations of Demetria McCain and Ann Lott along with their experience and qualifications. App. 834-841, 894-899. Testimony and other evidence tracking the statements in the declarations would be admissible as direct evidence. Fed. R. Civ. P. § 56(c)(4).

The need to use a variety of government sources to determine national bank investments in specific LIHTC projects was exacerbated by OCC's refusal to maintain or disclose information on the national bank investments.  App. 2211-2213. While some of the national bank investments in specific projects can be discerned from the publicly available OCC At-A-Glance tables, many cannot. OCC does not require or provide the names of the specific LIHTC projects on the At-A-Glance reports. The locations may be a specific city but may also be "nationwide" or by state or multi-state regions. The names of the investing partnership may not match the name of the LIHTC project App. 785-833.

The key to finding whether a specific LIHTC project is a national bank investment begins with the name of the limited partner that provides the equity for the low income housing credits

to the general partner of the limited partnership nominally owning the property. App. 2266. ICP generally obtained the equity limited partner name from TDHCA records or the Texas Secretary of State business organization records. In some instances, the equity limited partner is listed on the OCC At-A-Glance publication. App. 789-795. In other instances, the Federal Financial Institutions Examination Council's (FFIEC) National Information Center search site for national bank related entities would provide the information on whether the limited partner was a national bank related entity. App. 796-800. In a few instances, the Securities and Exchange Commission EDGAR site would provide this documentation. App. 813, 822. The process was disclosed to Defendants and is described in part in the Declarations of Katy Lopez, and Deanna Theobalt. App. 775-779, 2850-2851, 2881-2882.

The report of the telephone survey on the multifamily apartment acceptance of voucher participants as tenants was produced according to the safeguards set out in the requirements of Fed. R. Evid. 803(6). Ms. Gillespie made the record of the response at or near the time of the inquiry. Each inquiry receiving a response was followed up with a letter stating the response to the inquiry. The survey was a regular practice over a 21 month period. App. 2852-2853, 2892-2894. Gillespie, Lopez Declarations. The lack of positive responses was consistent with the day to day activities of the ICP Mobility Assistance Program counselors. App. 836. Whether or not the responses were truthful is not as important for the purposes of this case as whether the inquiry was made and the responses received were refusals to rent to voucher households. The apartment employee may have not been telling the truth but the public position announced was the unwillingness to rent to voucher households. App. 843-861 Landlords' refusal to rent to voucher households is a widely accepted practice. *Austin Apartment Ass'n v. City of Austin*, 89 F.Supp.3d

886 (W.D.Tex. 2015), *appeal dismissed* (5th Cir. 15-50186) (Aug. 06, 2015).  The State of Texas enacted a law protecting the landlord decision refusing to rent to voucher households from municipal ordinances prohibiting such a decision. Tex. Local Gov't Code § 250.007.

The newspaper articles from the 1940s Dallas newspapers are ancient documents and indicate the source on the face of the documents. App. 2717-2756. Fed. R. Evid. 901(a)(8). The articles are an exception to the hearsay rule. Fed. R. Evid. 803(16).

The neighborhood condition tables include violent crime ratings for the census tracts from the commercial neighborhood rating service "neighborhoodscout.com" published by Location, Inc. App. 85, 2884.These ratings are relied upon by persons in the particular occupation of applying for low income housing credits from TDHCA. These persons rely upon the ratings because the TDHCA Qualified Allocation Plan requires the use of the neighborhoodscout.com crime data. 10 Tex. Admin. Code § 11.9(c)(4)(B)(i)(VII), (ii)(V) (property crime rate); 10 TAC §11.9(e)(3)(G)(I) (violent crime rate). The reports are exceptions to the hearsay rule. Fed. R. Evid. 803(17).

**Conclusion**

ICP has adequately supported its motion for partial summary judgment.

Respectfully Submitted,

/s/ Michael M. Daniel
Michael M. Daniel
State Bar No. 05360500
DANIEL & BESHARA, P.C.
3301 Elm Street
Dallas, Texas 75226-1637
214-939-9230
Fax 214-741-3596
E-mail: daniel.michael@att.net
Attorney for Plaintiff

Laura B. Beshara
State Bar No. 02261750
DANIEL & BESHARA, P.C.
3301 Elm Street
Dallas, Texas 75226-1637
214-939-9230
Fax 214-741-3596
E-mail: laurabeshara@swbell.net
Attorney for Plaintiff

<u>Certificate of Service</u>

I hereby certify that on April 12, 2018 I electronically submitted the foregoing document with the clerk of the court for the U.S. District Court, Northern District of Texas, using the electronic case files system of the court. The electronic case files system will send a "Notice of Electronic Filing" to the following individuals who have consented in writing to accept this Notice as service of this document by electronic means: LISA ROBIN HASDAY, MARSHA STELSON EDNEY, and JAMES T. TODD, Jr.

s/ Michael M. Daniel

-71-