IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| THE INCLUSIVE COMMUNITIES PROJECT, INC., | § § § | |
| Plaintiff, | § § | |
| | § | Civil Action No. 3:14-CV-3013-D |
| VS. | § § | |
| THE UNITED STATES DEPARTMENT OF TREASURY, et al., | § § § § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION
## AND ORDER

Plaintiff The Inclusive Communities Project, Inc. ("ICP") brings this action against defendants U.S. Department of the Treasury ("Treasury") and Office of the Comptroller of the Currency ("OCC"), alleging claims under 42 U.S.C. § 3608(d), 42 U.S.C. § 3604(a), 42 U.S.C. § 1982, and the Fifth Amendment, essentially contending that defendants' administration of the Low Income Housing Tax Credit ("LIHTC") program created under the Tax Reform Act of 1986 is perpetuating racial segregation in LIHTC units in the city of Dallas and relegating minority families to unequal conditions of slum, blight, and distress. Treasury and OCC move for summary judgment on all claims, and ICP moves for partial summary judgment on the issue of standing and on its 42 U.S.C. § 3608(d) claim. For the reasons explained, the court grants defendants' motion as to ICP's claims against OCC based on a lack of standing, grants defendants' motion on the merits as to ICP's claims against Treasury, and denies ICP's motion for partial summary judgment. The court enters final

judgment in favor of defendants by separate judgment filed today.

I

The Tax Reform Act of 1986 established the LIHTC program to provide tax credit subsidies for the development and ownership of affordable rental housing. *See* 26 U.S.C. § 42.[1] Generally, the statute offers tax credits as incentives to developers who construct or rehabilitate "qualified low-income housing project[s]." 26 U.S.C. § 42(g)(1). To qualify for a tax credit under the statute, a project sponsor must commit to restricting rents on at least 40% of the affordable housing units for renters earning no more than 60% of the area's median income, or at least 20% of the units for renters earning 50% or less of the area's median income.

Each year, Congress allocates a certain amount of LIHTCs to the states based on population. State or local housing credit agencies ("HCAs")[2] have the exclusive authority to allocate these LIHTCs. Under 26 U.S.C. § 42(m), each HCA is required to develop a qualified allocation plan ("QAP") that sets out the state's priorities and selection criteria for

---

[1] Because both sides move for summary judgment, the court will recount the evidence that is undisputed, and, when it is necessary to set out evidence that is contested, will do so favorably to the side who is the summary judgment nonmovant in the context of that evidence. *See, e.g., GoForIt Entm't, LLC v. DigiMedia.com L.P.*, 750 F.Supp.2d 712, 718 n.4 (N.D. Tex. 2010) (Fitzwater, C.J.) (quoting *AMX Corp. v. Pilote Films*, 2007 WL 1695120, at *1 n.2 (N.D. Tex. June 5, 2007) (Fitzwater, J.)).

[2] Defendants refer to HCAs—i.e., Housing Credit Agencies, which is the term the statute uses, and ICP refers to HFAs—i.e., Housing Finance Agencies. It appears that both sides are using slightly different terms to refer to the same agencies.

allocating LIHTCs among project sponsors' proposed projects.[3]

Treasury is the federal department charged with administering and regulating the LIHTC program. *See* 26 U.S.C. § 42(n) ("The Secretary [of the Treasury] shall prescribe such regulations as may be necessary or appropriate to carry out the purposes of this section."). OCC is an independent bureau of Treasury that is responsible for approving national banks' investments in LIHTC projects under the public welfare investment ("PWI") authority established in 12 U.S.C. § 24 (Eleventh).[4]

ICP is a nonprofit organization that seeks racial and socioeconomic integration in the Dallas metropolitan area. In particular, ICP assists low-income, predominantly African American families who are eligible for the Dallas Housing Authority's Section 8 Housing Choice Voucher program in finding affordable housing in predominately non-minority

---

[3]Under the statute, each QAP must give preference to projects that serve the lowest income tenants; serve income-eligible residents for the longest time-frame; and are located in qualified census tracts (defined as tracts with a poverty rate of at least 25%, or tracts in which 50% of the households have incomes below 60% of the area median income) and will contribute to a concerted community revitalization plan. *See* 26 U.S.C. § 42(m)(1)(B). Each QAP must also include selection criteria concerning project location; housing needs characteristics; project characteristics, including whether the project includes the use of existing housing as part of a community revitalization plan; sponsor characteristics; tenant populations with special housing needs; public housing waiting lists; tenant populations of individuals with children; projects intended for eventual tenant ownership; the energy efficiency of the project; and the historical nature of the project. *Id* at § 42(m)(1)(C).

[4]Under 12 U.S.C. § 24 (Eleventh), national banks are authorized to "make investments directly or indirectly, each of which is designed primarily to promote the public welfare, including the welfare of low- and moderate-income communities or families (such as by providing housing, services, or jobs)," so long as such investments do not "expose the association to unlimited liability." Under OCC regulations, projects that qualify for LIHTCs are acceptable PWIs.

concentrated areas free from the adverse effects of slum, blight, and distress.

ICP was the plaintiff in a lawsuit that sought relief from the Texas Department of Housing and Community Affairs ("TDHCA") for allegedly disproportionately allocating LIHTCs to developers proposing LIHTC units in non-Caucasian areas, thus perpetuating racial segregation in the location of LIHTC units in the Dallas Area. *See, e.g., Inclusive Cmtys. Project, Inc. v. Tex. Dep't of Hous. & Cmty. Affairs*, 860 F.Supp.2d 312 (N.D. Tex. 2012) (Fitzwater, C.J.), *rev'd*, 747 F.3d 275 (5th Cir. 2014), *aff'd and remanded*, ___ U.S. ___, 135 S.Ct. 2507 (2015). That lawsuit was comprehensively litigated and has been dismissed. *See Inclusive Cmtys. Project, Inc. v. Tex. Dep't of Hous. & Cmty. Affairs*, 2016 WL 4494322, at *1 (N.D. Tex. Aug. 26, 2016) (Fitzwater, J.).

In the instant lawsuit, ICP sues Treasury and OCC based on the same allegedly disproportionate allocation of LIHTCs in the city of Dallas, seeking to hold Treasury and OCC liable for their roles in "knowingly, consistently, and repeatedly allow[ing] and approv[ing] investments in LIHTC units that perpetuate racial segregation and unequal conditions." Am. Compl. ¶ 1. ICP asserts that defendants' actions in regulating the LIHTC program and approving national bank investments in LIHTC units located in racially segregated minority areas violate 42 U.S.C. § 3608(d), 42 U.S.C. § 3604(a), 42 U.S.C. § 1982, and the equal protection component of the Fifth Amendment.

Defendants move for summary judgment on all of ICP's claims. ICP moves for partial summary judgment on the issue of standing and on its 42 U.S.C. § 3608(d) claim. The court has heard oral argument.

II

When a summary judgment movant will not have the burden of proof on a claim, it can obtain summary judgment by pointing the court to the absence of evidence on any essential element of the nonmovant's claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once it does so, the nonmovant must go beyond its pleadings and designate specific facts demonstrating that there is a genuine issue for trial. *See id.* at 324; *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam). An issue is genuine if the evidence is such that a reasonable trier of fact could return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The nonmovant's failure to produce proof as to any essential element renders all other facts immaterial. *See TruGreen Landcare, L.L.C. v. Scott*, 512 F.Supp.2d 613, 623 (N.D. Tex. 2007) (Fitzwater, J.). Summary judgment is mandatory where the nonmovant fails to meet this burden. *Little*, 37 F.3d at 1076.

To be entitled to summary judgment on a claim on which the moving party will have the burden of proof, the party "must establish 'beyond peradventure all of the essential elements of the claim[.]'" *Bank One, Tex., N.A. v. Prudential Ins. Co. of Am.*, 878 F. Supp. 943, 962 (N.D. Tex. 1995) (Fitzwater, J.) (quoting *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986)). This means that the moving party must demonstrate that there are no genuine and material fact disputes and that it is entitled to summary judgment as a matter of law. *See Martin v. Alamo Cmty. Coll. Dist.*, 353 F.3d 409, 412 (5th Cir. 2003). "The court has noted that the 'beyond peradventure' standard is 'heavy.'" *Carolina Cas. Ins. Co. v.*

*Sowell*, 603 F.Supp.2d 914, 923-24 (N.D. Tex. 2009) (Fitzwater, C.J.) (quoting *Cont'l Cas. Co. v. St. Paul Fire & Marine Ins. Co.*, 2007 WL 2403656, at *10 (N.D. Tex. Aug. 23, 2007) (Fitzwater, J.)).

## III

The court begins by addressing both sides' motions on the issue of standing.

## A

"Federal courts are courts of limited jurisdiction, and absent jurisdiction conferred by statute, lack the power to adjudicate claims." *Stockman v. Fed. Election Comm'n*, 138 F.3d 144, 151 (5th Cir. 1998). It is well settled that "the issue of standing is one of subject matter jurisdiction." *Cobb v. Cent. States*, 461 F.3d 632, 635 (5th Cir. 2006). The doctrine of standing addresses the question of who may properly bring suit in federal court, and "is an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) ("*Defenders of Wildlife*"). It "involves both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). To establish standing, a plaintiff must meet both constitutional and prudential requirements. *See, e.g., Procter & Gamble Co. v. Amway Corp.*, 242 F.3d 539, 560 (5th Cir. 2001). The only issue in this case is constitutional standing, which requires that a litigant establish three elements: (1) injury-in-fact that is concrete and actual or imminent, not hypothetical; (2) a fairly traceable causal link between the injury and the defendant's actions; and (3) a likelihood that the injury will likely be redressed by a favorable decision. *E.g., Little v. KPMG LLP*, 575 F.3d 533, 540 (5th Cir.

2009). To obtain injunctive relief, a plaintiff must be "likely to suffer future injury." *City of L.A. v. Lyons*, 461 U.S. 95, 105 (1983). "Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief[.]" *O'Shea v. Littleton*, 414 U.S. 488, 495 (1974). The threat of future injury to the plaintiff "must be both real and immediate, not conjectural or hypothetical." *Lyons*, 461 U.S. at 102 (quotation marks omitted).

At the summary judgment stage, "each element [of standing] must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Defenders of Wildlife*, 504 U.S. at 561; *see also Cadle Co. v. Neubauer*, 562 F.3d 369, 371 (5th Cir. 2009) ("[B]ut when [standing is] challenged by a motion for summary judgment, . . . evidence is required, including affidavits and other facts. If such evidence is presented, whether controverted or not, it is accepted as true and survives summary judgment; if the evidence is controverted, standing must be supported adequately by the evidence adduced at trial." (internal quotation marks omitted) (quoting *Defenders of Wildlife*, 504 U.S. at 561)). Accordingly, to survive defendants' motion for summary judgment on the issue of standing, ICP must present evidence that creates a genuine issue of material fact. *See Croft v. Governor of Tex.*, 562 F.3d 735, 746 (5th Cir. 2009) ("At this stage of litigation—summary judgment—the plaintiffs' burden on standing is only to raise an issue of material fact."). And for ICP to establish its entitlement to partial summary judgment on the issue of standing—i.e, that it *has* standing—it must demonstrate beyond peradventure that it satisfies all three

- 7 -

essential elements of constitutional standing.

## B

### 1

Defendants move for summary judgment on the ground that ICP has failed to demonstrate the injury-in-fact element of constitutional standing. They maintain that ICP has failed to substantiate its claim that the injury it will suffer in the *future*—i.e., the economic injury arising from the increase in ICP resources needed to assist its clients to obtain affordable units in non-minority concentrated areas—is both real and immediate and not conjectural or hypothetical. This is so, according to defendants, because ICP's claim of future injury depends on the speculative assertions that many private landlords in non-minority areas will continue to refuse to accept vouchers, that project developers will continue to decline to propose affordable housing projects in non-minority parts of Dallas, and that the TDHCA would, if presented with proposed affordable housing projects in those areas, decline to allocate LIHTCs to those suburban projects.

### 2

The court holds that ICP has adduced sufficient evidence to create a genuine issue of material fact on the element of injury. In ICP's motion for partial summary judgment, which it incorporates into its response to defendants' summary judgment motion, ICP maintains that the concentration of LIHTC units in minority-concentrated census tracts causes it to suffer an economic injury because ICP must spend more money and time to locate available non-LIHTC units in non-minority concentrated census tracts for its clients. According to ICP,

only LIHTC landlords are prohibited by law from refusing to rent to voucher holders[5]; because non-LIHTC landlords are *not* prohibited from refusing to rent to voucher households and may either decline to rent or require the payment of higher security deposits or landlord incentive payments as a condition of renting to ICP's voucher client, the money and time it takes to locate and place ICP's clients in non-LIHTC units is substantially greater than the financial assistance that would be required to place them in LIHTC units; ICP's goal is to place its clients in housing units located in non-segregated areas; and the unavailability of LIHTC units in non-minority concentrated census tracts therefore increases ICP's operating costs. ICP adduces evidence, which defendants do not dispute, that for every additional LIHTC unit made available to ICP's clients, ICP would save between $350 and $950 per client move based on the difference in financial assistance paid to obtain LIHTC units for the client compared to the financial assistance paid to obtain non-LIHTC units for clients during that period. Accordingly, for every 100 additional LIHTC units made available to ICP's clients per year, ICP would save between $35,000 and $95,000.

Because ICP is seeking injunctive relief, it must establish that it is "likely to suffer future injury." *Lyons*, 461 U.S. at 105. Courts "have generally permitted future events which are sufficiently likely to occur to serve as a basis for standing when the plaintiffs, as here, are seeking injunctive relief." *K.P. v. LeBlanc*, 627 F.3d 115, 122 (5th Cir. 2010). ICP

---

[5]This means that if a LIHTC project has a vacancy or waiting list, the landlord cannot refuse to consider the ICP client as a tenant simply because the client wants to use a housing voucher.

has adduced sufficient evidence to permit the reasonable conclusion that the economic injury it has suffered in the past is sufficiently likely to continue to occur in the future.  For example, ICP points to evidence that landlords in Caucasian[6] areas continue to refuse to rent to voucher families rather than accept vouchers; that from 2009 through 2017, TDHCA refused to approve LIHTC allocations for six of the nine applications for LIHTC units in Caucasian census tracts in the city of Dallas; and that from 2009 to 2017, the application approval rate for units in Caucasian areas was substantially less than the approval rate for units in minority areas.  It also adduces evidence that TDHCA continues to implement local veto selection criteria that disproportionately deny LIHTCs to units in predominantly Caucasian census tracts, and that the gap between the allocation rates for LIHTC units to be in Caucasian areas and those in minority areas increased substantially after 2014, when the local veto selection criteria became effective.  The court holds that a reasonable trier of fact could find, based on this evidence, that it is sufficiently likely that the increased expenses ICP is forced to incur due to the unavailability of LIHTC housing in non-segregated areas are likely to continue into the future.  Accordingly, the court denies defendants' motion for summary judgment insofar as addressed to the injury-in-fact element of constitutional standing.

---

[6]Throughout this memorandum opinion and order, the court uses the term "Caucasian" to refer to the 2000 U.S. Census category for white persons who are neither Hispanic nor Latino.

The court also denies ICP's motion for partial summary judgment insofar as addressed to the injury-in-fact element of standing. In ICP's motion, it focuses on the present economic injury it has experienced as a result of the concentration of LIHTC units in minority concentrated census tracts, but it neither argues nor establishes beyond peradventure that this injury is likely to occur in the future. Accordingly, ICP is not entitled to summary judgment on this element of constitutional standing.

## C

The court next considers whether ICP has demonstrated that its injury is traceable to either defendant.

## 1

"[T]here must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Defenders of Wildlife*, 504 U.S. at 560 (alterations incorporated). In a suit such as this one, where the plaintiff challenges the legality of government action or inaction, the showing necessary to establish standing "depends considerably upon whether the plaintiff is himself an object of the action (or forgone action) at issue." *Id.* at 561. "If he is, there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it." *Id.* at 561-62. But when, as here, the plaintiff's asserted injury "arises from the government's allegedly unlawful regulation (or lack of regulation) of

*someone else* . . . causation and redressability ordinarily hinge on the response of the regulated (or regulable) third party to the government action or inaction—and perhaps on the response of others as well." *Id.* at 562. "Thus, when the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily 'substantially more difficult' to establish." *Id.* (quoting *Allen v. Wright*, 468 U.S. 737, 758 (1984); *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 44-45 (1976); *Warth*, 422 U.S. at 505).

2

Defendants contend that ICP has failed to establish that its injuries are fairly traceable to Treasury or OCC. They maintain that ICP alleges an economic injury due to increased costs, not because of the actions of Treasury or OCC, but because many of the private market landlords in non-minority areas refuse to accept vouchers, which reduces the supply of available units for voucher families; that ICP also alleges that its economic injury arises because LIHTC units are disproportionately located in predominantly minority areas, but has failed to produce any credible evidence that its increased costs are caused by Treasury or OCC and not by the actions of third parties, such as project sponsors, state or local governments, or the TDHCA; that this court previously found in *Inclusive Communities Project, Inc.*, 2016 WL 4494322, at *9, that no affordable housing project sponsors applied for LIHTCs in predominantly non-minority areas in Dallas since 1995 and that TDHCA did not deny any such application to locate a LIHTC project in a predominantly non-minority area during this same time frame; that ICP has admitted that state agencies and local

governments are the entities that approve, accept, or reject proposed affordable housing projects seeking LIHTCs and could not identify any discrete harm attributable to Treasury or OCC; and that, contrary to ICP's contention, the acts of third parties such as private landlords, project sponsors, and state and local government entities are the source of ICP's alleged injuries, and ICP offers no evidence that would substantiate its claim that Treasury and OCC are liable for its injuries.

ICP responds that OCC controls whether a national bank can purchase and own a LIHTC project that is located in a racially segregated area with unequal living conditions; that there are 57 national bank-owned LIHTC units with 9,782 units that are located in minority census tracts in Dallas; that these units constitute 57% of the total LIHTC units that were approved for locations in minority census tracts from 1995 through 2017; that OCC disapproval of a proposed national bank ownership in a LIHTC project would deprive the bank of the opportunity for ownership; that the OCC approval process currently accounts for 85% of the LIHTC investments in the nation[7]; that the coercive effect of prospective OCC review of such proposals pursuant to affirmatively furthering fair housing is reasonably likely to have made an appreciable difference in providing racially integrated LIHTC housing opportunities in Dallas; and that even a small increase in the percent of units in Caucasian areas would have made an appreciable difference in providing racially integrated LIHTC

---

[7]At oral argument, ICP's counsel clarified that ICP's evidence showed that "85 percent of the investments in equity for tax credits, for either tax credits or tax credit projects, in 2012, was made by banks or bank-related investments." Tr. Oral Arg. 35.

housing in Dallas for ICP and its clients. Regarding Treasury, ICP contends that the absence of a regulation allows conduct that otherwise would not occur and is a cause of the conduct; that state housing finance agencies —HFAs[8]—generally comply with Treasury's regulations governing their conduct; and that a Treasury regulation prohibiting the local veto selection criteria would exert a coercive effect in preventing or removing such criteria from HFA QAPs. In ICP's motion for partial summary judgment, it maintains that "[f]ederal agencies providing funding for and regulating discriminatory actions by state and local entities are a cause of that discrimination," Ps. 4/12/18 Br. 65; that the nature of the federal violation (i.e., funding, regulating, and approving) contradicts any argument that there can be only a single cause of state or local racial segregation; and that if ICP is injured by the existing distribution of low-income housing, and defendants' actions directly and significantly affect that distribution, it follows that ICP has established causation.

Defendants reply that ICP's theory of traceability relies on the same type of causal chain that attempts to connect the alleged failure to regulate the third-party conduct that actually injures ICP, which the Supreme Court rejected in *Allen*, 468 U.S. 737; that ICP fails to address defendants' showing that Treasury cannot, in fact, override the congressionally-designed LIHTC scheme in 26 U.S.C. § 42 to prevent the alleged injury that the TDHCA is causing ICP; that ICP's argument that TDHCA has denied LIHTC allocations based on the use of the "discriminatory local veto provisions" (which have nothing to do with OCC or the

---

[8]*See supra* note 2.

availability of project investors) undercuts its traceability theory with respect to OCC; and that ICP fails to address defendants' showings that:

> (i) Congress has not empowered the OCC to review or approve the TDHCA's location decisions; (ii) the TDHCA allocates LIHTCs to an affordable housing project *before* a national bank invests in such a project; and (iii) the OCC only regulates one of many types of LIHTC investors, which also include financial holding companies, bank holding companies, state-chartered banks, insurance companies, hedge funds, publicly-traded companies, and government-sponsored entities such as "Fannie Mae" and "Freddie Mac," none of which the OCC regulate.

Ds. 6/21/18 Reply Br. 6.

3

The court concludes that, as to ICP's claims against OCC, ICP has failed to meet its summary judgment burden concerning the traceability element of constitutional standing. In support of the element of traceability, ICP contends that there are 57 national bank-owned LIHTC units with 9,782 units located in Dallas; that these units are 57% of the total LIHTC units that were approved for locations in Dallas minority census tracts from 1995 through 2017; and that traceability is shown because "ICP has shown the number of segregated LIHTC projects and units and that the number is enough to make an appreciable difference." Ps. 5/17/18 Br. 42. The court, guided by the Supreme Court's reasoning in *Allen* and *Simon*, disagrees that ICP's showing is sufficient to meet its summary judgment burden with respect to traceability.

In *Allen* a group of parents of African American public school children brought a nationwide class action alleging that the Internal Revenue Service ("IRS") had not adopted

sufficient standards and procedures to fulfill its obligation to deny tax-exempt status to racially discriminatory private schools. *Allen*, 468 U.S. at 739. For standing purposes, their claimed injury, was that "the federal tax exemptions to racially discriminatory private schools in their communities impair their ability to have their public schools desegregated." *Id.* at 752-53.[9] The Court recognized that the injury the plaintiffs identified—i.e., their children's diminished ability to receive an education in a racially integrated school—was undoubtedly judicially cognizable, but it nonetheless held that the plaintiffs' claim of injury could not support standing because the alleged injury was not fairly traceable to the government conduct the plaintiffs challenged as unlawful. *Id.* at 757. The Court explained:

> [t]he diminished ability of respondents' children to receive a desegregated education would be fairly traceable to unlawful IRS grants of tax exemptions only if there were enough racially discriminatory private schools receiving tax exemptions in respondents' communities for withdrawal of those exemptions to make an appreciable difference in public school integration. Respondents have made no such allegation. It is, first, uncertain how many racially discriminatory private schools are in fact receiving tax exemptions. Moreover, it is entirely speculative, as respondents themselves conceded in the Court of Appeals, whether withdrawal of a tax exemption from any particular school would lead the school to change its policies.

*Id.* at 758. The Court concluded that "[t]he links in the chain of causation between the challenged Government conduct and the asserted injury are far too weak for the chain as a

---

[9]The plaintiffs also alleged that they were harmed directly by the mere fact of government financial aid to discriminatory private schools, but the Court rejected this theory, holding that plaintiffs "have no standing to complain simply that their Government is violating the law." *Allen*, 468 U.S. at 755.

whole to sustain respondents' standing." *Id.* at 759.

In *Simon* indigents and organizations composed of indigents brought suit against the Secretary of the Treasury and the Commissioner of the IRS, alleging that the IRS had violated the Internal Revenue Code and the Administrative Procedure Act by issuing a Revenue Ruling that allowed favorable tax treatment to a nonprofit hospital that offered indigents only emergency room services. *Simon*, 426 U.S. at 29. The *Simon* plaintiffs alleged that the IRS's Revenue Ruling "had 'encouraged' hospitals to deny services to indigents." *Id*. at 42. The Court, however, held that it was speculative "whether the denials of service specified in the complaint fairly can be traced to [the IRS's] 'encouragement' or instead result from decisions made by the hospitals without regard to the tax implications." *Id*. at 42-43. As the *Allen* Court explained in its discussion of *Simon*, "the causal connection [in *Simon*] depended on the decisions hospitals would make in response to withdrawal of tax-exempt status, and those decisions were sufficiently uncertain to break the chain of causation between the plaintiffs' injury and the challenged Government action." *Allen*, 468 U.S. at 759.

The chain of causation in the present case is even weaker than in *Allen* or *Simon*. In this case, the conduct that ICP challenges is OCC's approval of national bank investments in LIHTC projects located in racially segregated areas with unequal living conditions. The line of causation between that conduct and the increased time and resources ICP must expend to locate non-LIHTC units in non-minority concentrated census tracts for its clients is attenuated at best, as the court will now explain.

"From the perspective of [OCC,] the injury to [ICP] is highly indirect and 'results from the independent action of some third party not before the court.'" *Allen*, 468 U.S. at 757 (quoting *Simon*, 426 U.S. at 42). ICP concedes in its response brief that "[l]andlords in White non-Hispanic areas continue to refuse to rent to voucher families rather than accept the voucher," and it asserts that "TDHCA continues to implement local veto selection criteria that disproportionately deny LIHTCs to units in predominantly White census tracts." P. 5/17/18 Br. 41. ICP does not dispute that the availability of LIHTC projects in non-segregated areas is dependent on project sponsors' proposing affordable housing projects in these areas, local governments' enacting zoning and land-use policies for the projects,[10] and TDHCA's selecting the proposed projects for LIHTCs. Nor does ICP dispute that project sponsors propose affordable housing projects and that TDHCA selects those projects for LIHTCs *before* any national banks invest in them.

ICP fails to adduce *any* evidence that the lack of available low income housing in non-segregated areas of Dallas is traceable to OCC's conduct in approving national bank investments in LIHTC projects. It contends that the PWI process "is 'critical to the success' of the LIHTC program," and that the "coercive effect of prospective OCC review of such proposals . . . is reasonably likely to have made an appreciable difference providing racially integrated LIHTC housing opportunities in Dallas." *Id.* at 43; *see also* Tr. Oral Arg. 13

_____

[10]Under Texas law, local governments control the zoning, permitting, and other land use policies and practices that may be needed to build affordable housing projects within their boundaries.

("The traceability issue in this case involves the coercive power of Treasury and OCC to regulate on the location and neighborhood conditions in which tax credit units are located."). But ICP fails to show that OCC has the power to coerce the project sponsors who propose low income housing projects or the state HCAs charged with allocating LIHTCs. Nor does it show that if OCC had refused to approve national bank investments in LIHTC projects located in minority census tracts, LIHTC projects would instead have been located in Caucasian areas. *See, e.g., Simon*, 426 U.S. at 42-43 (concluding that petitioners lacked standing to challenge Revenue Ruling allowing favorable treatment to nonprofit hospitals that offered only emergency room services to indigents because, *inter alia*, "[i]t is purely speculative whether the denials of service specified in the complaint fairly can be traced to [IRS's] 'encouragement' or instead result from decisions made by the hospitals without regard to the tax implications.").

ICP contends that national banks own 57 units with 9,782 units that are located in minority census tracts in Dallas and that these units are 57% of the total LIHTC units that were approved for locations in minority census tracts in Dallas from 1995 through 2017. At oral argument, ICP's counsel asserted that bank investments in LIHTC units are "clearly essential." Tr. Oral Arg. 15. But the fact that, historically, national banks have invested in a significant percentage of LIHTC units located in minority census tracts in Dallas does not, without more, support the reasonable finding that these national bank investments *caused* the

LIHTC units to be located there.[11]  *See, e.g., Simon*, 426 U.S. at 42 ("The complaint here alleged only that [IRS], by the adoption of Revenue Ruling 69-545, had 'encouraged' hospitals to deny services to indigents.  The implicit corollary of this allegation is that a grant of respondents' requested relief, resulting in a requirement that all hospitals serve indigents as a condition to favorable tax treatment, would 'discourage' hospitals from denying their services to respondents.  But it does not follow from the allegation and its corollary that the denial of access to hospital services in fact results from petitioners' new Ruling, or that a court-ordered return by petitioners to their previous policy would result in respondents' receiving the hospital services they desire." (footnotes omitted)).

It is equally speculative whether the desired exercise of the court's remedial powers in this suit would result in the increased availability of LIHTC projects in non-segregated areas.  *See, e.g., id.* at 43.  ICP produces no evidence that there are an insufficient number of other (non-national bank) investors—including financial holding companies, bank holding companies, state-chartered banks, insurance companies, hedge funds, publicly-traded companies, or government-sponsored entities (none of which is regulated by OCC)—to support the continued development of LIHTC projects in minority census tracts even if OCC withdrew its approval of national bank investments there.  In other words, it is entirely

---

[11]The court does not suggest that it is impossible, given national banks' investment in 57% of the total LIHTC units located in minority census tracts, that withdrawal of OCC approval of these investments would, in fact, force LIHTC projects to relocate to non-segregated areas.  The court's holding is limited to the conclusion that ICP has failed to introduce any *evidence* that would support such a finding.

speculative whether withdrawal of national bank approval in LIHTC projects located in segregated areas would lead to the development of LIHTC projects in non-segregated areas. *See Allen*, 468 U.S. at 758.

Accordingly, the court grants defendants' motion for summary judgment and dismisses ICP's claims against OCC without prejudice for lack of constitutional standing.

4

Turning to the traceability element of standing as pertinent to ICP's claims against Treasury, the court concludes that ICP has created a genuine issue of material fact sufficient to withstand defendants' summary judgment motion. Unlike OCC, which only has the power to regulate one type of entity (national banks) that invests in LIHTC projects after they have already been selected, Treasury can issue regulations that could directly impact the location of LIHTC projects. Under 26 U.S.C. § 42(h)(3), Treasury administers the allocation of LIHTCs to Texas every year. Under 26 U.S.C. § 42(n), Treasury has the authority to "prescribe such regulations as may be necessary or appropriate to carry out the purposes" of the LIHTC program. *See also* 26 U.S.C. § 7805(a) ("Except where such authority is expressly given by this title to any person other than an officer or employee of the Treasury Department, the Secretary shall prescribe all needful rules and regulations for the enforcement of this title[.]").

ICP maintains in its summary judgment motion that the efforts and expenses it is forced to incur as a result of the unavailability of LIHTC housing in non-segregated areas are necessary because Treasury has failed to take specific regulatory actions. ICP cites, as an

- 21 -

example, evidence that the use of local selection criteria in state QAPs gives local government officials an effective veto over LIHTC applications, and that this so-called "local veto" has discriminatory effects with regard to the location of LIHTC projects. *See* P. 4/12/18 App. 1203-04 (Government Accountability Office ("GAO") letter noting that "officials from HUD's Office of Fair Housing and Equal Opportunity and Office of General Counsel have cited fair housing concerns in relation to any preferences or requirements for local approval or support because of the discriminatory influence these factors could have on where affordable housing is built."). ICP maintains that a Treasury regulation prohibiting local selection criteria would exert a coercive effect in preventing or removing such criteria from state QAPs, which would therefore result in the approval of LIHTCs for low income housing in areas that are not marked by racial segregation and unequal living conditions.

Defendants dispute, on the merits, the legality under the statutory scheme of a regulation prohibiting states from including certain local selection criteria in their QAPs. The court does not decide today whether Treasury's regulation of the states' local selection criteria is statutorily permissible. Assuming that it is, the court concludes that ICP has created a fact issue with respect to the traceability element of standing. In *Bennett v. Spear*, 520 U.S. 154 (1997), the Supreme Court explained that, "[w]hile . . . it does not suffice if the injury complained of is the result of the *independent* action of some third party not before the court, that does not exclude injury produced by determinative or coercive effect upon the action of someone else." *Id.* at 169-70 (internal quotation marks, brackets, and citations omitted). Because Treasury has the authority to regulate the entities charged with allocating

LIHTCs, and because there is evidence in the record that local selection criteria have exerted a discriminatory influence on where affordable housing is built, the court concludes that ICP has raised a genuine fact issue that its economic injury is fairly traceable to Treasury's failure to regulate with respect to the LIHTC program. But because ICP has not established traceability beyond peradventure, ICP is not entitled to partial summary judgment on the traceability element of constitutional standing.

D

Finally, the court turns to the redressability element of standing.

1

Defendants move for summary judgment on the redressability element of standing, contending, *inter alia*, that ICP cannot demonstrate that the relief it seeks is likely to redress its economic injury; that ICP's request for an order requiring Treasury to prohibit HCAs from including their own additional criteria in their QAPs is an impermissible attempt to alter the statutory scheme through judicial decree; and that even if the court could order the remedy ICP seeks, ICP could not show that such a remedy would likely increase LIHTC projects in non-minority areas because ICP would still be dependent on the independent actions and location decisions of project sponsors, and the TDHCA's application of existing federal QAP criteria to the selection of projects for LIHTCs (including, in particular, the selection criteria in 26 U.S.C. § 42(m)(1)(B)(ii)), would still require TDHCA to give preference to projects in the very minority areas that ICP disfavors.

ICP responds that "[t]he injuries are redressable. Courts can effectively remedy an

agency's failure to affirmatively further fair housing." P. 5/17/18 Br. 44. It also argues:

> HFAs generally comply with Treasury's regulations governing their conduct even with Treasury's minimal oversight. A Treasury regulation prohibiting the local veto selection criteria would exert such a coercive effect in preventing or removing such criteria from HFA QAPs. GAO found that a site selection standard discouraging LIHTC investments in low income, minority concentrated areas would make more units available outside of those areas. The federal government's Rental Policy Working Group recommended affirmatively furthering fair housing in the LIHTC program and explained that the third parties involved would comply with the standards. The National Commission on Fair Housing recommended that Treasury affirmatively further fair housing in the LIHTC program because it would work to provide more racially integrated LIHTC housing.

P. 5/17/18 Br. 43 (citations omitted).

## 2

The redressability element is satisfied if it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Bennett*, 520 U.S. at 167. The court concludes above that there are genuine fact issues as to whether ICP has suffered a cognizable injury-in-fact and whether that injury is fairly traceable to Treasury's failure to issue certain regulations with respect to the LIHTC program. Whether ICP's injury will be redressed by the injunctive relief ICP seeks, which includes, *inter alia*, an order enjoining Treasury to prohibit the use of non-federal eligibility and selection criteria for LIHTC allocations in the Dallas area that interfere with tax credit allocation decisions that affirmatively further fair housing, Am. Compl. ¶ 195(4), is also a genuine issue of fact. Accordingly, the court denies defendants' and ICP's motions for summary judgment on this

element of standing.

IV

Having decided that ICP's claims against Treasury cannot be dismissed at the summary judgment stage based on lack of constitutional standing, the court now turns to the merits of those claims.

The court begins with ICP's claim that Treasury has violated the requirement in 42 U.S.C. § 3608(d) that all executive departments and agencies "shall administer their programs and activities relating to housing and urban development . . . in a manner affirmatively to further the purposes of this subchapter." Defendants move for summary judgment, *inter alia*, on the ground that the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706, precludes the type of broad, programmatic relief ICP seeks. ICP moves for partial summary judgment establishing this claim.

A

It is well-settled that "there is no private right of action against the federal government for a violation of § 3608(d)." *Inclusive Cmtys. Project, Inc. v. U.S. Dep't of Treasury*, 2016 WL 6397643, at *4 (N.D. Tex. Oct. 28, 2016) (Fitzwater, J.) (citing cases). Accordingly, ICP must pursue its claim that defendants have violated § 3608(d) through the APA, which, *inter alia*, permits judicial review of "final agency action for which there is no adequate remedy in a court." 5 U.S.C. § 704 ("Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review."); *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 882 (1990) ("When, as here, review

- 25 -

is sought not pursuant to specific authorization in the substantive statute, but only under the general review provisions of the APA, the 'agency action' in question must be 'final agency action.'").  "Final agency actions are actions which (1) 'mark the consummation of the agency's decisionmaking process,' and (2) 'by which rights or obligations have been determined, or from which legal consequences will flow.'"  *Sierra Club v. Peterson*, 228 F.3d 559, 565 (5th Cir. 2000) (en banc) (quoting *Bennett*, 520 U.S. at 178).  The final action must be "an identifiable action or event."  *Lujan*, 497 U.S. at 899.  "Absent a specific and final agency action, [the court] lack[s] jurisdiction to consider a challenge to agency conduct."  *Sierra Club*, 228 F.3d at 565 (citing *American Airlines, Inc. v. Herman*, 176 F.3d 283, 287 (5th Cir. 1999)).

B

Defendants contend that the APA precludes the programmatic relief that ICP seeks and that an alleged "failure to administer" or enforce a "program" is unreviewable, regardless of how often the alleged failure is repeated.  Ds. 4/12/18 Br. 30.  They maintain that ICP's claims are based solely on Treasury's and OCC's alleged failures to exercise their statutory authority with respect to LIHTCs in the manner that ICP prefers; that ICP's policy preference for a more active role on the part of Treasury is not actionable under the APA; that ICP cannot seek "*wholesale* improvement" of the LIHTC program by judicial decree, *id.* at 31; that ICP cannot obtain review of its § 3608(d) claim simply because its amended complaint identifies particular affordable housing projects that banks have invested in; that ICP does not seek to overturn any specific approvals of these bank investments or even allege that

Treasury should have taken a different course of action with respect to the identified projects, but seeks, instead, to require Treasury to promulgate new regulations and issue new rulings, guidance, and/or notices, which would require Treasury to fund and develop the expertise to create an entirely new regulatory program to govern project sponsors' future decisions about where to locate affordable housing projects for LIHTCs and to control TDHCA's future selection of certain of those proposed projects for LIHTCs; and that ICP cannot obtain this type of wholesale relief under the APA.

ICP responds by pointing to the following "three specific Treasury actions challenged by ICP as actions for which 5 U.S.C. § 706(2) provide[s] for judicial review and a remedy":

> 1) Treasury's administration of the LIHTC without implementing, through regulations or other guidance, Treasury's affirmatively further fair housing obligation; 2) Treasury's decision allowing Texas to continue to use local veto provisions in the QAP despite the clear violation of the obligation to affirmatively further fair housing upon which the Treasury decision is based; and 3) Treasury's decision refusing to implement Treasury's affirmatively further fair housing obligation in the administration of the concerted community revitalization plan requirement of the federal restrictions on preferences for applications in [qualified census tracts ("QCTs")].

P. 5/17/18 Br. 47. ICP also contends that review under § 706(2) is authorized when the pattern of activity over time reveals a failure to administer the program in compliance with the obligation to affirmatively further fair housing; that this is not a broad, programmatic attack but a challenge focused on defendants' compliance with a specific statutory provision (§ 3608(d)); and that defendants have failed to cite any authority in which a court has

declined to assess federal agency compliance with a 42 U.S.C. § 3608 duty under the APA.

In reply, defendants contend, *inter alia*, that the cases on which ICP relies—*Shannon v. United States Department of Housing & Urban Development*, 436 F.2d 809 (3d Cir. 1970); *NAACP v. Secretary of Housing & Urban Development*, 817 F.2d 149 (1st Cir. 1987) (hereafter, "*NAACP v. Secretary of HUD*"); and *Darst-Webbe Tenants Association Board v. St. Louis Housing Authority*, 417 F.3d 898 (8th Cir. 2005)—are distinguishable because, unlike in this case, the plaintiffs in each of those cases were challenging discrete, final agency actions and were asking the court to set aside those discrete actions. Regarding ICP's March 12, 2008 petition for rulemaking, defendants maintain that Treasury *did* respond to ICP's petition; that a failure to respond does not provide a basis for awarding ICP the programmatic relief it seeks under the APA; and that, in any event, ICP's challenge to Treasury's alleged failure to respond to ICP's petition is time-barred under 28 U.S.C. § 2401(a).

C

In *Sierra Club* the *en banc* Fifth Circuit held that, where the plaintiffs had failed to challenge an "identifiable final agency action[,]" the district court did not have jurisdiction under the APA to review the agency's conduct. *Sierra Club*, 228 F.3d at 561. The plaintiffs in *Sierra Club* had sued the United States Forest Service ("Forest Service") in an attempt to stop the use of even-aged timber management,[12] alleging that specific acts of the Forest

---

[12]"Even-aged timber management" refers to timber harvesting techniques that involve cutting all or almost all of the trees in the same stand at the same time. *Sierra Club*, 228 F.3d

Service violated the National Forest Management Act of 1976 ("NFMA") and "challeng[ing] the Forest Service's entire program of allowing timber harvesting in the Texas forests." *Id.* at 563. The district court had concluded that "[t]he Forest Service's failure to implement timber sales in compliance with the NFMA and regulations, as alleged by Plaintiffs, is a final agency action for purposes of section 704" of the APA. *Id.* at 564 (citation omitted). The Fifth Circuit reversed. It relied heavily on the Supreme Court's opinion in *Lujan*, explaining:

> *Lujan* thus announced a prohibition on programmatic challenges: "respondent cannot seek wholesale improvement of this program by court decree, rather than in the offices of the Department or the halls of Congress, where programmatic improvements are normally made." The decision makes clear that this prohibition is motivated by institutional limits on courts which constrain our review to narrow and concrete actual controversies. We thereby not only avoid encroaching on the other branches of government, but we continue to respect the expert judgment of agencies specifically created to deal with complex and technical issues.

*Sierra Club*, 228 F.3d at 566 (citations omitted). The *en banc* court then concluded that the plaintiffs' challenge was "precisely the type of programmatic challenge that the Supreme Court struck down in *Lujan*." *Id.* Plaintiffs were challenging past, ongoing, and future timber sales approved by the Forest Service, arguing that the Forest Service had failed to monitor and inventory properly in conducting these sales. The *en banc* Fifth Circuit concluded that plaintiffs' challenge

---

at 562.

sought "wholesale improvement," of the Forest Service's "program" of timber management in the Texas forests . . . . This is not a justiciable challenge because the program of timber management to which the environmental groups object does not "mark the 'consummation' of the agency's decisionmaking process," or constitute "an identifiable action or event[.]" Instead, as in *Lujan*, the environmental groups have impermissibly attempted to "demand a general judicial review of the [Forest Service's] day-to-day operations." The district court's accession to this demand, by reviewing and then enjoining almost all of the Forest Service's program of timber management in Texas forests until the Forest Service complies with the NFMA, exceeded the court's jurisdiction under the APA.

*Id.* (second alteration in original) (citations omitted); *see also, e.g., Am. Disabled for Attendant Programs Today v. U.S. Dep't of Hous. & Urban Dev.*, 170 F.3d 381, 389 (3d Cir. 1999) (hereafter, "*ADAPT*") (rejecting "broad-based attack on HUD's investigative and enforcement scheme," and holding that judicial review was barred under § 704 because plaintiffs did not point to any final agency action demonstrating that HUD had completely abdicated enforcement of the Fair Housing Act Amendments, in violation of § 3608(e)(5)); *Nev. Ass'n of Ctys. v. Dep't of Interior*, 2015 WL 1130982, at *2-4 (D. Nev. Mar. 12, 2015) (dismissing "programmatic attack" under APA alleging that defendants failed to manage Nevada's wild horses and burros in compliance with the Wild Horse Act, noting "[p]laintiffs essentially ask the Court to compel compliance with the Act and refashion Federal Defendants' management of wild horses and burros in Nevada[] [b]ut Plaintiffs 'cannot seek *wholesale* improvement of this program by court decree.'" (citation omitted)), *aff'd*, 686 Fed. Appx. 407 (9th Cir. 2017).

D

Similar to the plaintiffs in *Sierra Club*, ICP has failed to point to any specific action on the part of Treasury that constitutes the type of "final agency action" that § 704 requires. ICP challenges Treasury's "administration of the LIHTC" program without implementing regulations or guidance that would affirmatively further fair housing; Treasury's "decision" to allow Texas to continue to use local veto provisions in the QAP; and Treasury's "decision" not to implement additional affirmatively further fair housing obligations in connection with the federal preference for developments that contribute to a concerted community revitalization plan. Ps. 5/17/18 Br. 47. None of these three "actions," however, "mark[s] the consummation" of the agency's decisionmaking process or constitutes an action "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett*, 520 U.S. at 178 (internal quotation marks omitted).

ICP's general challenge to Treasury's "administration of the LIHTC without implementing, through regulations or other guidance, Treasury's affirmatively further fair housing obligation," P. 5/17/18 Br. 47, is "precisely the type of programmatic challenge that the Supreme Court struck down in *Lujan*." *Sierra Club*, 228 F.3d at 566. ICP does not point to any specific LIHTC allocation or approval of a national bank investment that it seeks to have held unlawful and set aside.[13] Instead, it complains about the way that Treasury has

_____

[13]To the extent ICP has identified specific low income housing projects for which LIHTCs have been allocated, or in which national bank investment has been approved, ICP uses these specific projects "as evidence to support [its] sweeping argument" that Treasury's administration of the LIHTC project over the past 32 years violates § 3608(d). *Sierra Club*,

administered and managed the entire LIHTC program—i.e., by permitting local HCAs to allocate LIHTCs without requiring that low income housing projects be located in non-segregated areas.[14]  But as the Supreme Court explained in *Lujan*, ICP "cannot seek

---

228 F.3d at 567 ("the APA does not allow [a plaintiff] to challenge an entire program by simply identifying specific allegedly-improper final agency actions within that program."). ICP does not contend that Treasury took any action with respect to these specific projects that would constitute "final agency action" under 5 U.S.C. § 704.  Nor does it seek to overturn any specific decision with respect to any of these projects.  In any event, *Sierra Club* makes clear that "it is at least entirely certain that the flaws in the entire 'program'—consisting principally of the many individual actions referenced in the complaint, and presumably actions yet to be taken as well—cannot be laid before the courts for wholesale correction under the APA, simply because one of them that is ripe for review adversely affects one of respondent's members."  *Sierra Club*, 228 F.3d at 567-68 (quoting *Lujan*, 497 U.S. at 892-93).

[14]ICP's requested relief further supports the court's conclusion that ICP has failed to identify any final agency action that the court can hold unlawful and set aside under 5 U.S.C. § 706.  ICP asks the court to issue an injunction that, *inter alia*, enjoins Treasury's and OCC's approval of investments in LIHTC projects by regulated national bank entities if such investments will make dwelling units available in racially concentrated minority areas marked by conditions of slum, blight, and distress, unless the development of the units will contribute to a concerted community revitalization plan and program; enjoins Treasury and OCC to require that the profits, dividends, and other distributions from tax credit investments or interest income from debt investments received by banks from their public welfare investments in LIHTC projects be devoted in part to housing mobility counseling services; enjoins Treasury to provide guidelines and incentives that will focus on providing national bank investments in LIHTC units in locations that do not subject low income minority families to conditions of racial segregation in minority areas marked by slum, blight, and distress and that expands the supply of LIHTC units outside of those areas; and enjoins Treasury to prohibit the use of non-federal eligibility and selection criteria for LIHTC allocations in the Dallas area that interfere with tax credit allocation decisions that affirmatively further fair housing.  Am Compl. ¶ 195.  It essentially asks the court to compel Treasury to rewrite the rules regarding national bank investment in LIHTCs and the allocation of LIHTCs in the Dallas area.  But as the court explains above, ICP is not permitted to "seek *wholesale* improvement of this program by court decree, rather than in the offices of the Department or the halls of Congress, where programmatic improvements are normally made." *Lujan*, 497 U.S. at 891.  ICP has not pointed to any specific final agency

*wholesale* improvement of [a federal] program by court decree, rather than in the offices of the Department or the halls of Congress, where programmatic improvements are normally made." *Lujan*, 497 U.S. at 891.

ICP has also failed to point to any final agency action with respect to Treasury's alleged "decision refusing to implement Treasury's affirmatively further fair housing obligation in the administration of the concerted community revitalization plan requirement of the federal restrictions on preferences for applications in QCTs." P. 5/17/18 Br. 47. In fact, it is unclear to the court what "decision" ICP is even referring to. In Treasury Notice 2016-77, published in December 2016,[15] Treasury specifically stated that it was considering providing guidance to clarify the preference in § 42(m)(1)(B)(ii)(III) for projects located in QCTs and the development of which contribute to a concerted community revitalization plan, and it requested public comment regarding the contents of that guidance. P. 4/12/18 App. 1450. A request for public comment, however, does not in this instance constitute a final agency decision under § 704 of the APA. And ICP does not point to any other action with respect to the "concerted community revitalization plan" requirement of 26 U.S.C. § 42(m)(1)(B)(ii)(III) (stating that a QAP is to give preference in allocating housing credit dollar amounts to "projects which are located in [QCTs] and the development of which

---

action that this court would be able to hold unlawful and set aside under § 706 of the APA.

[15]ICP has not pleaded any claim based on Treasury Notice 2016-77, which was issued *after* ICP filed its amended complaint. Nonetheless, even if it had been properly pleaded, an APA claim based on this notice would fail for the reasons explained here.

contributes to a concerted community revitalization plan.") that consummates Treasury's decisionmaking process, *Bennett*, 520 U.S. at 178; that determines any rights or obligations, *id.*; or that ICP seeks to set aside.

To the extent ICP challenges Treasury's "decision' allowing Texas to continue to use local veto provisions in the QAP, ICP has likewise failed to identify any final agency action in which Treasury made any such decision. Assuming *arguendo* that ICP intended to rely on Revenue Ruling 2016-29, which was published on December 27, 2016,[16] nothing in that revenue ruling can fairly be read as a final decision "allowing" TDHCA to rely on a local veto. *See* Rev. Rul. 2016-29, 2016-52 I.R.B. 875 (2016) (stating that "[w]hen state housing credit agencies allocate housing credit dollar amounts, § 42(m)(1)(A)(ii) does not require or encourage these agencies to reject all proposals that do not obtain the approval of the locality where the project developer proposes to place the project. That is, it neither requires nor encourages housing credit agencies to honor local vetoes."). Nor does ICP seek to set aside this revenue ruling or any other specific agency action relating to Texas' "local veto."[17]

_____

[16]As with Treasury Notice 2016-77, Revenue Ruling 2016-29 post-dates ICP's amended complaint, and ICP has not pleaded any claim based on Revenue Ruling 2016-29.

[17]In its response, ICP contends that it challenged Treasury's actions in its March 12, 2008 petition for rulemaking and that the petition remains undecided "despite Treasury's legal obligation to decide and give reasons for the decision." P. 5/17/18 Br. 47. But ICP does not contend that Treasury's failure in this respect itself constitutes a violation of § 3608(d). In fact, it limits the "Treasury actions challenged by ICP as actions for which 5 U.S.C. § 706(2) provide[s] for judicial review and a remedy" to the "three specific Treasury actions" quoted above. *Id.* Nor has ICP pleaded any cause of action based on Treasury's alleged failure to decide ICP's March 12, 2008 petition for rulemaking.

E

ICP contends that judicial review under § 706(2) "is authorized when the pattern of activity over time reveals a failure to administer the program in compliance [with] the obligation to affirmatively further fair housing," P. 5/17/18 Br. 48; *see also id.* (quoting *NAACP v. Secretary of HUD*, 817 F.2d at 158, for the proposition that 5 U.S.C. § 706(2) permits a "straightforward evaluation of whether agency activity over time has furthered the statutory goal, and, if not, for an explanation of why not and a determination of whether a given explanation, in light of the statute is satisfactory."). This court, however, is not bound to follow the First Circuit's decision in *NAACP v. Secretary of HUD*. Even if it were, there is "an essential difference between the specific activity reviewed by the court in [*NAACP v. Secretary of HUD*] and the all-encompassing review [the court is] asked to undertake here." *ADAPT*, 170 F.3d at 388. In *NAACP v. Secretary of HUD* the court held that it was able to review HUD's actions under the APA, in part, because the "NAACP ask[ed] for review of a *series of decisions* to determine whether, taken together, they violate the obligation to further the goals of Title VIII." *NAACP v. Secretary of HUD*, 817 F.2d at 159 (emphasis added). The panel was reviewing "various acts and omissions related to HUD's administration of its Community Development Block Grant . . . and Urban Development Action Grant . . . programs in the City of Boston." *Id.* at 151. By contrast, in the present case ICP does not point to any specific decision or series of decisions made by Treasury in

relation to the LIHTC program that did not further the policies of the FHA.[18]

F

In sum, under the APA, the court's jurisdiction extends only to "challenges to identifiable final agency actions." *Sierra Club*, 228 F.3d at 569. Reaching the merits of ICP's programmatic challenge to Treasury's administration of the LIHTC program would require the court to "ignor[e] the critical limits on judicial review which define the role of courts in the modern administrative state." *Id.* at 570. Accordingly, because ICP has not challenged any identifiable final agency action, the court concludes that it lacks jurisdiction under the APA to decide the merits of ICP's § 3608(d) claim. The court therefore grants defendants' motion for summary judgment on this claim, and it denies ICP's motion for partial summary judgment to the extent addressed to this claim.

V

The court now turns to defendants' motion for summary judgment on ICP's intentional discrimination claims brought under 42 U.S.C. § 3604(a)[19] and 42 U.S.C. §

---

[18]The other two cases on which ICP relies are similarly distinguishable. In *Shannon* the plaintiffs challenged "[a] number of substantive and procedural irregularities . . . in the steps leading to federal approval of the contract of insurance and the approval of a project for a rent supplement contract. *Shannon*, 436 F.2d at 811. In *Darst-Webbe* the plaintiffs challenged HUD's alleged "fail[ure] to adequately consider impact on protected class members and affirmatively furthering fair housing when it approved the City's Section 108 loan guarantee and approved the Housing Authority's Hope VI plan." *Darst-Webbe*, 417 F.3d at 906-07.

[19]42 U.S.C. § 3604(a) makes it unlawful to "refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial

1982.[20]

A

1

Defendants move for summary judgment on ICP's § 3604(a) claim on the ground that ICP has not demonstrated that Treasury has made housing "unavailable," as the statute requires. Defendants maintain that,

> [b]y congressional design, project sponsors not only propose that the TDHCA allocate LIHTCs for the construction or rehabilitation of affordable housing projects, but these sponsors also commit to rent either 40 or 50 percent of these units to low- and moderate-income individuals. 26 U.S.C. § 42(g). And by congressional design, it is the TDHCA that has authority to allocate LIHTCs to affordable housing projects based on point systems reflecting the state's priorities for the desired type, location, and ownership of affordable housing. *See id.* § 42(m). Thus, while project sponsors are obviously engaged in the rental of housing, and while it may be reasonable to consider the TDHCA to be sufficiently involved in the provision of housing and housing-related activities and services to subject it to the requirements of § 3604(a) . . . Congress has not prescribed, and neither Treasury nor the OCC has assumed, such a role.

Ds. 4/12/18 Br. 49-50. Defendants contend that Treasury's involvement with LIHTC projects is limited to issuing such regulations as may be necessary to ensure compliance with the requirements of § 42 and to the IRS's administration of the tax credit, including, as may

---

status, or national origin."

[20]42 U.S.C. § 1982 provides that "[a]ll citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property."

be appropriate, the acceptance, denial, or recapture of the credit, as part of its broader administration of the Tax Code, and that none of these activities can be considered to have made housing unavailable, in violation of 42 U.S.C. § 3604(a).

ICP responds that liability under the FHA is not limited to landlords, sellers, and creditors; that defendants have made federally assisted housing disproportionately unavailable in Caucasian areas to a predominantly black group of LIHTC tenants while Caucasian tenants are not so disadvantaged in their right to rent the LIHTC housing; that this is a claim that some citizens are being denied the same right to lease property as is enjoyed by white citizens; and that the FHA "makes governments liable for otherwise making dwellings unavailable by actions that have the discriminatory intent to perpetuate racial segregation." P. 5/17/18 Br. 39.

In reply, defendants contend, *inter alia*, that § 3604 does not make Treasury liable for alleged discriminatory practices by the institutions it supervises and does not make Treasury liable for discrimination by third parties (such as the affordable housing project sponsors who ICP claims are allegedly discriminating) because Treasury does not have any regulatory relationship with those third parties.

2

Section 3604(a) of the FHA provides that it is unlawful to "make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin." Courts have broadly interpreted the prohibition in § 3604(a) against making a residence "unavailable." For example, § 3604(a) has been applied when government

agencies have taken actions that prevented the construction of housing when the circumstances indicated a discriminatory intent or impact against anticipated future residents who are members of a class protected under the Act. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977); *Dews v. Town of Sunnyvale*, 109 F.Supp.2d 526 (N.D. Tex. 2000) (Buchmeyer, C.J.). Courts have also "construed the phrase 'otherwise make unavailable or deny' in subsection (a) to encompass mortgage 'redlining,' insurance redlining, racial steering, exclusionary zoning decisions, and other actions by individuals or governmental units which directly affect the availability of housing to minorities." *Bloch v. Frischholz*, 587 F.3d 771, 777 (7th Cir. 2009) (quoting *Southend Neighborhood Improvement Ass'n v. Cty. of St. Clair*, 743 F.2d 1207, 1209 & n.3 (7th Cir. 1984)). In all of these cases, however, the defendants have taken some action that "directly affect[s] the availability of housing to minorities." *Id.* ICP does not cite, nor has the court located through its own research, any case in which liability under § 3604(a) has been premised on the failure of a federal department or agency to regulate the state and local entities and various third parties whose conduct together contributes to the unavailability of low-income housing in non-minority-concentrated areas.

ICP maintains in its response brief that Treasury has "made federally assisted housing disproportionately unavailable in White non-Hispanic areas," P. 5/17/18 Br. 39, but ICP has failed to point to any conduct on the part of *Treasury* that has made low-income housing unavailable to minorities in Dallas. It is undisputed that, under the statutory scheme, Congress allocates LIHTCs to the states each year based on population, 26 U.S.C. §

42(h)(3)(C), and that state or local HCAs (such as TDHCA) are given the exclusive authority to allocate credits to private sponsors seeking to build or rehabilitate affordable housing projects, based on a system reflecting each state's priorities for the desired type, location, and ownership of affordable housing, 26 U.S.C. § 42(m)(1). Thus assuming *arguendo* that any entity has made LIHTC housing unavailable in Dallas, it is TDHCA,[21] the project sponsors, or the local government entities, not Treasury. In fact, ICP maintains that TDHCA, in connection with various local governmental entities, made LIHTC housing unavailable in non-segregated areas. *See* P. 4/12/18 App. 897 ("The LIHTC applications in non-minority concentrated areas for which [an ICP subsidiary] provided support and which were rejected by TDHCA includes applications rejected *because of the requirements for municipal and state representative support.*" (emphasis added)).

In its amended complaint, ICP alleges that "Treasury's policy and practice [of] refusing to regulate the LIHTC program to prevent racial segregation and to accomplish affirmatively furthering fair housing is the Treasury's discriminatory housing practice challenged in this complaint." Am. Compl. ¶ 188. But Treasury's theoretical ability to issue regulations that might have *prevented* the unavailability of non-segregated low-income

---

[21]The court's inclusion of TDHCA as an actor who may have made LIHTC housing unavailable in Dallas is not inconsistent with its decisions in *Inclusive Communities Project, Inc.*, 860 F.Supp.2d at 321 (finding against ICP on its intentional discrimination claim), or *Inclusive Communities. Project, Inc.*, 2016 WL 4494322, at *13 (finding against ICP on its disparate impact claim). An entity's conduct can make affordable housing unavailable without being the result of the entity's intent to discriminate, or resulting in a disparate impact, in violation of the FHA.

housing in Dallas does not, without more, establish that Treasury is liable under § 3604(a) for making that housing unavailable in the first place.  Because ICP has failed to adduce any evidence that it was Treasury, as opposed to TDHCA, state and local government entities, or project sponsors, who made housing in non-segregated areas of Dallas unavailable, the court grants defendants' motion for summary judgment on ICP's § 3604(a) claim against Treasury.[22]

B

Because it is undisputed that Treasury is not engaged in the sale or rental of property, *see* Ds. 4/12/18 App. 56 ("ICP admits . . . that Treasury is neither the owner, the landlord, the manager, the lender, or the investor in individual housing projects involved in the [LIHTC] program."), the court also grants defendants' motion for summary judgment on ICP's claim against Treasury under 42 U.S.C. § 1982.  Section 1982 "grants to all citizens, without regard to race or color, 'the same right' to purchase and lease property as is enjoyed by white citizens."  *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 420 (1968) (quoting 42 U.S.C. § 1982).

Defendants contend that Treasury's involvement with LIHTC projects is limited to issuing such regulations as may be necessary to ensure compliance with the requirements of

---

[22]The court holds above that ICP has created a genuine fact issue on the question whether, *for standing purposes*, ICP's economic injury is fairly traceable to Treasury's failure to regulate the allocation of LIHTCs.  *See supra* § III (C)(4).  But this holding does not require the court to similarly conclude that ICP has created a genuine fact issue concerning the merits of its intentional discrimination claims.

§ 42 and to the IRS's administration of credit, as part of its broader administration of the Tax Code, and that these activities do not constitute the sale or rental of housing sufficient to subject Treasury to the requirements of 42 U.S.C. § 1982. ICP responds:

> Defendants have made federally assisted housing disproportionately unavailable in White non-Hispanic areas to a predominantly Black group of LIHTC tenants while White tenants are not so disadvantaged in their right to rent the LIHTC housing. This is a claim that some citizens are being denied the same right to lease property as is enjoyed by White citizens.

P. 5/17/18 Br. 39 (citations omitted).

The court concludes above that ICP has failed to adduce evidence that would support the reasonable finding that Treasury, as opposed to TDHCA or some other actor, has made LIHTC housing unavailable. *See supra* § V(A)(2). Accordingly, for the same reasons that the court is granting defendants' motion for summary judgment on ICP's § 3604 claim, it grants defendants' motion on ICP's § 1982 claim.

Alternatively, the court concludes, for the reasons set out below, *see infra* § VI, that defendants are entitled to summary judgment on ICP's intentional discrimination claims brought under 42 U.S.C. § 3604(a) and 42 U.S.C. § 1982 because ICP has failed to create a genuine issue of material fact on the question whether Treasury intentionally discriminated against ICP.

The court turns, finally, to ICP's claim under 42 U.S.C. § 1983[23] that Treasury has violated the equal protection component[24] of the Fifth Amendment.

"Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." *Arlington Heights*, 429 U.S. at 265. "[R]acial discrimination need only be one purpose, and not even a primary purpose," however, of an official action for a violation to occur. *United States v. Brown*, 561 F.3d 420, 433 (5th Cir. 2009) (citation omitted). "Legislative motivation or intent is a paradigmatic fact question." *Prejean v. Foster*, 227 F.3d 504, 509 (5th Cir. 2000) (citing *Hunt v. Cromartie*, 526 U.S. 541, 549 (1999)). "Proving the motivation behind official action is often a problematic undertaking." *Hunter v. Underwood*, 471 U.S. 222, 228 (1985).

In *Arlington Heights* the Supreme Court set out five nonexhaustive factors to determine whether a particular decision was made with a discriminatory purpose, and courts must perform a "sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *See Arlington Heights*, 429 U.S. at 266-68. The so-called *Arlington Heights* factors include: "(1) the historical background of the decision, (2) the specific

---

[23]Although ICP does not specify that its equal protection claim is brought under 42 U.S.C. § 1983, the court assumes that it is.

[24]*See Inclusive Cmtys. Project, Inc. v. U.S. Dep't of Treasury*, 2015 WL 4629635, at *5 n.2 (N.D. Tex. Aug. 4, 2015) (Fitzwater, J.).

sequence of events leading up to the decision, (3) departures from the normal procedural sequence, (4) substantive departures, and (5) legislative history, especially where there are contemporary statements by members of the decision-making body." *Overton v. City of Austin*, 871 F.2d 529, 540 (5th Cir. 1989) (citing *Arlington Heights*, 429 U.S. at 267-68). "Legislators' awareness of a disparate impact on a protected group is not enough: the law must be passed *because of* that disparate impact." *Veasey v. Abbott*, 830 F.3d 216, 231 (5th Cir. 2016) (en banc) (citing *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979)). The challengers bear the burden to show that racial discrimination was a "'substantial' or 'motivating' factor behind enactment of the law"; if they meet that burden, "the burden shifts to the law's defenders to demonstrate that the law would have been enacted without this factor." *Hunter*, 471 U.S. at 228 (citation omitted).

B

Defendants move for summary judgment on ICP's intentional discrimination claims arguing, *inter alia*, that ICP cannot meet its burden of establishing intentional discrimination. ICP responds that the *Arlington Heights* factors and other evidence show racial intent as one cause of Treasury's refusal to implement affirmatively furthering fair housing in the administration of the LIHTC program. The court sets out each category of ICP's evidence of intentional discrimination below, and assesses whether, considering the totality of the relevant evidence, ICP has created a genuine issue of material fact on the question whether an invidious discriminatory purpose was a motivating factor for Treasury's decision not to regulate the LIHTC program in the manner ICP advocates.

ICP presents several arguments and supporting evidence that correspond, loosely, with the first *Arlington Heights* factor, i.e., the historical background of the decision.[25] It contends that the racial segregation and unequal conditions in the Dallas LIHTC projects are the functional equivalent of the results of *de jure* and purposeful segregation in Dallas, except on a much larger scale. ICP points to evidence that 96% of the 28,874 LIHTC units in Dallas are located in predominantly minority census neighborhoods and tracts and that the living conditions in many of those are extreme and unequal;[26] that the racial segregation and indicators of unequal conditions throughout the Dallas seven county Metropolitan Division ("DMD") have increased over time and that racial segregation in the DMD exceeds segregation nationally; that the LIHTC system is a new program and the magnitude of racial segregation and unequal conditions in the LIHTC program in Dallas and DMD shows a

---

[25]The court concludes above that ICP has failed to point to any final agency decision that it is challenging as unlawful. *See supra* § IV(D). The court will nevertheless assume *arguendo* for purposes of ICP's equal protection claim that Treasury made a "decision" not to enact any regulations or take other action in furtherance of its duty to affirmatively further fair housing.

[26]ICP also argues that segregation and unequal conditions inflict serious and lasting injuries on the children subjected to these conditions in most of the LIHTC units in Dallas, citing, *inter alia*, the expert report of Professor Ann Owens ("Professor Owens"). Defendants have filed a motion *in limine* seeking to exclude Professor Owens' expert report, arguing that the report is not relevant or helpful to the trier of fact. Because the court has not considered Professor Owens' report in deciding the pending motions, and because the court is today granting defendants' motion for summary judgment, the court denies as moot defendants' May 17, 2018 motion *in limine*.

systemic pattern of racial segregation and unequal conditions that is explicable only on racial grounds; that the legislative history of the FHA makes clear that the need for the Act was caused by the refusal of federal agencies to enforce civil rights provisions; that even though the FHA was enacted 50 years ago, Treasury did not mention the obligation to affirmatively further fair housing until 2016, when it published Revenue Ruling 2016-29 regarding the use of local veto selection criteria in state QAPs; that Treasury has never applied the obligation to affirmatively further fair housing in its administration or regulation of the LIHTC program; that Treasury refused to comply with its civil rights obligations until 2016 when it enacted the Title VI regulation, admitting that the LIHTC program could be subject to those civil rights protections; that for 32 years, Treasury has refused to adopt an institutionalized method to consider the racial and economic information needed to prevent the perpetuation of racial segregation; that while refusing to administer the LIHTC program in compliance with the clear congressional mandate of 42 U.S.C. § 3608(d), Treasury also delayed implementation of two other congressional mandates (i.e., the legal obligation to prevent discrimination against voucher tenants and the legal obligation to require compliance with the habitability standards for LIHTC units and projects); and that Treasury's adherence to its refusal to affirmatively further fair housing despite the foreseeability of the racial segregation and consequent injuries that have resulted supports the inference of intent.

Defendants maintain in reply that, to the extent ICP intends to rely on evidence of disparate impact in order to support is intentional discrimination claims, ICP has failed to present admissible evidence that makes out a prima facie case for disparate impact, that

shows that one or more of defendants' policies are the cause of such disparate impact, or that shows that defendants pursued those policies *because of* that disparate impact. They also contend that ICP's assertion that Treasury's alleged failure to take sufficient action demonstrates an invidious purpose does not withstand scrutiny because ICP fails to point to any authority to support its claims that such inaction evinces intentional discrimination under the *Arlington Heights* factors, and, in any event, ICP has completely ignored the actions that Treasury has taken since the enactment of the FHA to combat racial discrimination.

2

In detailing the "historical background" of Treasury's conduct with respect to the FHA, generally, and the LIHTC program, specifically, ICP appears to suggest that Treasury's awareness (or the fact that Treasury should have been aware) of the cumulative effects of its failure to prevent LIHTC affordable housing projects from being disproportionately located in certain predominantly minority neighborhoods supports a finding of intentional discrimination. For example, ICP cites evidence that 96% of the LIHTC units in Dallas are located in minority census tracts; that the living conditions in those neighborhoods are unequal; and that there has been an increase in racial segregation in the DMD over time,[27]

---

[27]ICP is correct that this court's dismissal of its disparate impact claim does not preclude ICP from relying on disparate impact *evidence* to show intentional discrimination. To support a claim of intentional discrimination, however, ICP's evidence must show that Treasury acted *because of* the alleged disparate impact. *See Veasey*, 830 F.3d at 231. ICP has not come forward with any evidence that Treasury knew about the racial segregation or unequal living conditions in the LIHTC program in Dallas, *see* P. 5/17/18 Br. 20 (stating that "Treasury does not collect the information to show the racial composition of the LIHTC locations," but noting that Treasury has "*access* to both HUD LIHTC reports and data

arguing that the magnitude of racial segregation and unequal conditions in the LIHTC program in Dallas "shows a systemic pattern of racial segregation and unequal conditions that is explicable only on racial grounds." P. 5/17/18 Br. 20 (citing *Dowdell v. City of Apopka, Fla.*, 698 F.2d 1181, 1196 (11th Cir. 1983)).[28]

ICP's evidence, however, does not "reveal[] a series of official actions taken for invidious purposes." *Arlington Heights*, 429 U.S. at 267. Nor does it support the reasonable finding that Treasury intentionally discriminated in its administration of the LIHTC program. Neither "volition" nor "awareness of consequences" is sufficient to support a finding of discriminatory purpose. *Pers. Adm'r of Mass.*, 442 U.S. at 279 ("'Discriminatory purpose,' however, implies more than intent as volition or intent as awareness of consequences."). Rather, discriminatory purpose requires that the decisionmaker, in this case Treasury,[29] "selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Id.* (citation omitted). ICP has

_____

showing neighborhood conditions"), or that Treasury took any action (or failed to take action) *because of* the alleged disparity. *See Veasey*, 830 F.3d at 231.

[28]*Dowdell* is easily distinguishable. In that case the city was accused of intentionally discriminating in the provision of municipal services. *Dowdell*, 698 F.2d at 1184. The court of appeals affirmed the district court's finding of intent, noting, *inter alia*, evidence of a "systematic pattern of municipal expenditures in all areas of town except the black community." *Id.* at 1186.

[29]At oral argument, ICP conceded that it did not have evidence that any single decisionmaker acted with a discriminatory purpose. Instead, it argued that "[w]e have a systematic administration-to-administration continuation of the same policy and the same decision, not to take effective action to affirmatively further fair housing in the location and the conditions." Tr. Oral Arg. 20.

not identified any evidence in the historical background of the LIHTC program that would substantiate a claim that Treasury "selected or reaffirmed" a course of action "because of" its adverse effects on the race of ICP's clients.[30]

3

ICP maintains that, despite passage of the FHA 50 years ago, "Treasury did not mention the obligation to affirmatively further fair housing until 2016 when it published the Revenue Ruling on the use of local veto selection criteria in LIHTC QAPs." P. 5/17/18 Br. 21. It also contends that "Treasury has never applied the obligation to affirmatively further fair housing in its administration or regulation of the LIHTC program," *id.* at 22; that Treasury refused to comply with its obligations under Title VI of the 1964 Civil Rights Act until it passed its Title VI regulation in 2016, "admit[ting] that the LIHTC program could be subject to those civil rights protections," *id.*; and that Treasury also delayed in implementing the statute requiring owners not to discriminate against voucher tenants until eight years after the statute passed, and in implementing the congressional mandate requiring habitability standards for LIHTC units and projects. Evidence that Treasury failed to take a certain

---

[30]Nor can ICP show that Treasury "*created* a system of racially segregated housing." P. 5/17/18 Br. 20 (emphasis added). As the court explains above, *see supra* § V(A)(2), the location of LIHTC units in Dallas is the product of the decisions of various private and government actors, including individual project sponsors, state and local government entities, and TDHCA, which has the ultimate authority to allocate LIHTC credits. Accordingly, because Treasury is not the entity responsible for allocating LIHTCs and there is no evidence that Treasury either knew or intended the LIHTC program in Dallas to be racially segregated, there is no basis from which to find that Treasury "created" a system of racially segregated housing.

course of action (or delayed in taking action), however, does not, without more, enable a reasonable trier of fact to find that it acted or failed to act for an invidious purpose. *See, e.g., Lee v. City of L.A.*, 250 F.3d 668, 687 (9th Cir. 2001) ("With respect to the discriminatory purpose element of their equal protection claim, plaintiffs plead only that defendants knowingly or with deliberate indifference to the rights of the mentally disabled adopted facially neutral policies of inaction that have had a discriminatory impact on disabled persons. Plaintiffs failed to allege that defendants' acts or omissions were motivated by discriminatory animus toward the mentally disabled as a protected class."); *Grimes By & Through Grimes v. Sobol*, 832 F. Supp. 704, 708 (S.D.N.Y. 1993) ("conscious failure to adopt a curriculum that includes more material regarding African Americans . . . [is] inadequate to sustain [an] inference [of intentional discrimination]."), *aff'd*, 37 F.3d 857 (2d Cir. 1994).

Treasury's failure to regulate the LIHTC program in the way that ICP desires,[31] and

---

[31] ICP's statement that "Treasury has *never* applied the obligation to affirmatively further fair housing in its administration or regulation of the LIHTC program," is inaccurate. P. 5/17/18 Br. 22 (emphasis added). Although Treasury has not issued any regulation regarding the location of LIHTC projects, it *has* taken several steps that, viewed objectively, affirmatively further fair housing. For example, in 1994 Treasury issued a regulation stating that, if a residential unit in a building is not for use by the general public, it is not eligible for a LIHTC, and that "[a] residential rental unit is for use by the general public if the unit is rented in a manner consistent with housing policy governing non-discrimination, as evidenced by rules or regulations of [HUD]." 26 C.F.R. § 1.42-9. Additionally, Treasury, HUD, and the U.S. Department of Justice ("DOJ") entered into a Memorandum of Understanding ("MOU") to provide a mechanism for HUD and DOJ to report fair-housing findings to the IRS. "The MOU clarifies the agencies' respective roles in investigating and enforcing fair housing laws and provides that the IRS, after receipt of such findings from HUD or DOJ, may, when appropriate, deny a taxpayer's current claimed LIHTCs and/or

its delay in implementing certain sections of the LIHTC statute are explicable based on any number of reasons.[32] ICP does not point to any evidence that would support the reasonable finding that Treasury failed to act, or delayed in acting, because it intended to discriminate on the basis of race.

4

Finally, even if it was "foreseeab[le]," as ICP argues, that racial segregation would result from Treasury's "refusal to affirmatively further fair housing," Ps. 5/17/18 Br. 30, the alleged foreseeability of ICP's injury, alone, is insufficient to support its claim of intentional discrimination. *See Lee*, 250 F.3d at 687 ("The mere fact that defendants' facially neutral policies had a foreseeably disproportionate impact on an identifiable group does not mean that they violated the Equal Protection Clause."); *Lora v. Bd. of Educ.*, 623 F.2d 248, 250 (2d Cir.1980) ("*Dayton Board of Education v. Brinkman*, 443 U.S. 526 (1979) and *Columbus*

---

recapture previously claimed LIHTCs." Ds. 4/12/18 Br. 37. Also, Treasury issued Revenue 2016-29, which clarifies that the current statutory requirement for HCAs to provide local jurisdictions with a "reasonable opportunity" to comment on a proposed LIHTC project is not the same as requiring the jurisdiction's approval. *See* Rev. Rul. 2016-29, 2016-52 I.R.Bl 875. ICP disputes the effectiveness of these measures, and argues that they "do[] not address the perpetuation of racial segregation and unequal living conditions caused by the allocation selection procedure set out in state QAPs." P. 5/17/18 Br. 7. But even if Treasury's actions with respect to the LIHTC program have not produced the effect ICP desires, the fact remains that Treasury has, in fact, taken *some* action that affirmatively furthers fair housing, or, at least, that does not affirmatively *dis*favor fair housing.

[32]For example, it is entirely plausible that Treasury has not issued any regulations with respect to the location of LIHTC projects because it has interpreted the statute as delegating exclusive responsibility for allocating LIHTCs to state HCAs such as TDHCA. *See* Ds 4/12/18 Br. 6.

*Board of Education v. Penick*, 443 U.S. 449 (1979) . . . held that 'foreseeable result' is one type of quite relevant evidence of racially discriminatory purpose but, standing alone is not sufficient to establish the requisite discriminatory intent on the part of the Board."); *id.* at 251 ("It is the function of the District Judge to make findings from objective evidence of the presence or absence of discriminatory purpose; inferences from evidence of discriminatory impact will not substitute sufficiently for a finding of actual motivation in concluding that constitutional violation has occurred. . . . Foreseeability per se is insufficient since foreseeability may be helpless and unintentional."); *Cf. Penick* , 443 U.S. at 452-53, 464-65 (noting that district court correctly recognized that "disparate impact and foreseeable consequences, without more, do not establish a constitutional violation," but affirming conclusion that school board intentionally discriminated where evidence demonstrated that school board "never actively set out to dismantle [intentionally segregated] system," but, instead, had recently approved optional attendance zones, discontiguous attendance areas, and boundary changes that "maintained and enhanced racial imbalance in the Columbus public schools.")

D

ICP next contends that the specific sequence of events leading up to Treasury's refusal to prohibit the use of local veto selection criteria in QAPs shows a willingness to condone the perpetuation of racial segregation. ICP maintains that, in 2016, GAO found that the use of local selection criteria was common in many of the state QAPs and stated that HUD's fair housing concerns about the use of local selection criteria had been directly communicated

to Treasury with the direction to eliminate the local approval requirements from QAPs as a top priority, but that Treasury's 2016 Revenue Ruling failed to eliminate these local approval or support requirements, instead stating that the Tax Code does not require or encourage such provisions. ICP also posits that Treasury's refusal to respond to ICP's 2008 petition for rulemaking, which requested that Treasury provide reasons for its refusal to issue affirmatively furthering fair housing regulations, is a specific sequence of events that casts doubt on the credibility of its reasons for the refusal claimed in this lawsuit.

Defendants reply that Treasury's failure to meet its obligations under § 3608 cannot in and of itself demonstrate an invidious purpose; that Treasury *did* respond to ICP's 2008 petition for rulemaking; that ICP complains that the 2016 notice did not go as far as ICP would have liked, but that it never shows how declining to enact ICP's preferred policy constitutes a departure from Treasury's normal sequence of events; and that in the absence of any actual evidence of an invidious purpose, the court should not rely on ICP's speculation about Treasury's motives.

The court holds, largely for the reasons explained in defendants' reply brief, that ICP has not shown any specific sequence of events that would support a finding of intentional discrimination. In its brief, ICP argues:

> [t]he sequence starts with Treasury receiving notice of a likely violation of the Fair Housing Act in a widely used QAP selection criteria and HUD's position that elimination of the criteria causing the discriminatory effect was a top priority. The sequence ends with Treasury's statement that does not eliminate the criteria from QAPs but points out that the criteria is not required by the LIHTC statute. By not enacting a regulation to

> eliminate the use of local veto selection criteria, Treasury
> directly and explicitly accepted and condoned the use of
> selection criteria that HUD had found discriminatory. This
> supports the finding of intent by showing Treasury's refusal to
> use its civil rights authority to end a discriminatory practice, an
> action consistent with discriminatory intent.

P. 5/17/18 Br. 25-26. ICP has adduced no evidence, however, that would permit a

reasonable trier of fact to find that Treasury's failure to issue a regulation eliminating the use

of local veto selection criteria can be attributed to an invidious purpose.

Moreover, Treasury neither "accepts" nor "condones" the use of selection criteria in

Revenue Ruling 2016-29. In fact, Treasury's position, if anything, tends to support ICP's

position by stating that the Code does not require or encourage local veto criteria and that an

allocating agency is not authorized to abandon the responsibility to exercise its own

judgment:

> The Code requires that each local jurisdiction have a
> "reasonable opportunity" to comment on any proposal to
> allocate a housing credit dollar amount to a project within that
> jurisdiction. This requirement is not the same as requiring the
> jurisdiction's approval. The clear meaning of "reasonable
> opportunity to comment" is that the jurisdiction has a chance to
> weigh in, or even object, but not that every objection will be
> honored.
>
> Thus, § 42(m)(1)(A)(ii) ensures only the opportunity for local
> input to the allocation decision. It does not authorize an
> allocating agency to abandon the responsibility to exercise its
> own judgment. In particular, it does not require or encourage
> allocating agencies to bestow veto power over LIHTC projects
> either on local communities or on local public officials.

Rev. Rul. 2016-29, 2016-52 I.R.B. 875. ICP's belief that Revenue Ruling 2016-29 does not

go far enough to eliminate segregation in the location of LIHTC housing does not show a specific sequence of events supporting the conclusion that Treasury engaged in intentional discrimination.

E

ICP advances several other arguments in support of its contention that Treasury has acted with a discriminatory purpose. It contends that Treasury input only 3,100 of 168,000 noncompliance forms between 2009 and 2015, and that refusing to look at noncompliance reports is not a credible defense for a government charged with perpetuation of racial segregation; that under the statute, an HFA cannot prefer locations in QCTs unless there is an added benefit to the neighborhood in the form of the project's contribution to a concerted community revitalization plan, and that Treasury knows that state HFAs violate this QAP provision yet, despite this knowledge, Treasury does not monitor HFAs' compliance with this or other QAP requirements; that Treasury's tolerance for placing LIHTC projects in locations that exacerbate poverty concentrations without revitalization is a characteristic of deliberate racial segregation and supports a finding of intent; that Treasury is subject to a national nondiscrimination policy and legal duty to overcome historic patterns of racial segregation in housing, yet it has exempted state HFAs from compliance with the federal policy against racial segregation in housing; and that Treasury has refused to require any actions that address unequal neighborhood living conditions, permitting QCT preferences to be given to LIHTC projects in Dallas without any revitalization plan despite Treasury's recognition that placing LIHTC projects in QCTs risks exacerbation of concentrations of

poverty.

To the extent ICP is attempting to establish intentional discrimination through evidence that Treasury has failed to issue regulations requiring compliance with the requirement in 26 U.S.C. § 42 (m)(1)(B)(ii)(III) (stating that a QAP must give preference to "projects which are located in [QCTs] and the development of which contributes to a concerted community revitalization plan"), or through evidence that Treasury has inadequately monitored state HCAs to ensure compliance with the LIHTC statute, this evidence does not create a genuine fact issue on the question whether any failure to act on the part of Treasury was motivated by an intent to discriminate on the basis of race.

F

Courts in this circuit, including this court, routinely grant summary judgment on claims of intentional discrimination claims where the plaintiff fails to produce evidence showing that the defendant acted with a racially discriminatory intent or purpose. *See, e.g., Gonzalez v. City Plan Com'n*, 2007 WL 1836872, at *5 (N.D. Tex. June 26, 2007) (Lynn, J.) ("In short, there is simply no evidence that Defendants' actions—selling two narrow strips of land to the abutting landowner and approving the replatting of that landowner's property consistently with state and local law, with one minor and rationally-explained exception—were tainted by discriminatory purpose against Plaintiffs. Summary Judgment is accordingly granted against Plaintiffs' claim of discrimination in violation of the Equal Protection Clause."); *Arbor Bend Villas Hous., L.P. v. Tarrant Cty. Hous. Fin. Corp.*, 2005 WL 548104, at *11 (N.D. Tex. Mar. 9, 2005) (Means, J.) (granting summary judgment on

plaintiff's equal protection claim because plaintiff failed to raise genuine issue of material fact on the question of discriminatory intent); *GI Forum v. Texas Educ.*, 1999 WL 33290624, at *5 (W.D. Tex. July 27, 1999) ("After careful consideration of all of the *Arlington Heights* factors, the Court finds that the summary judgment evidence does not raise a material fact question on the issue of intentional discrimination. Instead, the summary judgment evidence establishes, beyond dispute, that the TAAS test has an adverse impact on minority students in the state. There is no basis for inferring that the impact was the result of intentional discrimination. Therefore, summary judgment must be granted in favor of the Defendants on the Plaintiffs' equal protection claim."). ICP's evidence at most permits the reasonable finding that Treasury was or should have been aware of the situation involving LIHTC housing in Dallas and failed to take action to remedy this segregation. But as courts have stated, "Legislators' awareness of a disparate impact on a protected group is not enough: the law must be passed *because of* that disparate impact." *Veasey*, 830 F.3d at 231 (citing *Pers. Adm'r of Mass*, 442 U.S. at 279). ICP has failed to come forward with any evidence that would support the reasonable finding that Treasury took any action (or failed to act) because of the racial segregation in LIHTC units in the city of Dallas. In other words, ICP has failed to create a genuine issue of material fact on the question whether Treasury intentionally discriminated based on race.

Indeed, the court questions an approach that, like ICP's, treats Treasury monolithically, without distinguishing among the administrations whose conduct may be at issue (including Presidents Clinton, Bush, Obama, and Trump). *See* Tr. Oral Arg. 18 (ICP

counsel, in response to question from the court, maintaining that intentional discrimination went on during prior administrations).  It seems quite doubtful that, in the modern era of our republic, four consecutive administrations, representing different political parties, different political philosophies, different policy priorities, and different approaches to governing, would *all* engage in the same or substantially similar form of intentional race discrimination. That ICP seems to be alleging this gives greater force to the conclusion that a reasonable trier of fact could not find in its favor.

Accordingly, the court grants defendants' motion for summary judgment on ICP's Fifth Amendment equal protection claim brought against Treasury.[33]

\* \* \*

For the reasons explained, the court grants defendants' motion for summary judgment based on a lack of constitutional standing as to ICP's claims against OCC and grants defendants' motion for summary judgment on the merits as to ICP's claims against Treasury.

---

[33]Because the court is granting defendants' motion for summary judgment on this ground, it does not address their contention that the doctrine of judicial estoppel precludes ICP from pursuing its intentional discrimination claims against Treasury and OCC.

The court denies ICP's motion for partial summary judgment. The court enters final judgment in favor of defendants by separate judgment filed today.

**SO ORDERED**.

February 6, 2019.

_____
SIDNEY A. FITZWATER
SENIOR JUDGE